Steven Hyder (P69875)
**The Hyder Law Firm, P.C.**
PO Box 2242
Monroe, MI 48161
hyders@hyderlawfirm.com
Phone (734) 757-4586


David Anziska
Jeff Kurzon
Jesse Strauss (admission pending)
**Kurzon Strauss LLP**
305 Broadway, 9th Floor
New York, NY 10007
Phone (212) 822-1496
Facsimile (212) 822-1407
www.KurzonStrauss.com

*Counsel for Plaintiffs, individually
and for all others similarly situated*

### UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF MICHIGAN

| | | |
|---|---|---|
| JOHN T. MACDONALD JR., CHELSEA A.  PEJIC, SHAWN HAFF, and STEVEN BARON, on behalf of themselves and all others similarly situated, | : : : : : | **Case No._____** |
| | : | |
| Plaintiffs, | : : | **CLASS ACTION COMPLAINT** |
| v. | : : | |
| THOMAS M. COOLEY LAW SCHOOL, and DOES 1-20, | : : | |
| Defendants. | : : | |
| | : | **JURY TRIAL DEMANDED** |

Plaintiffs, acting for themselves and for all persons who currently attend or graduated from the Thomas M. Cooley Law School during the relevant time period (collectively "Plaintiffs"), allege as follows.  Plaintiffs' allegations are based on the investigation of counsel, including but not limited to reviews of advertising and marketing material, various publicly available information and interviews of former students, and are thus made on information and belief, except as to individual actions of Plaintiffs, as to which Plaintiffs have personal knowledge.

## PRELIMINARY STATEME NT

*"Sunlight is the Best Disinfectant"* – Justice Louis Brandeis

1.      This action seeks to remedy a systemic, ongoing fraud that is ubiquitous in the legal education industry and threatens to leave a generation of law students in dire financial straits.  Essentially, Plaintiffs want to bring an element of "sunlight" or transparency to the way law schools report post-graduate employment data and salary information, by requiring that they make critical, material disclosures that will give both prospective and current students a more accurate picture of their post-graduate financial situation, as opposed to the *status quo* where law schools are incentivized to engage in all sorts of legerdemain when tabulating employment statistics.

2.      Churning out nearly 1,000 newly-minted JD graduates each year, the Thomas M. Cooley School of Law ("Thomas Cooley" or "Defendants") is by far the largest law school in the country with approximately 4,000 students spread out across four campuses, the overwhelming majority of whom -- 82 percent -- are enrolled on a part-time basis.   Indeed, Thomas Cooley's enormous class size and diverse student body is a point of pride for the school, which expressly markets itself as being "committed to providing a legal education to people from all walks of

life." To that end, Thomas Cooley in its Mission Statement represents that its underlying purpose is to "prepare its graduates for entry into the legal profession through an integrated program with practical legal scholarship as its guiding principle and focus," by imbuing them with the requisite skills and knowledge "needed to be a success in the law and a valuable member of society."

3.    Unfortunately, in reality, far from preparing its many, many students for entry into the legal profession and imbuing them with the skills and knowledge necessary to succeed in law, the school consigns most of them to years of indentured servitude, saddling them with tens of thousands of dollars in crushing, non-dischargeable debt that will take literally decades to pay off.  The school has done this while blatantly misrepresenting and manipulating its employment statistics to prospective students, employing the type of "Enron-style" accounting techniques that would leave most for-profit companies facing the long barrel of a government investigation and the prospect of paying a substantial civil fine.  These deceptions are perpetuated so as to prevent prospective students from realizing the obvious -- that attending Thomas Cooley and forking over nearly $100,000 in tuition payments is a terrible investment which makes little economic sense and, most likely, will never pay off.

4.    Specifically, Thomas Cooley, through both its print and internet marketing materials, commits two basic **written, uniform misrepresentations**.  First, the school during the class period claims that a substantial majority of its graduates -- roughly between 75 and 80 percent -- secure employment within nine months of graduation.  However, the reality of the situation is that these seemingly robust numbers include *any* type of employment, including jobs that have absolutely nothing to do with the legal industry, do not require a JD degree or are temporary or part-time in nature.   Rather, if Thomas Cooley was to disclose the more pertinent

employment statistic -- i.e. <u>those graduates who have secured full-time, permanent positions for which a JD degree is required or preferred</u> -- the numbers would drop dramatically, and could be well below *30 percent*, if not even lower.

5.     Second, Thomas Cooley grossly inflates its graduates' reported mean salaries, by calculating them based on a small, mostly self-selected subset of graduates who actually submit their salary information.  If the Defendants were to disclose salary data based on a broad, statistically meaningful representation of its graduates, by including more graduates who have failed to secure full-time, permanent employment, the reported mean salaries would decline precipitously. [1]

6.     Defendants' deceptions are all the more shocking considering that they are being perpetuated on naïve, relatively unsophisticated consumers -- many of whom are barely removed from college -- who are often making their first "big-ticket" purchase.  These students tend to apply to law school with one objective in mind: to attain the kind of job that provides the compensation and lifestyle that are commensurate with and worthy of the enormous time, money and personal sacrifice invested in a legal education.

7.     Compounding problems, there is no place where prospective students can find Thomas Cooley's "real" employment numbers.  Indeed, the school supplies the same dubious statistics to the *U.S. News & World Report* ("*US News*") and the American Bar Association ("ABA"), the two primary sources of information for law school employment data.  Like

---

[1] True to its past patterns and practices of lashing out at critics and tolerating absolutely zero dissent, Thomas Cooley, in a crude, cynical attempt to intimidate potential plaintiffs, chill free speech and police the Internet, has filed two sham, SLAPP lawsuits in Michigan State court against Plaintiffs' Counsel, Kurzon Strauss LLP ("Kurzon Strauss"), and its attorneys David Anziska and Jesse Strauss, and four "John Doe" plaintiffs for alleged defamatory statements made over the Internet.  Needless to say, these lawsuits have been met with near universal derision, engendering a strong backlash in both the press and the legal community, and are deficient on both procedural and substantive grounds.

Thomas Cooley, these sources count as "employed" those who have secured employment in *any* capacity in *any* kind of job, no matter how unrelated to the legal field.

8.     By playing fast and loose with its employment data, Thomas Cooley creates an impression of bountiful employment opportunity that in reality does not exist.  This problem has grown more acute since the onset of the "Great Recession" in 2008.  The stark reality of the situation is that law students today face the grimmest job market in decades. Yet Thomas Cooley, instead of telling the sobering truth to prospective and current students, continues to make the fantastical claim that the overwhelming majority of its graduates are gainfully employed.

9.     Worse yet, Thomas Cooley deceives its students while saddling them with tens of thousands of dollars in crushing, non-dischargeable debt.  According to *US News*, Thomas Cooley students graduate on average with a whopping *$105,798* in loans, with over 90 percent of them assuming debt to attend the school.  The current annual tuition for full-time students at Thomas Cooley is $30,644 and $19,714 for part-time students, excluding thousands of dollars in living expenses, making it one of the more expense law schools in the country, despite the fact that it is ranked in the fourth or bottom tier by the *U.S. News* in its annual law school rankings.

10.    Unfortunately, Thomas Cooley's false and fraudulent representations and omissions are endemic in the law school industry, as nearly every school to a certain degree blatantly manipulates their employment data to make themselves more attractive to prospective students.   It is a dirty industry secret that law schools employ a variety of deceptive practices and accounting legerdemain to "pretty up" or "cook" the job numbers, including, among other things, hiring recent unemployed graduates as "research assistants" or providing them with "public interest" stipends so as to classify them as employed, excluding graduates who do not

supply employment information from employment surveys, refusing to categorize unemployed graduates who are not "actively" seeking employment as unemployed and classifying graduates who have only secured temporary, part-time employment as being "fully" employed.

11.     Thus, the law school industry today is much like a game of three-card monte, with law schools flipping ace after ace, while a phalanx of non-suspecting players wager mostly borrowed money based on asymmetrical information on a game few of them can win. To a remarkable extent, law schools have been astonishingly successful in carrying out this scheme. Last year law schools awarded over 43,000 JD degrees, an increase of 11 percent from a decade earlier, while law school tuition over the past two decades has risen exponentially, far exceeding both inflation and any increase in attorneys' starting salaries. Not surprisingly, the debt burden of law school graduates has risen correspondingly, and the average debt burden for graduates of private institutions is now over $100,000.

