# EXHIBIT 4

*The New*
# REPUBLIC

Published on *The New Republic* ([http://www.tnr.com](http://www.tnr.com))

---

Served

How law schools completely misrepresent their job numbers.

- Paul Campos
- April 25, 2011 | 12:00 am



This month, thousands of ambitious young people are asking themselves the same question: Does it make sense to invest $100,000 to $250,000, and the next three years of my life, to become officially qualified to work as a lawyer? For most people considering law school, this question is hardly an easy one. Law schools, however, make it much harder than it needs to be by publishing misleading data about their employment statistics. Many law schools all but explicitly promise that, within a few months of graduation, practically all their graduates will obtain jobs as lawyers, by trumpeting employment figures of 95 percent, 97 percent, and even 99.8 percent. The truth is that less than half will.

There are two main sources of information on post-law-school employment rates. One is *U.S. News and World Report* (USNWR), which publishes statistics for individual schools as part of its annual law-school rankings. These rankings, of course, are much reviled but even more greatly feared by deans and admissions officers. (Prospective law students pay very careful attention to the rankings, which means law schools must as well.) Until little more than a month ago, almost all 198 ABA-accredited law schools were<u>reporting nine-month employment rates of more than</u>

90 percent, and it was a rare top 100 school that had a rate of less than 95 percent. But last month, in the wake of criticisms that these figures were literally incredible, USNWR revised its employment statistics in an effort to combat some of the legerdemain law schools engaged in, such as excluding from their calculations graduates who described themselves as unemployed but not seeking work. The new USNWR percentages are therefore somewhat less inaccurate: Schools that, until a few weeks ago, were claiming one in 500 graduates were unemployed now claim one in 30 are, while those who were advertising 95 percent employment rates are saying one in six graduates don't have jobs, and so on down the hierarchical line.

The other source is the National Association for Law Placement (NALP)—the group to which the ABA delegates the compiling of employment statistics that ABA-accredited law schools are required to report. According to the NALP, 88.2 percent of all law school graduates are "employed" within nine months of graduation. If we exclude people employed in non-legal jobs, and people doing part-time work, the NALP number drops to 62.9 percent.

There are a few problems, however, with even this lower number. The first is that it is only reported for law schools as a whole. NALP does not provide this number for individual schools, while USNWR does not report it at all. This means that the only school-specific information currently available to students is extremely misleading.

But the bigger problem is that the 62.9 percent figure is still too high. While it excludes non-legal jobs and part-time work, it does not exclude people in temporary positions. So it seems worth asking: How many of the graduates who report doing full-time legal work have *permanent* jobs—in the employment law sense of permanent—as opposed to doing temp work, such as being paid $20 an hour to proofread financial documents in a warehouse, or $12 an hour to do slightly glorified secretarial tasks?

In this regard, the public NALP data is of little use—while the NALP collects information from graduates about whether their jobs are permanent or temporary, it makes no distinction between the two in the information it publishes. In order to calculate this figure, I used employment data drawn from 183 individual NALP forms, in which graduates of one top 50 school self-reported their employment status nine months after graduation. This data suggests that fully one-third of those graduates who report they are working in full-time jobs that require a law degree are in temporary, rather than permanent, positions. (Some of these graduates are temporarily employed as judicial clerks, and, in those cases where the clerkships were with federal courts or state supreme courts, I have treated this as equivalent to permanent full-time legal employment. Such clerkships are difficult to obtain, and considered desirable credentials by legal employers. I have treated state trial court clerkships as genuinely temporary employment, since few law graduates will accept such a clerkship if they have the option of taking a full-time permanent legal job

instead. I have excluded the tiny percentage of graduates in state appellate court clerkships altogether, because the desirability of such positions compared to a full-time legal job is ambiguous.)

When we take temporary employment into account, it appears that approximately 45 percent of 2010 graduates of this particular top-50 law school had real legal jobs nine months after graduation. And the overall number is likely lower, since it seems probable that the temporary employment figures for the graduates of almost any top 50 school would be better than the average outcome for the graduates of the 198 ABA-accredited law schools as a whole.

Even this grim figure, however, may be unduly optimistic. All these statistics are based on self-reporting, and neither law schools nor NALP audit the data they publish. In the course of my research, I audited a representative sample of individual graduate responses and found several instances of people describing themselves as employed permanently or full-time, when in fact they had temporary or part-time jobs (I found no instances of inaccuracies running in the other direction). Perhaps some graduates exaggerate their employment status out of embarrassment, or for strategic reasons, but, whatever their reasons might be, this apparently not uncommon practice suggests that the true employment rate should be lowered even further.

Yet even this does not exhaust the dire news for those about to enter the legal profession. Some schools have adopted the practice of placing their graduates in temporary positions, which, whatever the rationale, has the benefit of helping to inflate their employment numbers. For example, this winter the top 50 school referenced above hired at least two unemployed graduates for short-term internships. Last year, Georgetown's law school <u>paid</u> three unemployed graduates $20 an hour to spend six weeks working in, of all places, its admissions office.

Nor have we considered how the "lucky" winners in the big law lottery often accept jobs that <u>make them miserable</u>, featuring insane hours and unfulfilling work, but which these graduates conclude they must take in order to pay their often astronomical educational debt (adjusted for inflation, public law school tuition has quintupled, and private law school tuition has nearly tripled, since the mid-1980s). If you're a law professor and you want to get depressed, try to figure out how many of your recent graduates have real legal jobs that pay enough to justify the tuition that funds your salary, and also involve doing the kind of work they wanted to do when they went to law school.

All of this suggests the extent to which prospective law students need more and better information. Of course, such information will make law school look like a far worse investment than it does at present. Still, if we assume that the point of academic work is to reveal the truth,

rather than to engage in the defense of a professional cartel from which law professors benefit more than almost anyone else, then this work needs to be done.

*Paul Campos is a professor of law at the University of Colorado.*