# EXHIBIT 7

PATRICK J. LEAHY, VERMONT, CHAIRMAN

HERB KOHL, WISCONSIN
DIANNE FEINSTEIN, CALIFORNIA
CHARLES E. SCHUMER, NEW YORK
RICHARD J. DURBIN, ILLINOIS
SHELDON WHITEHOUSE, RHODE ISLAND
AMY KLOBUCHAR, MINNESOTA
AL FRANKEN, MINNESOTA
CHRISTOPHER A. COONS, DELAWARE
RICHARD BLUMENTHAL, CONNECTICUT

CHARLES E. GRASSLEY, IOWA
ORRIN G. HATCH, UTAH
JON KYL, ARIZONA
JEFF SESSIONS, ALABAMA
LINDSEY O. GRAHAM, SOUTH CAROLINA
JOHN CORNYN, TEXAS
MICHAEL S. LEE, UTAH
TOM COBURN, OKLAHOMA

**United States Senate**
COMMITTEE ON THE JUDICIARY
WASHINGTON, DC 20510–6275

BRUCE A. COHEN, *Chief Counsel and Staff Director*
KOLAN L. DAVIS, *Republican Chief Counsel and Staff Director*

July 11, 2011

Mr. Stephen N. Zack
President
American Bar Association
321 North Clark Street
Chicago, IL 60654-7598

Dear President Zack,

      I am writing to express concern after reading a June 9, 2011 article in *The Chronicle of Higher Education* that reported that the American Bar Association (ABA) "was found to be out of compliance with 17 regulations, including the need to consider student-loan default rates in assessing programs."[1] In addition, though the National Advisory Committee on Institutional Quality and Integrity did not strip the ABA of its power to accredit law schools, the majority of its members "expressed frustration that they could not take stronger actions or at least state their concerns with stronger language."[2] My concern is that the ABA, which has the power to accredit law schools, was barely granted renewed recognition by the U.S. Department of Education's accreditation experts. Moreover, in the eyes of the National Advisory Committee on Institutional Quality and Integrity, the ABA appears to be doing little to assess student-loan default rates in its law school accreditation process.

      *The New York Times* also addressed similar issues in an April 30, 2011 article regarding what many law students interviewed by the *New York Times* referred to as a 'bait and switch' practice regarding merit-based scholarships.[3] According to the *New York Times*, ABA accredited law schools "offer more scholarships than [they] plan to renew[.]"[4] One result of this practice is that many law students lose their merit-based scholarships after their first year because they failed to maintain a certain grade-point average.[5] *The New York Times* articles raised concerns

---

[1] Eric Kelderman; "American Bar Association Take s Heat From Advisory Panel on Accreditation"; *The Chronicle of Higher Education* (June 9, 2011), available at http://chronicle.com/article/American-Bar-Association-Takes/127869/.
[2] *Id.*
[3] David Segal; "Law Students Lose the Grant Game as Schools Win"; *The New York Times* (Jan. 8, 2011), available at http://www.nytimes.com/2011/05/01/business/law-school-grants.html.
[4] *Id.*
[5] *Id.*

that some schools appear to set their grading curves in a manner which results in a large number of students losing their merit-based scholarships. Currently, the number of students attending law school and the amount they borrow is increasing while their ability to secure jobs and pay back the loans is decreasing as jobs disappear. The result is that millions of federally guaranteed taxpayer dollars are being borrowed at the great risk that many students may not be able to pay off their loans.

In 2009, the ABA found that 38,000 of the 145,000 enrolled law school students received merit-based scholarships.[6] For all the law schools over a three year period, this represents approximately $500 million in tuition assistance.[7] Despite the fact that merit-based aid appears to be a half billion dollar expense, the New York Times asserts that, "[n]obody knows exactly how many law school students nationwide lose scholarships each year," and "no oversight body tallies that figure."[8] I was extremely disturbed to find that the ABA does not exercise stronger oversight controls over its membership on this critical issue.

A recent study done by The Association for Legal Career Professionals (NALP) found that the overall employment rate for new law school graduates is 87.6%, "the lowest it has been since 1996."[9] On January 8, 2011, the *New York Times* reported that since 2008, 15,000 jobs at large firms have disappeared.[10] However, the number of law degrees awarded in 2009 represented an 11 percent growth over the last 10 years.[11] Furthermore, according to the article, nine new schools opened in the last 10 years,[12] and according to your website, five more schools are currently seeking ABA full accreditation.[13] This raises concerns over the health of the legal profession and the ability of these newly minted attorneys to pay back their federally guaranteed student loans.