12.     The dramatic increase in law school tuition has dovetailed with the dramatic increase in faculty compensation. Law school professors and deans are perhaps the best remunerated in academia today, enjoying both lavish perks and exorbitant salaries that rival those of Fortune 500 executives. For example, during the fiscal year of 2008-2009, Thomas Cooley dean, Don LeDuc, earned a staggering $548,047 in total compensation, making him one of the highest paid law school deans in the country, while retired dean and school founder, Thomas Brennan, earned nearly $370,000 in total compensation.

13.     After much public hand-wringing and increased scrutiny, the legal profession has finally begun to recognize the systemic fraud the law school industry has been perpetuating. Senator Barbara Boxer of California and Senator Charles Grasserly of Iowa have each sent separate letters to the President of the ABA, taking the organization to task for failing to properly

police the law school industry. Additionally, a coalition of 55 law school student body presidents have sent to Congress proposed legislation that would, among other things, create new reporting standards for employment data, require law schools to submit annual employment reports to the Department of Education ("DOE"), and empower the DOE to audit these reports. The problem has grown so acute that even the President of the California Bar Association in a much publicized article in the California Bar Journal openly implored law school deans to adopt more rigorous reporting standards by disclosing the type of detailed employment and salary information that would allow students to get a more realistic picture of their post-graduate financial situation.

14. These entreaties had fallen mostly on deaf ears until now, as the ABA's committee on accrediting law schools has just recently enacted guidelines that would expressly require law schools to report their true post-graduate employment rate, by disclosing the type of information Plaintiffs are seeking here: the exact percentage of graduates who have obtained permanent, full-time legal employment. Specifically, law schools will be required to break down their employment data so as to indicate whether a position is full-time or part-time, permanent or temporary, funded by the law school or an affiliated university, and whether bar passage or a JD degree is required or preferred.

15. Accordingly, Plaintiffs now seek to vindicate their interests through the court system. This action asserts claims under: a) Michigan's Consumer Protection Act, MCLS §445.901, *et seq.* (the "MCPA"); b) Fraud; and c) Negligent Misrepresentation. Plaintiffs seek damages and equitable relief on behalf of the class, which includes but is not limited to the following: refunding and reimbursing current and former students for tuition paid to Thomas Cooley; an order enjoining Thomas Cooley from continuing to market its false and inaccurate

6

employment data and salary information; an order requiring that Thomas Cooley retain a third party to independently audit all employment and salary data; costs and expenses, including attorneys' and experts' fees; and any additional relief that this Court determines to be necessary or appropriate to provide complete relief to Plaintiffs and the class.

## JURISDICTION AND VENUE

16.     This Court has original jurisdiction over this action under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2)("CAFA"), as to the named Plaintiffs and every member of the Class, because the proposed Class contains more than 100 members, the aggregate amount of controversy exceeds $5 million, less than two-thirds of the members reside in Michigan, and members reside across the U.S. and are therefore diverse from the Defendants.

17.     The Court has personal jurisdiction in this action by virtue of the fact that Defendants are based and headquartered in Michigan and have conducted business in Michigan.

18.     Venue is proper in this District pursuant to 28 U.S.C. 1391(b) inasmuch as the unlawful practices are alleged to have been committed in this District, Defendants regularly conduct business in this District, including operating its flagship Lansing campus, and at least some of the Plaintiffs reside in this District.

## PARTIES

19.     John T. MacDonald Jr. is a practicing attorney in Lansing, Michigan who is currently a member in good standing of the Michigan Bar.  Prior to attending law school, Mr. MacDonald was a commissioned Naval Officer who served for four years with distinction before receiving an honorable discharge. Mr. MacDonald graduated from Thomas Cooley's Lansing campus in 2010, and in total paid tens of thousands of dollars in tuition and fees to the school while incurring tens of thousands of dollars more in debt.  In applying and deciding to remain

enrolled at Thomas Cooley, Mr. MacDonald relied on salary data and employment information posted on Thomas Cooley's website and/or disseminated to third-party data clearinghouses and publications, such as the ABA and *US News*. Following his graduation from law school, Mr. MacDonald could not find full-time, permanent legal employment and was forced to open up his own law firm which he currently still operates.

20.     Chelsea A. Pejic is a practicing attorney in Chicago, Illinois who is currently a member in good standing of the Illinois Bar. Ms. Pejic graduated from Thomas Cooley's Lansing campus in 2006, and in total paid tens of thousands of dollars in tuition and fees to the school while incurring tens of thousands of dollars more in debt. In applying and deciding to remain enrolled at Thomas Cooley, Ms. Pejic relied on salary data and employment information posted on Thomas Cooley's website and/or disseminated to third-party data clearinghouses and publications, such as the ABA and *US News*. Following her graduation from law school, Ms. Pejic, despite circulating hundreds of resumes, could not obtain gainful legal employment and was forced to endure a long bout of unemployment. She has also worked as a voluntary staff attorney and a temporary contract attorney, while also operating for a brief period of time her own firm.

21.     Shawn Haff is a practicing attorney in Grand Rapids, Michigan who is currently a member in good standing of the Michigan Bar. Mr. Haff graduated from Thomas Cooley's Grand Rapids campus in 2010, and in total paid tens of thousands of dollars in tuition and fees to the school while incurring tens of thousands of dollars more in debt. In applying and deciding to remain enrolled at Thomas Cooley, Mr. Haff relied on salary data and employment information posted on Thomas Cooley's website and/or disseminated to third-party data clearinghouses and publications, such as the ABA and *US News*. Following his graduation from law school, Mr.

Haff could not find full-time, permanent legal employment and was forced to take temporary, contract assignments reviewing documents in order to make ends meet.  Currently, he owns and operates his own law firm.

22.     Steven Baron currently resides in Los Angeles, California.  He graduated from Thomas Cooley's Lansing campus in 2008, and in total paid tens of thousands of dollars in tuition and fees to the school while incurring tens of thousands of dollars more in debt.  In applying and deciding to remain enrolled at Thomas Cooley, Mr. Baron relied on salary data and employment information posted on Thomas Cooley's website and/or disseminated to third-party data clearinghouses and publications, such as the ABA and *US News*.  Following his graduation from law school, Mr. Baron, despite circulating hundreds of resumes, has been unable to obtain any kind of sustained employment and is currently unemployed.

23.     Defendant Thomas Cooley is an ABA accredited law school and non-profit corporation headquartered in Lansing, Michigan, but with satellite campuses also in Ann Arbor, Auburn Hills and Grand Rapids.  For the 2010-2011 academic year, it enrolled a total of 4,001 students, 82 percent of whom are matriculated on a part-time basis.  The current annual tuition for full-time students at Thomas Cooley is $30,644 and $19,714 for part-time students, bringing its per-credit-hour cost to $1,093, while miscellaneous costs such as room, board and living expenses are estimated to be an additional $14,686.   According to its 2008-2009 IRS 990 form, Thomas Cooley's total operating revenue is $96,478,621, including $96,091,697 in tuition fees, and its total operating costs are $90,524,839, including $44,769,472 in monies paid out for employees' salaries.   For the fiscal year of 2008-2009, the school paid its dean, Don LeDuc, $548,047 in total compensation, while still paying its former dean and school founder, Thomas

Brennan, $368,581 in total compensation.  Thomas Cooley's nine other highest paid employees earned between $193,925 and $242,476 in total compensation.

24.     The true names and capacities (whether individual, corporate, associate or otherwise) of Defendants Does 1 though 20, inclusive, are unknown to Plaintiffs.  Plaintiffs sue these Defendants by fictitious names and will seek leave to amend this Complaint after their identities are learned.  Each fictitious Defendant contributed to the acts and practices alleged herein.  Plaintiffs are informed and believe that the fictitiously named Defendants proximately caused Plaintiffs' damages.

## FACTUAL ALLEGATIONS

### I.     Background Information

25.     Churning out nearly 1,000 newly-minted JD graduates each year, Thomas Cooley is by far the largest law school in the country with approximately 4,000 students spread out across four campuses, the overwhelming majority of whom -- 82 percent -- are enrolled on a part-time basis.   Just recently, on August 8, 2011, Thomas Cooley announced that it will be opening a Tampa Bay-area campus in Riverview, Florida in May 2012 that can accommodate a planned enrollment of 700 students.