In November 2009, the ABA Commission on the Impact of the Economic Crises on the Profession and Legal Needs published an article stating that "[s]tudents are now competing for half as many jobs at top law firms . . . as last year," and that "[r]ecruitment at many levels of the job market is declining by similar amounts."[14] The article describes the employment prospects of the class of 2009 and 2010 as "bleak" and speculates that "many members of the class of 2010

---

[6] *Id.*
[7] *Id.*
[8] *Id.*
[9] THE ASSOCIATION FOR LEGAL CAREER PROFESSIONALS, EMPLOYMENT FOR THE CLASS OF 2010 – SELECTED FINDINGS, CLASS OF 2010 GRADUATES FACED WORST JOB MARKET SINCE MID-1990S:LONGSTANDING EMPLOYMENT PATTERNS INTERRUPTED (2009), available at http://www.nalp.org/uploads/Classof2010SelectedFindings.pdf; (noting that 1996 was the last year in a six year decline in the employment rate that followed the 1990-1991 recession).
[10] David Segal; "Is Law School a Losing Game"; *The New York Times* (Apr. 30, 2011), available at http://www.nytimes.com/2011/01/09/business/09law.html [hereinafter Losing Game].
[11] *Id.*
[12] *Id.*
[13] http://www.americanbar.org/groups/legal_education/resources/aba_approved_law_schools.html; accessed June 6, 2011.
[14] ABA COMMISSION ON THE IMPACT OF THE ECONOMIC CRISES ON THE PROFESSION AND LEGAL NEEDS, THE VALUE PROPOSITION OF ATTENDING LAW SCHOOL (2009), available at http://www.americanbar.org/content/dam/aba/migrated/lsd/legaled/value.authcheckdam.pdf.

and 2011 may graduate without a job."[15] Not only do recent graduates face bleak job prospects, they borrow on average $71,436 at public schools and $91,506 at private schools.[16] *The New York Times* article from January 8, 2011 reports that law school graduates enter the workforce with as much as a quarter of a million dollars in student loans, many of which are federally guaranteed.[17]

Given the questions being raised by the increase of the number of law schools, the increase in graduate debt, and the decrease in graduate job prospects, this raises concerns regarding the ABA's internal controls. As the Ranking Member of the United States Senate Committee on the Judiciary, I have an interest in the health of the legal profession. To the extent that taxpayer dollars are used, I also have an interest in ensuring that the students who take out federally-backed loans are in a position to pay back their loans and that the default rates on these loans do not increase. To further explore these concerns, please provide written responses to the following questions:

1. Does the American Bar Association compile data on the number of schools which offer scholarships to more students than can statistically retain those scholarships?

2. If so, how many schools, and how many total scholarships are affected?

3. Does the American Bar Association take these "bait and switch" allegations into account in the accreditation process?

4. If so, how?

5. If not, why not?

6. Does the American Bar Association maintain data on the dollar amount of merit based scholarships offered each year?

7. If not, does the American Bar Association plan to begin maintaining this information?

8. Does the American Bar Association maintain data on the dollar amount of merit based scholarships that are revoked after the offeree's first year of law school?

9. If not, does the American Bar Association plan to begin maintaining this information?

10. Does the American Bar Association publish data on the amount of first-year merit based scholarships in comparison to the amount of non-first-year merit based scholarships?

11. Does the American Bar Association plan to begin maintaining this information?

---

[15] *Id.*
[16] *See id*, citing ABA SECTION OF LEGAL EDUC. & ADMISSIONS TO THE BAR, AVERAGE AMOUNT BORROWED FOR LAW SCHOOL, 2001–2008 (2008), available at http://www.abanet.org/legaled/statistics/charts/stats%20-%2020.pdf.
[17] *See* Losing Game, *supra*, note 10.

12. Has the American Bar Association raised concerns with law schools about the practice of awarding more first-year merit based scholarships than they plan to renew?

13. If so, how has the American Bar Association raised this concern?

14. Does the American Bar Association have any education programs that aid students in assessing whether or not they are borrowing more than they can reasonably expect to repay?

15. Does the American Bar Association have a program to ensure borrowers do not-default on their federally-backed student loans?

16. How many law schools has the American Bar Association provisionally accredited during the last 20 years?

17. Does the American Bar Association maintain this information in a publicly accessible database?

18. How many law schools has the American Bar Association fully accredited during the last 20 years?

19. Has the American Bar Association ever revoked provisional or full accreditation during the last 20 years?

20. If so, how many law schools lost their provisional or full accreditation?

21. From 1990 to the present, has the American Bar Association ever placed a law school on probation?

22. If so, which law schools were placed on probation?

23. Did any of these law schools regain full accreditation?

24. If so, within what time period?

25. When examining candidates for membership on the accreditation committee, what efforts does the American Bar Association make to ensure that membership is balanced between legal practitioners and academics?

26. Does the American Bar Association track the professional background of its committee membership?

27. If so, how does the professional background of committee membership break down in percentage format on committees related to the accreditation of law schools?

28. If not, why doesn't the American Bar Association track the professional background of committee membership?

29. Does the American Bar Association track the professional background of the officers that approve or revoke provisional or full law school accreditation?

30. If so, how does the professional background of officers that approve or revoke provisional or full law school accreditation break down in percentage format?

31. If not, why doesn't the American Bar Association track the professional background of officers that approve or revoke provisional or full law school accreditation?

Thank you in advance for your prompt attention to this matter. I would appreciate receiving your response to this letter by July 25, 2011. When responding, please number your answers in accordance with my questions. Should you have any questions regarding this matter, please do not hesitate to contact Chris Lucas on my staff at (202) 224-5225.

Sincerely,

*Chuck Grassley*

Charles E. Grassley
Ranking Member
Committee on the Judiciary