26.     According to *US News*, Thomas Cooley has the lowest admissions standards of any accredited and provisionally accredited law school in the country.  For 2010, it accepted approximately 83 percent of all applicants, an acceptance rate that is nearly 15 percentage points more than the second least selective law school, Phoenix School of Law.  The mean LSAT score for incoming students is 146 and the mean undergraduate GPA is 2.99, both lows for all accredited and provisionary accredited law schools.

27.     Yet despite its relatively lax admissions standards, remaining enrolled in Thomas Cooley is quite difficult, as the school has, comparatively speaking, lackluster retention rates. Almost <u>32 percent</u> of the nearly 1,500 students who enroll in Thomas Cooley fail to matriculate for their second year, while, incredibly, second-year students still enjoy an attrition rate of 10 percent.  Even 22 third-year students -- approximately three percent of the class -- either failed or dropped out during the academic year.

28.     In marketing itself to students, Thomas Cooley makes a number of bold, if not incredulous statements that are incommensurate to its low academic and reputational standings in the legal marketplace.  For example, Dean LeDuc and former Dean Brennan publish their own law school rankings which, coincidentally, ranks Thomas Cooley as the second "best" law school in the country, right below the top-ranked school, Harvard Law School, and well above such notable institutions as Yale, Columbia, the University of Chicago and Stanford.  These largely self-serving rankings include numerous factors that, at first glance, have little pedagogical or edifying value and have absolutely nothing to do with training students to be attorneys, such as the overall size of the student body, total minority enrollment, library total square footage, library seating capacity, and the square footage of a law school's physical premises.  Each of these factors are given equal statistical weight to other, seemingly more important factors, like bar passage rate and percentage of graduates employed.

## II.     <u>Underlying Fraud Claims</u>

29.     Thomas Cooley is approved for accreditation by the ABA's Section of Legal Education and Admissions to the Bar.   As mandated by Section 509(a) of the ABA's 2010-2011 Standards for Approval of Law Schools ("Section 509(a)"), an accredited law school must

"publish basic consumer information" in a "fair and accurate manner reflective of actual practice."

30.    Pursuant to this requirement, Thomas Cooley publishes its employment statistics on its website under the "Consumer Information" tab.   In posting the data and marketing itself to prospective students, the school includes a separate tab, titled "Alumni Success Stories," which highlights the employment achievements of recent graduates and includes glowing testimonials from graduates explaining how attending Thomas Cooley helped them secure their current positions.

A.    **Statements Constituting Fraud**

31.     Currently, Thomas Cooley posts on its website the employment data and salary information for the class of 2010, which is composed of students who graduated in September 2009, January 2010 and May 2010.  *See* 2010 Thomas Cooley Employment Report and Salary Survey (the "Employment Report") (attaching Ex. 1).[2] According to the Employment Report, based on a relatively unimpressive response rate of 84 percent (meaning that 154 of 934 graduates failed to respond to the survey), approximately 76 class were employed nine months after graduation, 50 percent of whom were allegedly working in private practice, 18 percent in "business," 15 percent in government, two percent in public interest, and three percent both in judicial clerkships and academic.   The average salary for graduates in private practice was

---

[2] Upon information and belief, Thomas Cooley posted similar reports on its website and marketing material during the class period, and further disseminated the raw information that served as the basis for such reports to various third-party data clearinghouses and publications, such as the ABA and *US News*.

$52,318, $71,470 for those in "business," $53,312 for those in government and $49,171 for those in public interest.[3]

32.     Tellingly, the data makes a number of startling factual omissions that would give prospective students a more accurate picture of their post-graduation employment prospects.  For example, Thomas Cooley simply presents an overall employment number, and fails to break down what percentage of graduates were employed in either part-time or temporary positions, or whether a job requires a JD degree.  Accordingly, based on these classifications, a graduate could be working as a barista in Starbucks -- or toiling away in *any* capacity in *any* kind of job, no matter how menial or poorly compensated or unrelated to law -- and would be deemed employed and working in "business," even though such employment is clearly temporary in nature and obviously does not require a JD degree.  Similarly, a contract attorney who has yet to secure permanent employment and is forced to toil away in transitory document review projects would be deemed "employed" under Thomas Cooley's broad guidelines.

33.     Thomas Cooley also grossly inflates its graduates' reported mean salaries, by calculating them based on a small, mostly self-selected subset of graduates who actually submit their salary information, thereby presenting statistically meaningless data that is not an emblematic representation of the entire class.  Thus, to take the above example, if a graduate working in Starbucks as a barista did not report his/her salary information that could potentially have a significant statistical effect on Thomas Cooley's reported mean salary for those employed in "business," lowering the number substantially from a seemingly impressive $71,470.

### B.     Disseminating False Information to Third Parties

---

[3] Since 2006, Thomas Cooley's reported placement rates have ranged between 76 and 82 percent, with similar ranges dating back until 2000.

34.     The school also disseminates employment data and salary information to other sources that are readily available to prospective students.   In general, there are three primary sources that Thomas Cooley -- along with all other accredited law schools -- provides such information to:  *US News,* the ABA and the National Association of Law Placement or NALP.[4] However, the *US News* and the ABA simply require law schools to report an overall employment number, and do not require schools to distinguish between part-time and full-time jobs or temporary and permanent employment.   Consequently, the data contained in these sources is riddled with the same legerdemain, dubious calculations and deliberate omissions as found in the employment information posted and marketed by Thomas Cooley on its website and brochures.

35.     In a recent letter sent to the deans of all accredited law schools, Brian Kelly, the editor-in-chief of the *US News*, essentially conceded this point, acidly noting that the "entire law school sector is perceived to be less than candid" when reporting employment data, and that many schools appear "not to treat the ABA reporting rules with the seriousness one would assume."  Robert Morse, "U.S. News Urges Law School Deans to Improve Employment Data," *U.S. News & World Report*, March 9, 2011 (attaching Ex. 2).   Acknowledging the obvious, Kelly concludes, "Perhaps we need metrics besides total employment rates to evaluate a successful law program." *Id*.

36.     Nonetheless, despite knowing full well of the deficiencies in law school-supplied employment data, such information constitutes a whopping 18 percent (four percent for the employment rate upon graduation and 14 percent for the rate nine months after graduation) of a

---

[4] All ABA-accredited and provisionally-accredited law schools are required to provide employment data to the ABA, but only submit such data to *U.S. News* and NALP on a voluntary basis.

law school's ranking in *US News*, the second most important factor after a law school's peer assessment.

37.     As for NALP, law schools when responding to its questionnaire must not simply report an overall employment number, but specifically break down the exact type of employment their graduates have obtained, differentiating between part-time and full-time jobs or whether a position requires a JD degree.  Unfortunately, NALP does not either publish or make available to the public these questionnaires, and instead compiles and tabulates their data into a single document which contains aggregate statistical information from all law schools.  *See* NALP Class of 2009 National Summary Report ("NALP Employment Report") (attaching Ex. 3).

38.      In other words, Thomas Cooley, by virtue of its participation in NALP's annual employment survey, clearly has the means to and actually does distinguish between various degrees of employment, and breaks down the exact percentage of its recent graduates who have secured either part-time or full-time employment or whether a position requires a JD degree. Yet, rather than including these numbers on its website and marketing material and making this information available to public at large, the school continues to present highly misleading data to prospective and current students that grossly inflate post-graduation employment rates while depicting an unrealistic, if not entirely inaccurate picture of bountiful career prospects that do not exist.

**III.    Manipulating Employment Data**

39.     In reality, the employment data reported and marketed by Thomas Cooley bears little resemblance to the actual experiences and dim employment opportunities encountered by their recent graduates.

40.     Indeed, based on interviews with former students and other investigatory work, Plaintiffs believe that perhaps fewer than *20 percent* -- if not even fewer -- of recent Thomas Cooley graduates secure full-time, permanent employment for which a JD degree is required or preferred within nine months of graduating, and that the majority of them work in either part-time or temporary positions.  For example, according to Thomas Cooley's Employment Report, an astounding 157 out of a total 285 graduates working in private practice are employed by law firms with 2-10 attorney, while 70 graduates -- or nearly 25 percent -- are solo practitioners.  *See* Ex. 1.  Most likely, the overwhelming majority of these graduates are not gainfully employed, and are either working on a part-time or temporary basis.  To that end, only 11 students -- or about one percent of Thomas Cooley's entire graduating class – are purportedly working in firms with more than 100 attorneys.

41.     Moreover, an examination of the NALP Employment Report confirms that Thomas Cooley blatantly manipulates employment data, and that substantially fewer than 76 percent of recent graduates are gainfully employed.

42.     According to NALP, 88.2 percent of all law school graduates are "employed" within nine months of graduation.   However, upon greater scrutiny, this number is virtually meaningless, as it includes *any* kind of employment, no matter how unrelated to the legal field. *See* Ex. 3.

43.     Rather, the NALP Employment Report further breaks down this number into specific percentages of graduates who are working either part-time or in non-legal jobs.  By doing this, it appears that, in actuality, only 62.9 percent of all graduates have secured some kind of full-time legal employment.

44.     Still, even that number is grossly inflated, as the NALP Employment Report does not distinguish between temporary and permanent employment, and, thus, does not expressly exclude temporary positions.   If the report was to exclude temporary employment, most likely the employment number would fall well below 50 percent. [5]

45.     One must also bear in mind that the NALP employment number includes data supplied by all law schools, the overwhelming majority of whom are ranked significantly higher and have considerable more prestige than Thomas Cooley, which is ranked by *US News* in the bottom or fourth tier of all accredited law schools.   As such, logic dictates that Thomas Cooley's true employment rate would be well below the statistical mean of the bell curve.

46.     Upon information and belief, Thomas Cooley has also employed a limited program to further "pretty up" their employment numbers, by, among other things, hiring unemployed graduates as "research assistants" or other "make work" positions for a specified period of time, so as to classify them as "employed" in various employment surveys.   In some instances, upon information and belief, these internships begin in the ninth month following graduation, right before Thomas Cooley would be required to report its employment data to the ABA, NALP and *US News*.

47.     This practice is emblematic of the extreme measures many law schools across the country have undertaken recently to paper over the devastation that the Great Recession has wrought.   According to NALP, 42 percent of all law schools have created post-graduate "jobs

---

[5] For greater analysis on the accuracy -- or inaccuracy -- of law school employment data see Professor Paul Campos's article in the *New Republic*, "Served: How Law Schools Completely Misrepresent Their Job Numbers" (April 25, 2011), where he courageously takes law schools to task for adopting dubious accounting methods in tabulating and reporting recent graduates' employment data.  (Attached as Ex. 4) In particular, he deftly demonstrates through some impressive deductive reasoning how for one highly ranked state school the actual percentage of graduates who have secured full-time, permanent legal positions could be as low as 33 percent.  (*Id*).

programs" into which they hired their own recently graduated students.  In particular, for the class of 2009, it is estimated that these programs provided over 800 jobs, accounting for a full two percentage points in the NALP overall employment rate.  For the class of 2010, this number has jumped to 1,200 jobs, or approximately 2.7 percent of all jobs taken by law school graduates. *See* "Selected NALP Findings for the Class of 2010" (attaching Ex. 5).  Thus, instead of coming clean to prospective and current students and acknowledging the steep odds that graduates face in securing gainful employment, law schools continue to bury their heads in the sand like nothing is wrong, as if they can somehow wish away the brutal reality of the current economic environment.

48.      Thomas Cooley's manipulation of employment data is all the more galling considering that its students are graduating in one of the grimmest legal job markets in decades. Since 2009 alone, some 15,000 attorney and legal-staff jobs have been eliminated by large corporate law firms, while commoditized, legal-entry work such as document review is increasingly being outsourced to countries outside the US, such as India.   The entry-level employment offer rate for 2009 summer associates was at a historic low of 69 percent, as compared to 90 percent in 2008 and 93 percent in 2007.  Scores of law firms have cancelled summer programs, and in a recent survey 55 percent of law schools reported a decrease of 30 percent or more of the number of firms doing on-campus interviews, an unprecedented decline. In another survey, only 3 percent of on-campus recruiters indicated that they were looking to hire third-year law students, as compared to 25 percent in 2008 and 42 percent in 2007.

49.      The job statistics for the class of 2010 are equally grim, if not more so. According to NALP, the overall employment rate for new law school graduates is the lowest it has been since 1996.  *See* Ex. 5. Only 68.4 percent of the class have obtained employment for

18

which a JD degree is required, while barely over 50 percent of the class are working in private practice, a five-percent drop from the previous year.  *Id*.  A paltry 71 percent of the class have obtained a job that is both full-time and permanent.  *Id*.  The number of graduates working as solo practitioners has similarly soared, rising to 5.7 percent of all graduates employed in private practice, which is most likely a result of graduates, faced with negligible job prospects, being forced to hang up their own shingle.  *Id*.

50.      The starting salaries of newly minted lawyers have likewise dropped precipitously over the past few years.  The national median salary for the class of 2010 was $63,000, a $9000 -- or 13 percent -- decline from the previous year, while the national mean salary was $84,111, an almost $10,000 -- or ten percent -- decline from the previous year. [6] Moreover, because many large law firm salaries cluster around $145,000 and $160,000, whereas most smaller firm salaries hover in the $40,000 to $65,000 range, relatively few salaries were actually near the overall median or mean.

51.      A recent study by the consulting company Economic Modeling Specialist, Inc. ("EMSI") confirms the historically weak job market and dire employment prospects facing current law school graduates. [7] According to the study, every state besides Nebraska and Wisconsin are producing more attorneys than they need for the foreseeable future.  Across the country, there were twice as many people who passed the bar in 2009 -- 53,508 -- as there were job openings -- 26,239.  In Michigan the numbers are particularly daunting, with 1,024 people having passed the bar, even though the state is estimated to only need 862 new lawyers for each year through 2015, leaving an annual surplus of 162 attorneys.

---

[6] *See* http://www.nalp.org/classof2010_salpressrel.
[7] *See* http://economix.blogs.nytimes.com/2011/06/27/the-lawyer-surplus-state-by-state/.

52.     More disturbingly, Thomas Cooley misleads and defrauds its students while saddling them with tens of thousands of dollars in crushing, non-dischargeable debt.  According to *US News*, Thomas Cooley students graduate on average with a staggering *$105,798* in loans, with a stunning 93 percent of them taking out loans to attend the school.  Thomas Cooley's tuition has also increased dramatically in the past 15 years, with annual increases of over five percent.

53.     Thomas Cooley's sharp increase in tuition in recent years mirrors the tuition trend in the legal education industry in general.  Over the past two decades, law school tuition has risen exponentially, far exceeding both inflation and any increase in lawyers' starting salaries, and at many private institutions can exceed well over $40,000 annually, excluding living expenses.  Specifically, between 1989 and 2009, tuition rates have shot up by 317 percent, well above the 71 percent seen at colleges.  Not surprisingly, the debt burden of law school graduates continues to rise unabated, and the average debt burden for graduates of private institutions is now over $100,000.

54.     The dramatic increase in law school tuition has dovetailed with the dramatic increase in faculty compensation.  Law school professors and deans are perhaps the best remunerated in academia today, enjoying both lavish perks and exorbitant salaries that rival those of Fortune 500 executives.  For example, during the fiscal year of 2008-2009, Thomas Cooley paid its dean, Don LeDuc, $548,047 in total compensation, while still paying its former dean and school founder, Thomas Brennan, $368,581 in total compensation.  Thomas Cooley's nine other highest paid employees earned between $193,925 and $242,476 in total compensation.

55.     Thomas Cooley, as with any law school, has every incentive to perpetuate this mass deception, because they are not required by the ABA, Department of Education or any

other governing body to independently audit or verify their employment data.  The incentive to cheat is so great that even one law school dean, Phillip J. Closius of the University of Baltimore School of Law, in a *New York Times* exposé about the manipulation of placement rates went to the extent of publicly conceding that "[t]here are millions of dollars riding on students' decisions about where to go to law school, and that creates real institutional pressures [to manipulate data]."[8]

56.      Moreover, Thomas Cooley is primarily marketing its product to naïve, relatively unsophisticated consumers -- many of whom are barely removed from college -- who are often making their first "big-ticket" purchase based on asymmetrical information.  These prospective students are applying to law school with one objective in mind: to attain the kind of job that provides compensation and a lifestyle that is commensurate with and worthy of the enormous time, money and personal sacrifice invested in a legal education.   However, if Thomas Cooley was to disclose accurate employment data and the steep odds its graduates face in securing

---

[8] On July 29, 2011, Mr. Closius formally resigned as dean from the University of Baltimore. In stepping down, Mr. Closius  circulated a highly controversial -- and surprisingly frank -- resignation letter in which he conceded that the University of Baltimore president had asked for his resignation, and that the tensions between them had largely stemmed from the law school's rapidly rising tuition and the fact that the University was essentially using the school to subsidize the undergraduate program, retaining an astounding 45 percent of all revenue generated by law tuition, fees and state subsidies.  *See* http://abovethelaw.com/2011/07/a-law-dean-resigns-and-spills-the-beans-on-how-his-university-has-been-taking-advantage-of-law-students/#more-85162.  The problem had grown so acute that the ABA's Accreditation Committee requested that the University submit a report by March 2012 "which provides in part a rationale for the School of Law's share of costs for non-law school activities and central administration services and information about any agreement between the Law School and the University regarding a fair process by which the Law School's contribution to the University for direct and indirect costs will be determined." *Id.*

gainful employment, it would become abundantly clear to any rational purchaser how poor of an investment attending Thomas Cooley is.

57.     To a remarkable extent, Thomas Cooley -- like most law schools -- has been astonishingly successful in pulling the wool over prospective students.  Currently, Thomas Cooley enrolls about 4,000 students, and its enrollment has skyrocketed since 2006, when the ABA finally granted accreditation to its three satellite campuses.  Last year, law schools awarded over 43,000 JD degrees (an additional 41,156 this year), an increase of 11 percent from a decade earlier, while the number of students taking the law school entrance examination (LSAT) increased by over 20 percent between 2007 and 2009.  For the 2009-2010 academic year, a record 154,549 students enrolled in American law schools, including a record 51,426 first-year students.  The total number of law schools has increased by nine percent over the past decade, and, despite the ominous employment trends and dearth of available jobs, there are a handful of new law schools that are slated to open their doors in the next few years.  Allowing the *status quo* to persist will almost certainly ensure that tens of thousands of law school graduates -- a whole "lost" generation of lawyers -- will continue to be churned out over the next decade with absolutely no realistic chance of ever earning back their investment.

## IV.     Manipulating Salary Information

58.     Further, Thomas Cooley grossly inflates their graduates' reported mean salaries, by calculating them based on a small, mostly self-selected subset of graduates who actually reported their salary information, and not on a broad, statistically meaningful representation of its graduates.

59.     For that matter, Thomas Cooley doesn't even publish in its Employment Report the percentage or number of students who actually report salary information.  *See* Ex. 1.  As

such, there is no possible way for a prospective student looking at Thomas Cooley's marketing material to determine if the reported salary information accurately reflects the salaries earned by recent Thomas Cooley graduates.

60. Additionally, an examination of employment data produced by *U.S. News* demonstrates the dubious value and deceptive nature of Thomas Cooley's mean salary information. According to *US News*, for the class of 2009, only *38 percent* of graduates working in the private sector -- i.e. private practice or "business" -- reported salary information, which is a mere 18 percent of the all graduates reporting employment data. Meanwhile *US News* did not report the percentage of students working in non-private-sector positions, such as government or public interest, who disclosed salary information.

61. Upon information and belief, Plaintiffs believe that a substantial portion of recent Thomas Cooley graduates make significantly less than the reported mean salaries, and that Thomas Cooley has failed to include these salaries in any statistical analysis or calculations. Thomas Cooley knowingly and purposely omits the salaries of graduates who have secured only temporary or part-time employment from its official marketing material. This material nondisclosure has the effect of "goosing" the numbers, making it appear their graduates earn substantially more money than the reality of the situation.

62. In actuality, many Thomas Cooley graduates are in dire financial straits, living paycheck to paycheck, barely able to pay off their tens of thousands of dollars in non-dischargeable debt, much less save enough money for down payments for homes or other major purchases that signify one's entrance into adulthood. They are working in mostly dead-end jobs, doing document review and other menial, mindless drudgery, essentially functioning as glorified paralegals or secretaries with little control over their careers. In short, they have not obtained --

23

and most likely never will obtain -- the kind of job that they thought would be waiting for them upon graduating from law school.

**V.      Changing the Status Quo**

63.      Fortunately, after much public hand-wringing and increased media scrutiny, the tectonic plates in the legal profession have finally begun to shift, as practitioners and politicians alike are starting to roundly demand that law schools change their deceptive ways and accurately report all available employment information.

64.      For example, Senator Barbara Boxer of California has sent two separate letters to Stephen Zack, President of the ABA, taking his organization to task for failing to properly police the law school industry.   *See* Letters from Senator Barbara Boxer to Stephen Zack, dated March 31, 2011 & May 20, 2011 ("Boxer Letters")(attaching Ex. 6). In her most recent letter, she directly implores the ABA to require that all law schools *independently* audit and verify employment data and salary information that are either included in marketing material to prospective students or disseminated to third-party information clearinghouses and publications, such as *US News* and the ABA.   Senator Charles Grasserly of Iowa, just recently, has sent his own letter to the ABA, demanding that the organization answer 31 detailed questions pertaining to the ABA's regulation of the law school industry.  *See* Letter from Senator Charles Grasserly to Stephen Zack, dated July 11, 2011 (attaching Ex. 7).  In particular, Senator Grasserly references the questionable practices employed by law schools when offering merit-based scholarships (i.e. they extend substantially more scholarships than they can possibly renew), the supersaturated job market facing new graduates, and the increased debt burden assumed by law school students as raising serious concerns whether tax payers will ultimately be on the hook for the hundreds of

millions of dollars in federally-backed loans that ultimately flow into law school coffers each year.

65.    Similarly, a coalition of 55 law school student body presidents, fed up with the ABA's inability to properly police law schools, have sent to Congress proposed legislation that would ensure "enhanced accuracy, accountability and transparency in the reporting of data pertaining to legal education." *See* Student Bar Association's Proposed Bill ("SBA Bill") and accompanying Press Release (attaching Ex. 8).  Among other things, the proposed legislation creates a new standard for reporting employment data, requires law schools to submit annual employment reports to the Department of Education, mandates that law school deans personally endorse such reports, and empowers the DOE to audit the reports.  The SBA Bill expressly aims to parallel federal securities laws, where publicly-held companies must submit annual reports to the SEC disclosing material financial information.

66.    The problem has gotten so far out of hand that Bill Hebert, President of the California Bar Association, in a much publicized article in the California Bar Journal exhorts law school deans to adopt more rigorous reporting standards by disclosing the type of detailed employment and salary data that would allow students to get a realistic picture of their post-graduate financial situation.  Bill Hebert, "What is the Value of the Law Degree?" California Bar Journal, February 2011(attaching Ex. 9).  Hebert chides schools for "hiding employment outcomes in aggregate statistical forms," and impresses upon them the need to reveal the exact percentage of their graduates who have actually obtained full-time, permanent employment -- the type of information Plaintiffs are now seeking.  *Id*.

**VI.    Role of the ABA**

25

67.     The ABA's Section of Legal Education and Admissions to the Bar is responsible

for accrediting and regulating all accredited legal institutions.  Unfortunately, despite years of

vociferous complaints by industry insiders regarding the pervasive practice that law schools

blatantly manipulate employment data, the ABA has been largely derelict in its duties,

essentially allowing law schools to behave with impunity as they bamboozle their students.[9]  Not

surprisingly, the ABA's Legal Education Council is dominated by law school deans, as both its

current chair, John O'Brien of the New England School of Law, and chair-elect, Kent Syverud of

the Washington University School of Law, are deans of large, prominent law schools.  Likewise,

the committee of the Legal Education Council which is directly responsible for regulating the

reporting of post-graduate placement data -- i.e. the Questionnaire Committee -- is dominated by

law school deans and professors, including its current chair, Dean Art Gaudio of the Western

New England College School of Law.

68.     It is only until recently that the ABA has finally adopted measures that would

require greater reporting transparency, by specifically mandating that law schools "unbundle"

employment data.  "The Questionnaire Committee's Report on Reporting Law School Placement

Data," dated May 28, 2011 (attaching Ex. 10).  Admittedly, these new guidelines mark a positive

first step forward and at least attempts to rectify the most egregious deceptive practices, by,

_____

[9] To that end, the ABA's overall competency has recently been questioned by the
National Advisory Committee on Institutional Quality and Integrity, which advises the
Department of Education on accreditation issues.  Specifically, the committee found that the
ABA had failed to comply with 17 regulations, including, among others, failing "to set a
standard for job placement by its member institutions." *See*
http://taxprof.typepad.com/taxprof_blog/2011/06/aba-is.html.  One of the members on the
committee, Arthur Keiser, publicly accused the ABA of "not getting it," noting that an
accrediting agency would never accredit an institution with 17 outstanding issues.  *Id*; *see also*
Ex. 7 (quoting June 11, 2011 article from *The Chronicle of Higher Education* which describes
the committee's members as expressing "frustration that they could not take stronger actions or
at least state their concerns [regarding the ABA's lackluster accreditation process] with stronger
language."

among other things, expressly mandating that law schools distinguish between various degrees of employment, such as full-time or part-time and permanent or temporary, or whether a position actually requires a JD degree.

69.     Nonetheless, the ABA hasn't gone nearly far enough in disincentivizing schools from "cooking" the data.  First, the guidelines will not go into effect for at least another year, thereby allowing law schools to continue deceiving prospective students.  Second, the guidelines still permit schools to continue self-reporting all employment data and salary information, and do not require that they retain unrelated, independent third-parties to audit and verify such data.

70.     Last, after initially agreeing to rely on the independent-minded and industry gold-standard NALP to gather the relevant employment data, the ABA, in a complete 180-degree turn, has decided to cut NALP out of the process entirely.  *See e.g.* Karen Sloan, "*NALP Clashes with ABA over Jobs Data – and Hints at Legal Action*," National Law Journal, August 1, 2011, http://www.law.com/jsp/nlj/PubArticleNLJ.jsp?id=1202509192905&NALP_clashes_with_ABA _over_jobs_data__and_hints_at_taking_legal_action&slreturn=1&hbxlogin=1.  In assessing the reason for this apparent about-face, James Leipold, NALP's Executive Director, stressed , "I think they [the ABA] see NALP's candor about the state of the legal job market as harmful to the industry.  I believe their intent is to recapture their ability to control the message to the public about the status of the job market. There's a conflict of interest here."  *Id*; *see also* Professor William D. Henderson, "*More Data but Less Transparency*," National Law Journal, August 2, 2011,http://www.law.com/jsp/nlj/PubArticleNLJ.jsp?id=1202509393144&More_data_but_less_t ransparency&slreturn=1&hbxlogin=1 (noting that ABA's proposal would undermine NALP's ability to collect, analyze and publish accurate employment data; "In a nutshell, here is the problem. Law schools are heavily burdened by information requests. The law schools will

comply with any information request from the ABA because the ABA is their accrediting

agency. If the ABA and NALP cover much of the same ground but use different terminology --

the ABA will have to invent its own to avoid infringing on NALP's detailed classification

system -- then some schools may forgo the voluntary submission to NALP. Unfortunately,

NALP cannot publish reliable industry-level statistics if law schools cannot spare the time and

expense to fill out a duplicative information request.").

71.     The sobering reality of the situation is that law schools are no different than the

proverbial fox guarding the henhouse, and when given the opportunity and incentive to act

within their self-interests by making themselves look better, they almost certainly will.  Indeed,

the Dean of Villanova Law School was forced to come clean and admit that the school in the past

"knowingly" reported false and inaccurate information to the ABA.  Rather, just as publicly-held

companies must independently audit their financial statements so as to ensure the integrity of the

marketplace, the same must be demanded of law schools so as to ensure that prospective students

-- i.e. consumers -- are making well-informed, carefully-considered decisions based on 100-

percent accurate information.

## VII.   **Thomas Cooley Attempts to Intimidate its Critics**

72.     Instead of coming clean about its failure to disclose accurate employment

information, Thomas Cooley, in a crude, cynical attempt to intimidate potential plaintiffs, chill

free speech and police the Internet, has filed two facially meritless, sham, SLAPP lawsuits in

Michigan State court against Plaintiffs' Counsel, Kurzon Strauss and two of its attorneys, and

four "John Doe" plaintiffs for alleged defamatory statements made over the Internet.  *See*

*Thomas M. Cooley Law School v. Kurzon Strauss LLP, et al.*, Case No. 11780-CZ (Ingham Cir.

Ct. July 14, 2011); *Thomas M. Cooley Law School v. John Doe 1, et al.*, Case No. 11781-CZ

(Ingham Cir. Ct. July 14, 2011).[10]

73.     Needless to say, these lawsuits have been met with near universal derision,

engendering a strong backlash in both the press and the legal community.  *See in general* Elie

Mystal, "Cooley Lawsuit Update: One Of The 'Cooley Four' Responds To The Law School's Complaint,"

Abovethelaw.com, July 15, 2011, http://abovethelaw.com/2011/07/cooley-lawsuit-update-one-of-the-

cooley-four-responds-to-the-law-schools-complaint/#more-83109.

74.     In a stirring defense of his right to free speech and a sharp rebuke of Thomas

Cooley's plainly ridiculous lawsuit, one of the "John Doe" plaintiffs, "Rockstar05", admonished

the school for its bullying behavior.  Specifically, he writes: "I believe I was very clear

throughout my dated blog post that I was expressing my personal opinion. I would analogize my

entire post reflecting my personal experience and personal views of the Thomas M. Cooley Law

School to watching a movie on a Friday night then publishing online statements asserting that it

was a poor investment of time, money, and certainly not worthwhile -- to boycott the movie and

go ahead and watch that other movie that released the same Friday or any other movie. Do

motion picture producers go out and publicly file lawsuits against each and every one who

trashes their film? Let's make the analysis more relevant and assume I flatter myself and liken

my blog post to a giant public platform to express my views and opinions. Will Michael Bay go

out and sue Roger Ebert, who is arguably one of the biggest critics in America, for trashing his

movie?"[11]

_____

[10]  Kurzon Strauss and attorneys David Anziska and Jesse Strauss fully intend to move to
dismiss the lawsuit on both procedural and substantive grounds, and further intend to seek
sanctions against Thomas Cooley and its attorneys and to strike certain scurrilous allegations.
     [11] http://www.qfora.com/jdu/thread.php?threadId=18891#post266764.

75.     As to his point that Thomas Cooley manipulates its employment statistics,
"Rockstar05" acidly notes: "As for distorted employment data, I have previously acknowledged
that this is not a problem that is confined to Cooley alone. The ABA regulation of school
reported employment data has been widely criticized by commentators, scambloggers, law
professors, in addition to industry experts and analysts as being misleading. Common grounds
for criticism include the idea of self-reported employment data by the law schools and notable
deficiencies in the reporting in terms of not disclosing overall response rates and either having a
breakdown or reflecting employment that actually requires a law degree. Since I concur with the
opinions of these critics and publicize it, will this opinion and view subject me to another 200
law suits filed by each and every ABA approved law school?"[12]

76.     Perhaps most damning of all, "Rockstar05" stresses that although his alleged
defamatory blog post has been up for over five months, the school, until now, had not even
attempted to contact him and request that he take it down, and instead resorted to immediate
legal action. ("Finally, I would like to add that Cooley has not attempted to contact me even
once, either through e-mail or through a blog comment on this post. If they had done so, or
perhaps even are willing to retract their lawsuit at this early stage, I would consider removing the
post altogether.")[13] This fact alone, more than anything, unequivocally demonstrates that Thomas
Cooley's true intentions are not to merely defend its reputation, but steamroll its critics and
vanquish all honest debate.

## CLASS ACTION ALLEGATIONS

77.     This action is brought and may properly be maintained as a class action pursuant
to Rule 23(b)(2) and (b)(3) of the Federal Rule of Civil Procedure.  Plaintiffs bring this action,

---

[12] *Id.*
[13] *Id.*

on behalf of themselves and all other similarly situated, as representative members of the following proposed class (the "Class"):

> All persons who are either presently enrolled or graduated from the Thomas M. Cooley Law School within the statutory period.

78.     Excluded from the Class are Defendants, Thomas Cooley, its employees, officers and directors, the Judge(s) assigned to this case, and the attorneys of record in this case. Plaintiffs reserve the right to amend the Class definition if discovery and further investigation reveal that the Class should be expanded or otherwise modified.

79.     For the foregoing reasons, this action fulfills the standards and requirements as outlined in Rule 23(b)(2) and (b)(3) of the Federal Rule of Civil Procedure:

**A.     The Parties are Numerous and Easily Ascertainable**

80.     The proposed Class is so numerous that it is manifestly impracticable to bring them all before the court.  Though the exact number and identities of the Class is unknown at this time, they can be ascertained through appropriate discovery, and likely contain thousands of people, as nearly one thousand students graduate from Thomas Cooley each year.  The number and identities of other Class members may be determined from Defendants' records and files, and potential Class members may easily be notified about the pendency of this action.

**B.     Common Questions of Law and Facts Predominate**

81.     This action presents questions of law and facts common to the Class, including, but not limited to, the following:

> a.     Whether Defendants are engaged in deceptive, misleading, unfair, fraudulent and/or otherwise unlawful practices through their non-disclosure of material facts and

affirmative misleading statements regarding post-graduate employment data and salary information;

b.      Whether Defendants know the true and real percentage of recent graduates who secure full-time, permanent employment for which a JD degree is required or preferred and are, therefore, gainfully employed;

c.      Whether Defendants' conduct violated the MCPA and constitute fraud, constructive fraud and/or negligent misrepresentation, as alleged herein;

d.      Whether Plaintiffs and Class members are entitled to recover actual damages as a result of the actions alleged herein;

e.      Whether Plaintiffs and members of the Class are entitled to recover restitution of tuition monies remitted to Defendants as a result of the actions alleged herein;

f.      Whether Plaintiffs and members of the Class are entitled to ancillary relief, including the disgorgement of unearned profits, as a result of the actions alleged herein;

g.      Whether Plaintiffs and Class members of the Class are entitled to recover punitive damages as a result of the actions alleged herein;

h.      Whether Plaintiff and Class members are entitled to an award of reasonable attorneys' fees, pre-judgment interest and costs of this suit;

i.      Whether Defendants should be forced to retain independent, non-related third-parties to audit and verify their post-graduate employment data and salary information; and

j.      Whether Defendants should be enjoined from continuing to make false and misleading representations and omissions regarding their post-graduate employment data and salary information.

**C.      Plaintiffs' Claims Are Typical of the Class**

82.    Plaintiffs' claims are typical of the claims and of the members of the Class because they have all been damaged in the same manner and way as a result of Defendants' failure to disclose material facts and policies of misrepresentation and omissions.  Accordingly, the interests of the representative Plaintiffs are co-extensive with the interests of each Class member, and all have a common right of recovery based upon the same facts.

**D.    The Class Representatives Can Adequately Represent the Class**

83.    Plaintiffs are adequate representatives of the Class because Plaintiffs are members of the Class and their interests do not conflict with the interests of the Class.  The interests of the Class will be fairly and adequately protected by Plaintiffs and their undersigned counsel, who are competent and experienced in the prosecution of class action litigation.

**E.    A Class Action Provides a Substantial Benefit to the Courts and Litigants**

84.    Should individual Class members be required to bring separate actions, courts throughout Michigan would be confronted by a multiplicity of lawsuits, thus burdening the court system while also creating the risk of inconsistent rulings and contradictory judgments.  In contrast to proceeding on a case-by-case basis, in which inconsistent results would magnify the delay and expense to all parties and the court system, this class action will present far fewer management difficulties while providing unitary adjudication, economies of scale and comprehensive supervision by a single court.

85.    Members of the Class almost invariably lack the means to pay attorneys to prosecute their claims individually.  Given the complexity of the issues presented here, individual claims are not sufficiently sizeable to attract the interests of highly able and dedicated attorneys who will prosecute them on a contingency basis.  Only by aggregating claims can

Plaintiffs gain the leverage necessary to pursue a just and global resolution of the issues raised in this Complaint.

86.      WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray for an order certifying the Class and appointing Plaintiffs and their counsel of record to represent the Class.

## FIRST CAUSE OF ACTION

### (Against All Defendants for Violations of the Consumer Protection Act, MCLS §445.901, *et seq*.)

87.      Plaintiffs incorporate by reference each and every allegation set forth above as if fully stated herein.

88.      Defendants' actions constitute unlawful, unfair, deceptive and fraudulent actions/practices as defined by the Consumer Protection Act, MCLS §445.901, *et seq.* or the MCPA, as they occurred in the course of trade or commerce.

89.      As part of its fraudulent marketing practices and recruitment program, Thomas Cooley engaged in a pattern and practice of knowingly and intentionally making numerous false representations and omissions of material facts, with the intent to deceive and fraudulently induce reliance by Plaintiffs and the members of the Class.  These false representations and omissions were uniform and identical in nature, and include, without limitation, the following:

a.      Stating false placement rates during the recruitment process;

b.      Manipulating post-graduate employment data, so as to give the appearance that the overwhelming majority of recent graduates secure full-time, permanent employment for which a JD degree is required or preferred;

c.      Grossly inflating the salaries earned by recent graduates;

34

d.      Disseminating false post-graduate employment data and salary information to various third-party data clearinghouses and publications, such as the ABA and *US News*;

d.      Making deceptive and misleading statements, representations and omissions concerning Thomas Cooley's reputation with potential employers;

e.      Making deceptive and misleading statements, representations and omissions concerning the value of a Thomas Cooley law degree; and

f.      Making deceptive and misleading statements, representations and omissions concerning the pace at which recent graduates can obtain gainful employment in their chosen field.

90.      In general, Plaintiffs and members of the Class enrolled at Thomas Cooley for the purpose of securing upon graduation full-time, permanent employment for which a JD degree is required or preferred.  Defendants' acts, practices and omissions, therefore, were material to Plaintiffs' decision to enroll and attend Thomas Cooley, and were justifiably relied upon by Plaintiffs.

91.      The Defendants' above-alleged actions constitute unfair business practices since the actions were deceptive, immoral, unethical, oppressive, unscrupulous, substantially injurious, and operate to the competitive disadvantage of other law schools.  They are also likely to deceive the public.  Moreover, the injury to the Plaintiffs was substantial and outweighs the utility of the Defendants' practices.

92.      The unfair and deceptive trade acts and practices have directly, foreseeably and proximately caused damage to Plaintiffs and other members of the Class.

93.     The Defendants' practices, in addition, are unfair and deceptive because they have caused Plaintiffs and the Class substantial harm, which is not outweighed by any countervailing benefits to consumers or competition, and is not an injury consumers themselves could have reasonably avoided.

94.     The Defendants' acts and practices have misled and deceived the general public in the past, and will continue to mislead and deceive the general public into the future, by, among other things, causing them to apply to and enroll at Thomas Cooley under false pretenses.

95.     Plaintiffs are entitled to preliminary and permanent injunctive relief ordering the Defendants to immediately cease these unfair business practices, as well as disgorgement and restitution to Plaintiffs of all revenue associated with their unfair practices, or such revenues as the Court may find equitable and just.

## SECOND CAUSE OF ACTION

### (Against All Defendants for Fraud)

96.     Plaintiffs incorporate by reference each and every allegation set forth above as if fully stated herein.

97.     As part of its fraudulent marketing practices and recruitment program, Thomas Cooley engaged in a pattern and practice of knowingly and intentionally making numerous false representations and omissions of material facts, with the intent to deceive and fraudulently induce reliance by Plaintiffs and the members of the Class.  These false representations and omissions were uniform and identical in nature, and include, without limitation, the following:

a.     Stating false placement rates during the recruitment process;

36

b.     Manipulating post-graduate employment data, so as to give the appearance that the overwhelming majority of recent graduates secure full-time, permanent employment for which a JD degree is required or preferred;

c.     Grossly inflating the salaries earned by recent graduates;

d.     Disseminating false post-graduate employment data and salary information to various third-party data clearinghouses and publications, such as the ABA and *US News*;

d.     Making deceptive and misleading statements, representations and omissions concerning Thomas Cooley's reputation with potential employers;

e.     Making deceptive and misleading statements, representations and omissions concerning the value of a Thomas Cooley law degree; and

f.     Making deceptive and misleading statements, representations and omissions concerning the pace at which recent graduates can obtain gainful employment in their chosen field.

98.     In general, Plaintiffs and members of the Class enrolled at Thomas Cooley for the purpose of securing full-time, permanent employment upon graduation.  Defendants' acts and practices, therefore, were material to Plaintiffs' decision to enroll and attend Thomas Cooley, and were justifiably relied upon by Plaintiffs.

99.     Plaintiffs and members of the Class did in fact justifiably rely on these material representations and omissions when deciding to enroll at Thomas Cooley.  Specifically, Plaintiffs reviewed and relied upon post-graduate employment data and salary information posted on Thomas Cooley's website and included in marketing brochures, as well as all such information disseminated to third-party data clearinghouses and publications, such as the ABA and *US News*.

100.    The material representations and omissions were part of a common scheme, practice and plan conceived and executed by Thomas Cooley to mislead, deceive and defraud Plaintiffs and members of the Class.  Defendants made these statements and representations regarding their graduates' employment data and salary information, including their graduates' ability to secure full-time, permanent employment for which a JD degree is required or preferred, knowing full well they were false, untrue, fraudulent and deceptive.  In fact, Defendants know that the overwhelming majority of their graduates fail to secure gainful employment following graduation, and are forced to take jobs incommensurate to their education level.

101.    Plaintiffs were, at all relevant times, ignorant of the true facts and did not know that in actuality few Thomas Cooley graduates secure gainful employment following graduation. Had Plaintiffs known of the dire financial straits faced by the overwhelming majority of Thomas Cooley students following graduation, they would never have enrolled in Thomas Cooley and incurred tens of thousands of dollars in non-dischargeable debt.

102.    In addition, Thomas Cooley occupies a fiduciary position as educators, and owes a heightened duty of care to Plaintiffs and members of the Class to act in good faith and engage in fair dealings.  Likewise, by virtue of the fact that many of Thomas Cooley's staff and faculty are attorneys and members of the Michigan Bar, they have certain ethical obligations and responsibilities to Plaintiffs and members of the Class.  Defendants breached these heightened duties of care by making a series of material misstatements and omissions regarding their graduates' employment data and salary information.

103.    The above-referenced material misstatements and omissions were knowingly, willfully, intentionally, maliciously, oppressively, and fraudulently undertaken with the express purpose and intention of defrauding Plaintiffs and the members of the Class, as well as to the

substantial benefit of the Defendants.  Consequently, Plaintiffs and members of the Class are entitled to punitive damages, the disgorgement of tuition monies, the reimbursement of attorneys' fees and all other monetary and equitable relief as the Court may find equitable and just.

### THIRD CAUSE OF ACTION

**(Against All Defendants for Negligent Misrepresentation)**

104.    Plaintiffs incorporate by reference each and every allegation set forth above as if fully stated herein.

105.    As part of its fraudulent marketing practices and recruitment program, Thomas Cooley engaged in a pattern and practice of knowingly and intentionally making numerous false representations and omissions of material facts, with the intent to deceive and fraudulently induce reliance by Plaintiffs and the members of the Class.  These false representations and omissions were uniform and identical in nature, and include, without limitation, the following:

a.    Stating false placement rates during the recruitment process;

b.    Manipulating post-graduate employment data, so as to give the appearance that the overwhelming majority of recent graduates secure full-time, permanent employment for which a JD degree is required or preferred;

c.    Grossly inflating the salaries earned by recent graduates;

d.    Disseminating false post-graduate employment data and salary information to various third-party data clearinghouses and publications, such as the ABA and *US News*;

d.    Making deceptive and misleading statements, representations and omissions concerning Thomas Cooley's reputation with potential employers;

e.      Making deceptive and misleading statements, representations and omissions concerning the value of a Thomas Cooley law degree; and

f.      Making deceptive and misleading statements, representations and omissions concerning the pace at which recent graduates can obtain gainful employment in their chosen field.

106.    In general, Plaintiffs and members of the Class enrolled at Thomas Cooley for the purpose of securing full-time, permanent employment upon graduation.  Defendants' acts and practices, therefore, were material to Plaintiffs' decision to enroll and attend Thomas Cooley, and were justifiably relied upon by Plaintiffs.

107.    Plaintiffs and members of the Class did in fact justifiably rely on these material representations and omissions when deciding to enroll at Thomas Cooley.  Specifically, Plaintiffs reviewed and relied upon post-graduate employment data and salary information posted on Thomas Cooley's website and included in marketing brochures, as well as all such information disseminated to third-party data clearinghouses and publications, such as the ABA and *US News*.

108.    The material representations and omissions were part of a common scheme, practice and plan conceived and executed by Thomas Cooley to mislead, deceive and defraud Plaintiffs and members of the Class.  Defendants made these statements and representations regarding their graduates' employment data and salary information, including their graduates' ability to secure full-time, permanent employment for which a JD degree is required or preferred, knowing full well they were false, untrue, fraudulent and deceptive.  In fact, Defendant knows that the overwhelming majority of their graduates fail to secure gainful employment following graduation, and are forced to take jobs incommensurate to their education level.

109.    Plaintiffs were, at all relevant times, ignorant of the true facts and did not know that in actuality few Thomas Cooley graduates secure gainful employment following graduation. Had Plaintiffs known of the dire financial straits faced by the overwhelming majority of Thomas Cooley students following graduation, they would never have enrolled in Thomas Cooley and incurred tens of thousands of dollars in non-dischargeable debt.

110.    In addition, Thomas Cooley occupies a fiduciary position as educators, and owes a heightened duty of care to Plaintiffs and members of the Class to act in good faith and engage in fair dealings.  Likewise, by virtue of the fact that many of Thomas Cooley's staff and faculty are attorneys and members of the Michigan Bar, they have certain ethical obligations and responsibilities to Plaintiffs and members of the Class.  Defendants breached these heightened duties of care by making a series of material misstatements and omissions regarding their graduates' employment data and salary information.

111.    The above-referenced material misstatements and omissions were knowingly, willfully, intentionally, maliciously, oppressively, and fraudulently undertaken with the express purpose and intention of defrauding Plaintiffs and the members of the Class, as well as to the substantial benefit of the Defendants.  Consequently, Plaintiffs and members of the Class are entitled to punitive damages, the disgorgement of tuition monies, the reimbursement of attorneys' fees and all other monetary and equitable relief as the Court may find equitable and just.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and members of the Class, pray for relief and judgment against Defendants Thomas Cooley and Does 1 though 20 as follows:

1. For preliminary and injunctive relief enjoining Defendants, their agents, servants, employees and all persons acting in concert with them from continuing to engage in their unlawful recruitment program and manipulation of post-graduate employment data and salary information, and all other unfair, unlawful and /or fraudulent business practices alleged above and that may yet be discovered in the prosecution of this action;

2. For certification of the Class;

3. For restitution and disgorgement of all tuition monies remitted to Thomas Cooley, totaling $250 million;

4. For damages;

5. For punitive damages;

6. For an accounting by Defendants for any and all profits derived by them from the herein-alleged unlawful, unfair, and/or fraudulent conduct and/or business practices;

7. For injunctive relief ordering that Thomas Cooley retains unrelated, independent third-parties to audit and verify post-graduate employment data and salary information;

8. For attorneys' fees and expenses pursuant to all applicable laws;

9. For prejudgment interest; and

10. For such other and further relief as the Court may deem proper.


DATED: August 10, 2011                          RESPECTFULLY SUBMITTED,


                                                **THE HYDER LAW FIRM, P.C.**

By: /s/ Steven Hyder
    Steven Hyder (P69875)
    **The Hyder Law Firm, P.C.**
    PO Box 2242
    Monroe, MI 48161
    hyders@hyderlawfirm.com
    Phone (734) 757-4586


    David Anziska
    Jeff Kurzon
    Jesse Strauss (admission pending)
    **Kurzon Strauss LLP**
    305 Broadway, 9th Floor
    New York, NY 10007
    Phone (212) 822-1496
    Facsimile (212) 822-1407
    www.KurzonStrauss.com

    *Counsel for Plaintiffs, individually
    and for all others similarly situated*

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs hereby demand a jury trial on all causes of action so triable.

DATED: August 10, 2011                    RESPECTFULLY SUBMITTED,


                                          **THE HYDER LAW FIRM, P.C.**


                              By: <u>/s/ Steven Hyder</u>
                                  Steven Hyder (P69875)
                                  **The Hyder Law Firm, P.C.**
                                  PO Box 2242
                                  Monroe, MI 48161
                                  hyders@hyderlawfirm.com
                                  Phone (734) 757-4586


                                  David Anziska
                                  Jeff Kurzon
                                  Jesse Strauss (admission pending)
                                  **Kurzon Strauss LLP**
                                  305 Broadway, 9th Floor
                                  New York, NY 10007
                                  Phone (212) 822-1496
                                  Facsimile (212) 822-1407

                                  *Counsel for Plaintiffs, individually*
                                  *and for all others similarly situated*