| | |
|---|---|
| David Anziska<br>**Law Offices of David Anziska**<br>305 Broadway, 9th Fl.<br>New York, NY 10007<br>Phone (212) 822-1496<br>Facsimile (212) 822-1437 | Steven Hyder (P69875)<br>**The Hyder Law Firm, P.C.**<br>PO Box 2242<br>Monroe, MI 48161<br><u>hyders@hyderlawfirm.com</u><br>Phone (734) 757-4586 |

Jesse Strauss (admitted NY - 4182002)
**Strauss Law PLLC**
305 Broadway, 9th Fl.
New York, NY 10007
Phone (212) 822-1496
Facsimile (212) 822-1437

*Counsel for Plaintiffs, individually*
*and for all others similarly situated*

## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

| | | |
|---|---|---|
| JOHN T. MACDONALD JR., CHELSEA A. PEJIC, SHAWN HAFF, STEVEN BARON, DIMPLE KUMAR, CARRIE KALBFLEISCH, ANDERS CHRISTENSEN, DANNY WAKEFIELD, DAN GUINN, BENJAMIN FORSGREN, SHANE HOBBS, and KEVIN PRINCE, on behalf of themselves and all others similarly situated, | : : : : : : : : : : : : : : : : : : : : : : : | **Case No. 11-cv-00831**<br>Hon. Gordon J. Quist<br><br><br><br><br><br>**AMENDED CLASS ACTION COMPLAINT** |
| Plaintiffs, | | |
| v. | | |
| THOMAS M. COOLEY LAW SCHOOL, and DOES 1-20, | | |
| Defendants. | | **<u>JURY TRIAL DEMANDED</u>** |

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION……………………………………………………………………...1

JURISDICTION AND VENVUE……………………………………………………...7

PARTIES………………………………………………………………………………8

    I.     Plaintiffs………………………………………………………………8

    II.    Defendants…………………………………………………………22

FACTUAL ALLEGATIONS…………………………………………………………23

    I.     Background Information…………………………………………………23

        A.    A Veritable "JD Factory"……………………………………...23

        B.    Becoming "America's Largest Law School" While
             Maintaining an 80 Percent Placement Rate……………………………...24

        C.    History of Unfounded Claims………………………………………25

    II.    Underlying Fraud Allegations…………………………………………26

        A.    Statements Constituting Fraud………………………………...26

        B.    Disseminating False Information to Third Parties………………………30

    III.    Manipulating Employment Data………………………………………32

        A.    Proof of Fraud………………………………………………32

        B.    Intent to Defraud……………………………………………37

    IV.    Manipulating Salary Information………………………………………40

    V.    Challenging the *Status Quo*……………………………………...42

    VI.    Role of the ABA……………………………………………………45

CLASS ACTION ALLEGATIONS……………………………………………………50

FIRST CAUSE OF ACTION…………………………………………………………………53

SECOND CAUSE OF ACTION………………………………………………………...56

THIRD CAUSE OF ACTION…………………………………………………………...60

PRAYER FOR RELIEF…………………………………………………………………63

Plaintiffs, acting for themselves and for all persons who currently attend or graduated from the Thomas M. Cooley Law School during the relevant time period (collectively "Plaintiffs"), allege as follows. Plaintiffs' allegations are based on the investigation of counsel, including but not limited to reviews of advertising and marketing material, various publicly available information and interviews of former students, and are thus made on information and belief, except as to individual actions of Plaintiffs, as to which Plaintiffs have personal knowledge.

## PRELIMINARY STATEME NT

*"Sunlight is the Best Disinfectant"* – Justice Louis Brandeis

1.      This action seeks to remedy a systemic, ongoing fraud that is ubiquitous in the legal education industry and threatens to leave a generation of law students in dire financial straits. Essentially, Plaintiffs want to bring an element of "sunlight" or transparency to the way law schools report post-graduate employment data and salary information, by requiring that they make critical, material disclosures that will give both prospective and current students a more accurate picture of their post-graduate financial situation, as opposed to the *status quo* where law schools are incentivized to engage in all sorts of legerdemain when tabulating employment statistics.

2.      Churning out nearly 1,000 newly-minted JD graduates each year, the Thomas M. Cooley School of Law ("Thomas Cooley," "TCLS," or "Defendants") is by far the largest law school in the country with approximately 4,000 students spread out across four campuses, the overwhelming majority of whom -- 82 percent -- are enrolled on a part-time basis. Indeed, Thomas Cooley's enormous class size and diverse student body is a point of pride for the school, which expressly markets itself as being "committed to providing a legal education to people from

all walks of life." To that end, Thomas Cooley in its Mission Statement represents that its underlying purpose is to "prepare its graduates for entry into the legal profession through an integrated program with practical legal scholarship as its guiding principle and focus," by imbuing them with the requisite skills and knowledge "needed to be a success in the law and a valuable member of society."

3. Unfortunately, in reality, far from preparing its many, many students for entry into the legal profession and imbuing them with the skills and knowledge necessary to succeed in law, the school consigns most of them to years of indentured servitude, saddling them with tens of thousands of dollars in crushing, non-dischargeable debt that will take literally decades to pay off. The school has done this while blatantly misrepresenting and manipulating its employment statistics to prospective students, employing the type of "Enron-style" accounting techniques that would leave most for-profit companies facing the long barrel of a government investigation and the prospect of paying a substantial civil fine. These deceptions are perpetuated so as to prevent prospective students from realizing the obvious -- that attending Thomas Cooley and forking over nearly $100,000 in tuition payments is a terrible investment which makes little economic sense and, most likely, will never pay off.

4. Specifically, Thomas Cooley, through both print and internet marketing materials it produced and disseminated, makes **two uniform, written misrepresentations**:

a. First, from August 11, 2005 to the present ("Class Period"), TCLS reported with "Madoff"-like consistency that, depending on the year, between 76 and 82 percent of its graduates secured employment within nine months of graduation. The context of these representations make it appear to the reasonable consumer, such as Plaintiffs, that the jobs reported are <u>full-time, permanent positions for which a law degree is required or preferred.</u>

These numbers are false because Thomas Cooley's reported employment numbers include *any* type of employment, including jobs that have absolutely nothing to do with the legal industry, do not require a JD degree or are temporary or part-time in nature. If TCLS was to disclose the number of graduates who have secured full-time, permanent positions for which a JD degree is required or preferred, the numbers would drop dramatically, and could be well below *25 percent*, if not even lower.

        b.      Second, during the Class Period, TCLS grossly inflated its graduates' reported mean salaries, by calculating them based on a small, deliberately selected subset of graduates who submit their salary information. If the Defendants were to disclose salary data based on a broad, statistically meaningful representation of its graduates, by including more graduates who have failed to secure full-time, permanent employment, the reported mean salaries would decline precipitously.

        5.      Thomas Cooley's representations are demonstrably false for the following reasons:

        a.      Thomas Cooley's reported placement rates and salary information have remained eerily steady throughout the past decade, even though the total number of graduates from 2004 to 2009 has increased from 404 to 958 students -- an astounding *137 percent*. Indeed, TCLS's own internal documents reveal that school administrators during this period of unparalleled growth were concerned that larger classes would diminish their graduates' job prospects, but no meaningful change in the employment statistics materialized, and TCLS's placement rate barely budged from 82 to 78 percent between those years.

        b.      Thomas Cooley's reported placement rates and salary information have barely dipped since the onslaught of the "Great Recession," as the placement rates for the Class

3

of 2009 was an impressive 78 percent and 76 percent for the Class of 2010.   Currently, the legal employment market is highly oversaturated, with law schools churning out 43,000 JD degrees each year, even though roughly half as many jobs are available (26,000).  Yet, with legal jobs becoming increasingly scarce, Thomas Cooley, instead of telling the sobering truth to prospective and current students, continues to make the fantastical claim that the overwhelming majority of its graduates are gainfully employed.

        c.     As set forth in painstaking detail below, the employment and salary data reported by Thomas Cooley are at odds with employment statistics reported by NALP, meaning that for TCLS's statistics to be accurate it would likely need to be placing students well above the 40 percent of law school graduates nationally who secure full-time, permanent legal employment, despite its extremely lenient admission standards and being ranked in the bottom tier by every major law school rankings.

        6.     Unfortunately, Thomas Cooley's false and fraudulent representations and omissions are endemic in the law school industry, as nearly every school to a certain degree blatantly manipulates their employment data to make themselves more attractive to prospective students.   It is a dirty industry secret that law schools employ a variety of deceptive practices and accounting legerdemain to "pretty up" or "cook" the job numbers, including, among other things, hiring recent unemployed graduates as "research assistants" or providing them with "public interest" stipends so as to classify them as employed, excluding graduates who do not supply employment information from employment surveys, refusing to categorize unemployed graduates who are not "actively" seeking employment as unemployed and classifying graduates who have only secured temporary, part-time employment as being "fully" employed.

7.    Compounding problems, there is no place where prospective students can find Thomas Cooley's real employment numbers.  Indeed, the school provides the same dubious statistics to the *U.S. News & World Report* ("*US News*") and the American Bar Association ("ABA"), the two primary sources of information for law school employment data.  Like Thomas Cooley, these sources count as "employed" those who have secured employment in *any* capacity in *any* kind of job, no matter how unrelated to the legal field.

8.    By playing fast and loose with its employment data, Thomas Cooley creates an impression of bountiful employment opportunity that in reality does not exist, and bamboozles Plaintiffs into taking on substantial debt to finance their TCLS education.   According to *US News*, TCLS students graduate on average with a whopping $105,798 in loans, with over 90 percent of them assuming debt to attend the school.  The current annual tuition for full-time students at Thomas Cooley is $36,750, excluding thousands of dollars in living expenses, making it one of the more expensive law schools in the country, despite the fact that it is ranked in the fourth or bottom tier by the *U.S. News* in their annual law school rankings.

9.    To a remarkable degree, Thomas Cooley and the law school industry in general have been astonishingly successful in deceiving prospective students about the value of a law degree in an effort to maintain and increase both enrollment and tuition.  Last year, a record 51,426 first-year students enrolled in law schools, up by over 60 percent from 1971, while Thomas Cooley has enrolled over 1,500 first-year students in each of the past six years. Additionally, tuition at Thomas Cooley -- much like the rest of the law school industry -- has risen exponentially over the past two decades, far exceeding both inflation and any increase in attorneys' starting salaries, and since 2006 alone has risen by an incredible $12,000 or nearly 50 percent.

10.     The dramatic increase in law school tuition has dovetailed with the dramatic increase in faculty compensation, a fact which is especially true at Thomas Cooley where the faculty have handsomely profited at their students' expense.  For example, for the fiscal year 2008, Thomas Cooley Dean, Don LeDuc, earned a staggering $548,047 in total compensation and additional $523,213 for the fiscal year 2009, making him one of the highest paid law school deans in the country, while retired Dean and school founder, Thomas Brennan, earned nearly $370,000 in total compensation both during 2008 and 2009.

11.     After much public hand-wringing and increased scrutiny, the legal profession has finally begun to recognize the systemic fraud the law school industry has been perpetuating. Senator Barbara Boxer of California and Senator Charles Grassley of Iowa have each sent multiple letters to the President of the ABA, taking the organization to task for failing to properly police the law school industry.  Additionally, a coalition of 55 law school student body presidents have sent to Congress proposed legislation that would, among other things, create new reporting standards for employment data, require law schools to submit annual employment reports to the Department of Education ("DOE"), and empower the DOE to audit these reports. The problem has grown so acute that even both the current and past presidents of the California Bar Association in much publicized op-ed pieces each separately implored law school deans to adopt more rigorous reporting standards by disclosing the type of detailed employment and salary information that would allow students to get a more realistic picture of their post-graduate financial situation.

12.     These entreaties had fallen mostly on deaf ears until now, as the ABA's committee on accrediting law schools has just recently enacted guidelines that would expressly require law schools to report their true post-graduate employment rate, by disclosing the type of

6

information Plaintiffs are seeking here: the exact percentage of graduates who have obtained permanent, full-time legal employment.  Specifically, law schools will be required to break down their employment data so as to indicate whether a position is full-time or part-time, permanent or temporary, funded by the law school or an affiliated university, and whether bar passage or a JD degree is required or preferred.   Unfortunately, these changes come too late for Plaintiffs since they have already taken on tens of thousands of dollars in non-dischargeable debt based on Thomas Cooley's deceptive and misleading statements.   Moreover, there is no means by which Plaintiffs can obtain relief from the ABA because the organization specifically disallows disputes between individuals and approved law schools and the Federal Department of Education has no mechanism in place to entertain such concerns, nor are such statutorily authorized.

13.     Accordingly, Plaintiffs now seek to vindicate their interests through the court system and hold Thomas Cooley accountable for its deceptive and misleading practices. This action asserts claims: a) under Michigan's Consumer Protection Act, MCLS §445.901, *et seq.* (the "MCPA"); b) for Fraud; and c) for Negligent Misrepresentation.   Plaintiffs seek damages and equitable relief on behalf of the class, which includes but is not limited to the following: refunding and reimbursing current and former students for a portion of the tuition paid to Thomas Cooley; an order enjoining Thomas Cooley from continuing to market its false and inaccurate employment data and salary information; an order requiring that TCLS retains a third party to independently audit all employment and salary data; costs and expenses, including attorneys' and experts' fees; and any additional relief that this Court determines to be necessary or appropriate to provide complete relief to Plaintiffs and the class.

## JURISDICTION AND VENUE

13.     This Court has original jurisdiction over this action under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2)("CAFA"), as to the named Plaintiffs and every member of the Class, because the proposed Class contains more than 100 members, the aggregate amount of controversy exceeds $5 million, less than two-thirds of the members reside in Michigan, and members reside across the U.S. and are therefore diverse from the Defendants.

14.     The Court has personal jurisdiction in this action by virtue of the fact that Defendants are based and headquartered in Michigan and have conducted business in Michigan.

15.     Venue is proper in this District pursuant to 28 U.S.C. 1391(b) inasmuch as the unlawful practices are alleged to have been committed in this District, Defendants regularly conduct business in this District, including operating its flagship Lansing campus, and at least some of the Plaintiffs reside in this District.

**PARTIES**

I.      **Plaintiffs**

16.     John T. MacDonald Jr. is a practicing attorney in Lansing, Michigan who is currently a member in good standing of the Michigan Bar.  Prior to attending law school, Mr. MacDonald was a commissioned Naval Officer who served for four years with distinction before receiving an honorable discharge.  Mr. MacDonald graduated from Thomas Cooley's Lansing campus in 2010, and in total paid tens of thousands of dollars in tuition and fees to the school while incurring tens of thousands of dollars more in debt.  Mr. MacDonald did not enroll in Thomas Cooley with the intention of using his JD degree for an ongoing business or to start a non-legal business, but rather intended to use his JD degree to prospectively better himself and his personal circumstances through the attainment of full-time employment in the legal sector.  In applying and deciding to remain enrolled at Thomas Cooley, Mr. MacDonald relied on salary

8

data and employment information posted on TCLS's website, marketing material and/or disseminated to third-party data clearinghouses and publications, such as the ABA and *US News*, and specifically relied on TCLS's representations that, depending on the year, approximately 80 percent of its graduates were employed within nine months of graduation and earned a median salary of roughly $50,000.  Indeed, prior to Mr. McDonald's enrolling in Thomas Cooley, the school posted on its website an employment report asserting that 82 percent of 2005 graduates secured employment within nine of graduation, and while Mr. McDonald was enrolled in TCLS the school posted on its website an employment report asserting that 82 percent of 2006 graduates secured employment within nine months of graduation.  Furthermore, Mr. MacDonald when applying and deciding to remain enrolled in Thomas Cooley was unaware that the school's reported placement rates included temporary and part-time employment and/or employment for which a JD was not required or preferred -- employment Mr. MacDonald would have been eligible for even without obtaining a JD degree and paying TCLS's tuition.  Had Mr. MacDonald been aware that Thomas Cooley's reported placement rates included temporary and part-time employment and/or employment for which a JD was not required or preferred, he would have elected to either pay less to TCLS or perhaps not attend the school at all.  Following his graduation from law school, Mr. MacDonald could not find full-time, permanent legal employment and was forced to open up his own law firm which he currently still operates.

17.     Chelsea A. Pejic is a practicing attorney in Chicago, Illinois who is currently a member in good standing of the Illinois Bar.  Ms. Pejic graduated from Thomas Cooley's Lansing campus in 2006, and in total paid tens of thousands of dollars in tuition and fees to the school while incurring tens of thousands of dollars more in debt.  Ms. Pejic did not enroll in Thomas Cooley with the intention of using her JD degree for an ongoing business or to start a

9

non-legal business, but rather intended to use her JD degree to prospectively better herself and her personal circumstances through the attainment of full-time employment in the legal sector. In applying and deciding to remain enrolled at Thomas Cooley, Ms. Pejic relied on salary data and employment information posted on TCLS's website, marketing material and/or disseminated to third-party data clearinghouses and publications, such as the ABA and *US News*, and specifically relied on TCLS's representations that, depending on the year, approximately 80 percent of its graduates were employed within nine months of graduation and earned a median salary of roughly $50,000.  Indeed, prior to Ms. Pejic's enrolling in Thomas Cooley, the school posted on its website employment reports asserting that 79 percent of 2002 graduates secured employment within nine of graduation, and while Ms. Pejic was enrolled in TCLS the school posted on its website employment reports asserting that 77 percent of 2003 graduates and 79 percent of 2004 graduates secured employment within nine months of graduation.  Furthermore, Ms. Pejic when applying and deciding to remain enrolled in Thomas Cooley was unaware that the school's reported placement rates included temporary and part-time employment and/or employment for which a JD was not required or preferred -- employment Ms. Pejic would have been eligible for even without obtaining a JD degree and paying TCLS's tuition.  Had Ms. Pejic been aware that Thomas Cooley's reported placement rates included temporary and part-time employment and/or employment for which a JD was not required or preferred, she would have elected to either pay less to TCLS or perhaps not attend the school at all.  Following her graduation from law school, Ms. Pejic, despite circulating hundreds of resumes, could not obtain gainful legal employment and was forced to endure a long bout of unemployment.  She has also worked as a voluntary staff attorney and a temporary contract attorney, while also operating for a brief period of time her own firm.

18.     Shawn Haff is a practicing attorney in Grand Rapids, Michigan who is currently a member in good standing of the Michigan Bar.  Mr. Haff graduated from Thomas Cooley's Grand Rapids campus in 2010, and in total paid tens of thousands of dollars in tuition and fees to the school while incurring tens of thousands of dollars more in debt.  Mr. Haff did not enroll in Thomas Cooley with the intention of using his JD degree for an ongoing business or to start a non-legal business, but rather intended to use his JD degree to prospectively better himself and his personal circumstances through the attainment of full-time employment in the legal sector.  In applying and deciding to remain enrolled at Thomas Cooley, Mr. Haff relied on salary data and employment information posted on TCLS's website, marketing material and/or disseminated to third-party data clearinghouses and publications, such as the ABA and *US News*, and specifically relied on TCLS's representations that, depending on the year, approximately 80 percent of its graduates were employed within nine months of graduation and earned a median salary of roughly $50,000.  Indeed, prior to Mr. Haff's enrolling in Thomas Cooley, the school posted on its website an employment report asserting that 82 percent of 2005 graduates secured employment within nine of graduation, and while Mr. Haff was enrolled in TCLS the school posted on its website an employment report asserting that 82 percent of 2006 graduates secured employment within nine months of graduation.  Furthermore, Mr. Haff when applying and deciding to remain enrolled in Thomas Cooley was unaware that the school's reported placement rates included temporary and part-time employment and/or employment for which a JD was not required or preferred -- employment Mr. Haff would have been eligible for even without obtaining a JD degree and paying TCLS's tuition.  Had Mr. Haff been aware that Thomas Cooley's reported placement rates included temporary and part-time employment and/or employment for which a JD was not required or preferred, he would have elected to either pay

11

less to TCLS or perhaps not attend the school at all. Following his graduation from law school, Mr. Haff could not find full-time, permanent legal employment and was forced to take temporary, contract assignments reviewing documents in order to make ends meet.  Currently, he owns and operates his own law firm.

19.     Steven Baron currently resides in Los Angeles, California.  He graduated from Thomas Cooley's Lansing campus in 2008, and in total paid tens of thousands of dollars in tuition and fees to the school while incurring tens of thousands of dollars more in debt.  Mr. Baron did not enroll in Thomas Cooley with the intention of using his JD degree for an ongoing business or to start a non-legal business, but rather intended to use his JD degree to prospectively better himself and his personal circumstances through the attainment of full-time employment in the legal sector.  In applying and deciding to remain enrolled at Thomas Cooley, Mr. Baron relied on salary data and employment information posted on TCLS's website, marketing material and/or disseminated to third-party data clearinghouses and publications, such as the ABA and *US News*, and specifically relied on TCLS's representations that, depending on the year, approximately 80 percent of its graduates were employed within nine months of graduation and earned a median salary of roughly $50,000.  Indeed, prior to Mr. Baron's enrolling in Thomas Cooley, the school posted on its website employment reports asserting that 77 percent of 2003 graduates and 79 percent of 2004 graduates secured employment within nine of graduation, and while Mr. Baron was enrolled in TCLS the school posted on its website employment reports asserting that 82 percent of 2005 and 2006 graduates secured employment within nine months of graduation.  Furthermore, Mr. Baron when applying and deciding to remain enrolled in Thomas Cooley was unaware that the school's reported placement rates included temporary and part-time employment, and/or employment for which a JD was not required or preferred -- employment

Mr. Baron would have been eligible for even without obtaining a JD degree and paying TCLS's tuition. Had Mr. Baron been aware that Thomas Cooley's reported placement rates included temporary and part-time employment and/or employment for which a JD was not required or preferred, he would have elected to either pay less to TCLS or perhaps not attend the school at all. Following his graduation from law school, Mr. Baron, despite circulating hundreds of resumes, has been unable to obtain any kind of sustained employment and is currently unemployed.

20.     Dimple Kumar is a practicing attorney in New York who is currently a member in good standing of the New York Bar. Mr. Kumar graduated from Thomas Cooley's Lansing campus in January 2009, and in total paid tens of thousands of dollars in tuition and fees to the school while incurring tens of thousands of dollars more in debt. Mr. Kumar did not enroll in Thomas Cooley with the intention of using his JD degree for an ongoing business or to start a non-legal business, but rather intended to use his JD degree to prospectively better himself and his personal circumstances through the attainment of full-time employment in the legal sector. In applying and deciding to remain enrolled at Thomas Cooley, Mr. Kumar relied on salary data and employment information posted on TCLS's website, marketing material and/or disseminated to third-party data clearinghouses and publications, such as the ABA and *US News*, and specifically relied on TCLS's representations that, depending on the year, approximately 80 percent of its graduates were employed within nine months of graduation and earned a median salary of roughly $50,000. Indeed, prior to Mr. Kumar's enrolling in Thomas Cooley, the school posted on its website employment reports asserting that 77 percent of 2003 graduates and 79 percent of 2004 graduates secured employment within nine of graduation, and while Mr. Kumar was enrolled in TCLS the school posted on its website employment reports asserting that 82

percent of 2005 and 2006 graduates secured employment within nine months of graduation. Furthermore, Mr. Kumar when applying and deciding to remain enrolled in Thomas Cooley was unaware that the school's reported placement rates included temporary and part-time employment and/or employment for which a JD was not required or preferred -- employment Mr. Kumar would have been eligible for even without obtaining a JD degree and paying TCLS's tuition. Had Mr. Kumar been aware that Thomas Cooley's reported placement rates included temporary and part-time employment and/or employment for which a JD was not required or preferred, he would have elected to either pay less to TCLS or perhaps not attend the school at all. Following his graduation from law school, Mr. Kumar could not find full-time, permanent legal employment for over nine months and was forced to take temporary, contract assignments reviewing documents in order to make ends meet, until he found full-time employment practicing landlord-tenant law. Currently, he owns and operates his own law firm.

21.     Carrie Kalbfleisch is a practicing attorney in Shelbyville, Kentucky who is currently a member in good standing of the Kentucky Bar. Ms. Kalbfleisch graduated from Thomas Cooley's Lansing campus in 2010, and in total paid tens of thousands of dollars in tuition and fees to the school while incurring tens of thousands of dollars more in debt. Ms. Kalbfleisch did not enroll in Thomas Cooley with the intention of using her JD degree for an ongoing business or to start a non-legal business, but rather intended to use her JD degree to prospectively better herself and her personal circumstances through the attainment of full-time employment in the legal sector. In applying and deciding to remain enrolled at Thomas Cooley, Ms. Kalbfleisch relied on salary data and employment information posted on TCLS's website, marketing material and/or disseminated to third-party data clearinghouses and publications, such as the ABA and *US News*, and specifically relied on TCLS's representations that, depending on

the year, approximately 80 percent of its graduates were employed within nine months of graduation and earned a median salary of roughly $50,000.  Indeed, prior to Ms. Kalbfleisch's enrolling in Thomas Cooley, the school posted on its website an employment report asserting that 82 percent of 2005 graduates secured employment within nine of graduation, and while Ms. Kalbfleisch was enrolled in TCLS the school posted on its website an employment report asserting that 82 percent of 2006 graduates secured employment within nine months of graduation. Furthermore, Ms. Kalbfleisch when applying and deciding to remain enrolled in Thomas Cooley was unaware that the school's reported placement rates included temporary and part-time employment and/or employment for which a JD was not required or preferred -- employment Ms. Kalbfleisch would have been eligible for even without obtaining a JD degree and paying TCLS's tuition.  Had Ms. Kalbfleisch been aware that Thomas Cooley's reported placement rates included temporary and part-time employment and/or employment for which a JD was not required or preferred, she would have elected to either pay less to TCLS or perhaps not attend the school at all.  Following her graduation from law school, Ms. Kalbfleisch started her own law firm.

22.     Dan Guinn is a practicing attorney in Ohio who is currently a member in good standing of the Ohio Bar.  Prior to attending both college and law school, Mr. Guinn served for over eight years in the United States Navy.  Mr. Guinn graduated from Thomas Cooley's Lansing campus in 2009, and in total paid tens of thousands of dollars in tuition and fees to the school while incurring tens of thousands of dollars more in debt.  Mr. Guinn did not enroll in Thomas Cooley with the intention of using his JD degree for an ongoing business or to start a non-legal business, but rather intended to use his JD degree to prospectively better himself and his personal circumstances through the attainment of full-time employment in the legal sector.  In

applying and deciding to remain enrolled at Thomas Cooley, Mr. Guinn relied on salary data and employment information posted on TCLS's website, marketing material and/or disseminated to third-party data clearinghouses and publications, such as the ABA and *US News*, and specifically relied on TCLS's representations that, depending on the year, approximately 80 percent of its graduates were employed within nine months of graduation and earned a median salary of roughly $50,000. Indeed, prior to Mr. Guinn's enrolling in Thomas Cooley, the school posted on its website an employment report asserting that 82 percent of 2005 graduates secured employment within nine of graduation, and while Mr. Guinn was enrolled in TCLS the school posted on its website an employment report asserting that 82 percent of 2006 graduates secured employment within nine months of graduation. Furthermore, Mr. Guinn when applying and deciding to remain enrolled in Thomas Cooley was unaware that the school's reported placement rates included temporary and part-time employment and/or employment for which a JD was not required or preferred -- employment Mr. Guinn would have been eligible for even without obtaining a JD degree and paying TCLS's tuition. Had Mr. Guinn been aware that Thomas Cooley's reported placement rates included temporary and part-time employment and/or employment for which a JD was not required or preferred, he would have elected to either pay less to TCLS or perhaps not attend the school at all. Following his graduation from law school, Mr. Guinn could not find full-time, permanent legal employment and was forced to take temporary, contract assignments reviewing documents in order to make ends meet. Currently, he owns and operates his own law firm.

23.     Anders Christensen is a practicing attorney in Utah who is currently a member in good standing of the Utah Bar. Mr. Christenson graduated from Thomas Cooley's Lansing campus in 2010, and in total paid tens of thousands of dollars in tuition and fees to the school

while incurring tens of thousands of dollars more in debt. Mr. Christensen did not enroll in Thomas Cooley with the intention of using his JD degree for an ongoing business or start a non-legal business, but rather intended to use his JD degree to prospectively better himself and his personal circumstances through the attainment of full-time employment in the legal sector. In applying and deciding to remain enrolled at Thomas Cooley, Mr. Christensen relied on salary data and employment information posted on TCLS's website, marketing material and/or disseminated to third-party data clearinghouses and publications, such as the ABA and *US News*, and specifically relied on TCLS's representations that, depending on the year, approximately 80 percent of its graduates were employed within nine months of graduation and earned a median salary of roughly $50,000. Indeed, prior to Mr. Christensen's enrolling in Thomas Cooley, the school posted on its website an employment report asserting that 82 percent of 2005 graduates secured employment within nine of graduation, and while Mr. Christensen was enrolled in TCLS the school posted on its website an employment report asserting that 82 percent of 2006 graduates secured employment within nine months of graduation. Furthermore, Mr. Christensen when applying and deciding to remain enrolled in Thomas Cooley was unaware that the school's reported placement rates included temporary and part-time employment and/or employment for which a JD was not required or preferred -- employment Mr. Christensen would have been eligible for even without obtaining a JD degree and paying TCLS's tuition. Had Mr. Christensen been aware that Thomas Cooley's reported placement rates included temporary and part-time employment and/or employment for which a JD was not required or preferred, he would have elected to either pay less to TCLS or perhaps not attend the school at all. Following his graduation from law school, Mr. Christensen worked as a law clerk for a Utah law firm, and is currently an associate at the same firm.

24.     Danny Wakefield currently does not practice law even though he has passed the

Utah Bar Exam and used to be a member in good standing of the Utah Bar until he voluntarily

assumed inactive status due to the fact that he was unable to obtain any type of employment in

the legal industry.  Mr. Wakefield graduated from Thomas Cooley's Lansing campus in 2007,

and in total paid tens of thousands of dollars in tuition and fees to the school while incurring tens

of thousands of dollars more in debt.  Mr. Wakefield did not enroll in Thomas Cooley with the

intention of using his JD degree for an ongoing business or to start a non-legal business, but

rather intended to use his JD degree to prospectively better himself and his personal

circumstances through the attainment of full-time employment in the legal sector.  In applying

and deciding to remain enrolled at Thomas Cooley, Mr. Wakefield relied on salary data and

employment information posted on TCLS's website, marketing material and/or disseminated to

third-party data clearinghouses and publications, such as the ABA and *US News*, and specifically

relied on TCLS's representations that, depending on the year, approximately 80 percent of its

graduates were employed within nine months of graduation and earned a median salary of

roughly $50,000.  Indeed, prior to Mr. Wakefield's enrolling in Thomas Cooley, the school

posted on its website employment reports asserting that 79 percent of 2002 graduates and 77

percent of 2003 graduates secured employment within nine of graduation, and while Mr.

Wakefield was enrolled in TCLS the school posted on its website employment reports asserting

that 79 percent of 2004 graduates and 82 percent of 2005 graduates secured employment within

nine months of graduation.  Furthermore, Mr. Wakefield when applying and deciding to remain

enrolled in Thomas Cooley was unaware that the school's reported placement rates included

temporary and part-time employment and/or employment for which a JD was not required or

preferred -- employment Mr. Wakefield would have been eligible for even without obtaining a

18

JD degree and paying TCLS's tuition. Had Mr. Wakefield been aware that Thomas Cooley's reported placement rates included temporary and part-time employment and/or employment for which a JD was not required or preferred, he would have elected to either pay less to TCLS or perhaps not attend the school at all. Following his graduation from law school, Mr. Wakefield was unable to find any type of employment in the legal sector, and currently manages the deliveries of telephone books.

25.     Benjamin Forsgren is a contracts manager in Utah who is currently a member in good standing of the Utah Bar. Mr. Forsgren graduated from Thomas Cooley's Lansing campus in 2008, and in total paid tens of thousands of dollars in tuition and fees to the school while incurring tens of thousands of dollars more in debt. Mr. Forsgren did not enroll in Thomas Cooley with the intention of using his JD degree for an ongoing business or to start a non-legal business, but rather intended to use his JD degree to prospectively better himself and his personal circumstances through the attainment of full-time employment in the legal sector. In applying and deciding to remain enrolled at Thomas Cooley, Mr. Forsgren relied on salary data and employment information posted on TCLS's website, marketing material and/or disseminated to third-party data clearinghouses and publications, such as the ABA and *US News*, and specifically relied on TCLS's representations that, depending on the year, approximately 80 percent of its graduates were employed within nine months of graduation and earned a median salary of roughly $50,000. Indeed, prior to Mr. Forsgren's enrolling in Thomas Cooley, the school posted on its website employment reports asserting that 77 percent of 2003 graduates and 79 percent of 2004 graduates secured employment within nine of graduation, and while Mr. Forsgren was enrolled in TCLS the school posted on its website employment reports asserting that 82 percent of 2005 and 2006 graduates secured employment within nine months of graduation.

Furthermore, Mr. Forsgren when applying and deciding to remain enrolled in Thomas Cooley was unaware that the school's reported placement rates included temporary and part-time employment and/or employment for which a JD was not required or preferred -- employment Mr. Forsgren would have been eligible for even without obtaining a JD degree and paying TCLS's tuition.  Had Mr. Forsgren been aware that Thomas Cooley's reported placement rates included temporary and part-time employment and/or employment for which a JD was not required or preferred, he would have elected to either pay less to TCLS or perhaps not attend the school at all. Following his graduation from law school, Mr. Forsgren has worked as a contracts manager at a company in Utah.

26.  Shane Hobbs currently resides in Pennsylvania.  Mr. Hobbs graduated from Thomas Cooley's Lansing campus in 2010, and in total paid tens of thousands of dollars in tuition and fees to the school while incurring tens of thousands of dollars more in debt.  Mr. Hobbs did not enroll in Thomas Cooley with the intention of using his JD degree for an ongoing business or to start a non-legal business, but rather intended to use his JD degree to prospectively better himself and his personal circumstances through the attainment of full-time employment in the legal sector.  In applying and deciding to remain enrolled at Thomas Cooley, Mr. Hobbs relied on salary data and employment information posted on TCLS's website, marketing material and/or disseminated to third-party data clearinghouses and publications, such as the ABA and *US News*, and specifically relied on TCLS's representations that, depending on the year, approximately 80 percent of its graduates were employed within nine months of graduation and earned a median salary of roughly $50,000.  Indeed, prior to Mr. Hobbs's enrolling in Thomas Cooley, the school posted on its website an employment report asserting that 82 percent of 2005 graduates secured employment within nine of graduation, and while Mr. Hobbs was enrolled in

TCLS the school posted on its website an employment report asserting that 82 percent of 2006 graduates secured employment within nine months of graduation. Furthermore, Mr. Hobbs when applying and deciding to remain enrolled in Thomas Cooley was unaware that the school's reported placement rates included temporary and part-time employment and/or employment for which a JD was not required or preferred -- employment Mr. Hobbs would have been eligible for even without obtaining a JD degree and paying TCLS's tuition.  Had Mr. Hobbs been aware that Thomas Cooley's reported placement rates included temporary and part-time employment and/or employment for which a JD was not required or preferred, he would have elected to either pay less to TCLS or perhaps not attend the school at all.  Following his graduation from law school, Mr. Hobbs has been unable to secure any type of legal employment, and has worked as a substitute teacher and day laborer at a golf course.

27.     Kevin Prince is a practicing attorney in Michigan who is currently a member in good standing of the Michigan Bar.  Mr. Prince graduated from Thomas Cooley's Lansing campus in 2009, and in total paid tens of thousands of dollars in tuition and fees to the school while incurring tens of thousands of dollars more in debt.  Mr. Prince did not enroll in Thomas Cooley with the intention of using his JD degree for an ongoing business or to start a non-legal business, but rather intended to use his JD degree to prospectively better himself and his personal circumstances through the attainment of full-time employment in the legal sector.  In applying and deciding to remain enrolled at Thomas Cooley, Mr. Prince relied on salary data and employment information posted on TCLS's website, marketing material and/or disseminated to third-party data clearinghouses and publications, such as the ABA and *US News*, and specifically relied on TCLS's representations that, depending on the year, approximately 80 percent of its graduates were employed within nine months of graduation and earned a median salary of

roughly $50,000. Indeed, prior to Mr. Prince's enrolling in Thomas Cooley, the school posted on its website an employment report asserting that 82 percent of 2005 graduates secured employment within nine of graduation, and while Mr. Prince was enrolled in TCLS the school posted on its website an employment report asserting that 82 percent of 2006 graduates secured employment within nine months of graduation. Furthermore, Mr. Prince when applying and deciding to remain enrolled in Thomas Cooley was unaware that the school's reported placement rates included temporary and part-time employment and/or employment for which a JD was not required or preferred -- employment Mr. Prince would have been eligible for even without obtaining a JD degree and paying TCLS's tuition. Had Mr. Prince been aware that Thomas Cooley's reported placement rates included temporary and part-time employment and/or employment for which a JD was not required or preferred, he would have elected to either pay less to TCLS or perhaps not attend the school at all. Following his graduation from law school, Mr. Prince was forced to take temporary, contract assignments reviewing documents in order to make ends meet, until finding full-time, permanent employment nearly a year after graduating from law school.

## II.   <u>Defendants</u>

28.     Defendant Thomas Cooley is an ABA accredited law school and non-profit corporation headquartered in Lansing, Michigan, but with satellite campuses also in Ann Arbor, Auburn Hills and Grand Rapids. For the 2010-2011 academic year, it enrolled a total of 4,001 students, 82 percent of whom are matriculated on a part-time basis. The current annual tuition for full-time students at Thomas Cooley is $36,750, while miscellaneous costs such as room, board and living expenses bring the total cost to attending TCLS to an estimated $52,000. For the fiscal year 2009, Thomas Cooley's total operating revenue was $117,577,686 including

$108,979,296 in tuition fees, and its total operating costs are $97,196,760, including $47,158,197 in monies paid out for employees' salaries.   In the past two years, the school has paid its Dean, Don LeDuc, $548,047 and $523,213 in total compensation, while still paying its former Dean and school founder, Thomas Brennan, $368,581 in total compensation for 2008 and $370, 245 for 2009.  Thomas Cooley's 11 other highest paid employees earned between $200,225 and $249,499 in total compensation respectively.

29.     The true names and capacities (whether individual, corporate, associate or otherwise) of Defendants Does 1 though 20, inclusive, are unknown to Plaintiffs.  Plaintiffs sue these Defendants by fictitious names and will seek leave to amend this Complaint after their identities are learned.  Each fictitious Defendant contributed to the acts and practices alleged herein.  Plaintiffs are informed and believe that the fictitiously named Defendants proximately caused Plaintiffs' damages.

## FACTUAL ALLEGATIONS

**I.      Background Information**

**A.      A Veritable "JD Factory"**

30.     Churning out nearly 1,000 newly-minted JD graduates each year, Thomas Cooley is by far the largest law school in the country with approximately 4,000 students spread out across four campuses, the overwhelming majority of whom -- 82 percent -- are enrolled on a part-time basis.   Just recently, on August 8, 2011, Thomas Cooley announced that it will be opening a Tampa Bay-area campus in Riverview, Florida in May 2012 that can accommodate a planned enrollment of 700 students.

31.     According to *US News*, Thomas Cooley has the lowest admissions standards of any accredited or provisionally accredited law school in the country.  For 2010, it accepted 83

percent of all applicants, an acceptance rate that is nearly 15 percentage points more than the second least selective law school, Phoenix School of Law.  The mean LSAT score for incoming students is 146 and the mean undergraduate GPA is 2.99, both lows for all accredited and provisionary accredited law schools.

32.     Yet despite its relatively lax admissions standards, remaining enrolled in Thomas Cooley is quite difficult, as the school has, comparatively speaking, lackluster retention rates.  For example, in 2008 almost <u>32 percent</u> of the roughly 1,500 students who enrolled in Thomas Cooley failed to matriculate for their second year, while, incredibly, second-year students still enjoyed an attrition rate of 10 percent.  Even 22 third-year students -- approximately three percent of the class -- either failed or dropped out during the academic year.  Indeed, failing out hundreds of students each year seems to be an essential part of Thomas Cooley's business model, which is to enroll the maximum number of students, regardless of whether they are adequately prepared for law school, all the while retaining millions of dollars in tuition fees.

**B.      Becoming "America's Largest Law School"**
**While Maintaining an 80 Percent Placement Rate**

33.      Beginning in the early 2000s, Thomas Cooley embarked on a strategy to become "America's Largest Law School."  *See* "Thomas Cooley's Strategic Plan Summary June 2004 Report" (attaching Ex. 1).  Consequently, between 2001 and 2004, Thomas Cooley's entering class increased dramatically, rising from 918 students in 2001 to 1385 students in 2004, thereby fulfilling the administration's goal.  *Id.*  Likewise, as discussed *supra*, the number of graduates jumped from 404 in 2004 to 503 in 2005 to 612 in 2006 to a whopping 958 in 2009.

34.     However, in achieving this goal, the Thomas Cooley administration openly fretted that "[e]mployment remains a major challenge."  *Id* at p.3.  Yet, despite increasing its total number of graduates by an astounding *137* percent from 2004 to 2009, Thomas Cooley, defying

all rules of statistical probability and the principles of mathematics, has somehow maintained an 80 percent placement rate with "Madoff"-like consistency, even though the legal market -- especially in the State of Michigan, where the largest percentage of Thomas Cooley graduates practice -- has essentially stagnated.

    C.    **History of Unfounded Claims**

35.    In marketing itself to prospective students, Thomas Cooley makes a number of bold, if not incredulous statements that are incommensurate with its low academic and reputational standings in the legal marketplace.  For example, Dean LeDuc and former Dean Brennan publish their own law school rankings titled "Judging the Law Schools," which, coincidentally, ranks Thomas Cooley as the second "best" law school in the country, right below the top-ranked school, Harvard Law School, and well above such notable institutions as Yale, Columbia, the University of Chicago and Stanford.  These largely self-serving rankings include numerous factors that, at first glance, have little pedagogical or edifying value and have absolutely nothing to do with training students to be attorneys, such as the overall size of the student body, total minority enrollment, library total square footage, library seating capacity, and the square footage of a law school's physical premises.  Each of these factors are given equal statistical weight to other, seemingly more important factors, like bar passage rate and percentage of graduates employed.

36.    Naturally, Thomas Cooley's law school rankings have been met with great skepticism, if not outright ridicule, and no reputable academic or legal commentator takes it seriously.[1]  Nonetheless, the school continues to publish its "Judging the Law Schools" year in

---

[1] *See e.g.* Elie Mystal, "Latest Cooley Rankings Achieve New Heights of Intellectual Dishonesty," Abovethelaw.com, February 8, 2011 http://abovethelaw.com/2011/02/latest-cooley-law-school-rankings-achieve-new-heights-of-intellectual-dishonesty/ ("This, my friends, is funny.

and year out, releasing its 12th edition in February 2011, and engage in dubious marketing practices that are all too emblematic of its bottom-line mentality.

## II.   Underlying Fraud Claims

37.   Thomas Cooley is accredited by the ABA's Section of Legal Education and Admissions to the Bar.   As mandated by Section 509(a) of the ABA's 2010-2011 Standards for Approval of Law Schools ("Section 509(a)"), an accredited law school must "publish basic consumer information" in a "fair and accurate manner reflective of actual practice."  As of now and throughout the Class Period, law schools would satisfy this virtually meaningless and non-existent criterion by reporting jobs that are temporary or part-time or have absolutely nothing to do with obtaining a JD degree as "employment."

38.   Pursuant to this requirement, Thomas Cooley publishes its employment statistics on its website under the "Consumer Information" tab.   In posting the data and marketing itself to prospective students, the school includes a separate tab, titled "Alumni Success Stories," which highlights the employment achievements of recent graduates and includes glowing testimonials from graduates explaining how attending Thomas Cooley helped them secure their current positions.

### A.   Statements Constituting Fraud

39.   Currently and for the past eight months, Thomas Cooley has posted on its website the employment data and salary information for the Class of 2010, which is composed of

---

But it's also serious. Because there are real people studying at Cooley right now, and I don't think they understand how horrible it makes the school look when the administration publishes things like this… There are a lot of legal educators who hate the *U.S. News* law school rankings. There are a lot of people who think that the way *U.S. News* does things is wrong. But whatever chance you have of making your alternative rankings gain traction flies out of the window when you put yourself at #2 -- four tiers higher than where *U.S. News* has you."); *see also* Michael Kraemer, "Thomas Cooley is an Embarrassment," Politicalcartel.org, March 3, 2010, http://politicalcartel.org/2010/03/03/thomas-cooley-law-school-is-an-embarrassment/.

students who graduated in September 2009, January 2010 and May 2010.  *See* 2010 Thomas

Cooley Employment Report and Salary Survey (the "2010 Employment Report") (attaching Ex.

2).  This information is obtained by job surveys that Thomas Cooley sends out to all recent

graduates, and all information contained in this report is unaudited, unverified and self-reported.

According to the 2010 Employment Report, based on a relatively paltry response rate of 83

percent[2] (meaning that 154 of 934 graduates failed to respond to the survey), approximately 76

percent of the class were employed nine months after graduation, including 50 percent of whom

were allegedly working in private practice, 18 percent in "business," 15 percent in government,

two percent in public interest, and three percent both in judicial clerkships and academia.   The

average reported salary for the entire class was $54,796, including $52,318 for those in private

practice, $71,470 for those in "business," and $53,312 for those in government.

40.     Throughout the Class Period, Thomas Cooley has reported similar employment

reports demonstrating its graduates' purported success.  For example, for the Class of 2009,

based on a relatively paltry response rate of 84 percent[3] (i.e. 151 of 958 graduates failed to

respond to the survey), approximately 78 class were employed nine months after graduation,

including 56 percent of whom were allegedly working in private practice, 17 percent in

"business," 14 percent in government, four percent in public interest, five percent in judicial

clerkships and three percent in academia.  *See* 2009 Thomas Cooley Employment Report and

Salary Survey (the "2009 Employment Report") (attaching Ex. 3).[4]  The average salary for the

---

[2]Nationally, approximately 97 percent of 2010 law school graduates responded to their schools' employment survey.

[3]According to *US News*, Thomas Cooley's response rate was the third lowest of all accredited law schools for 2009, and nationally approximately 96 percent of 2009 graduates responded to their schools' employment survey.

[4]Upon information and belief, Defendants posted on its website the 2009 Employment Report between 2010 and 2011.

entire class was $52,000, including $52,000 for those in private practice, $61,000 for those in "business," and $50,000 for those in government.

41.     For the Class of 2006, the numbers seemed even more impressive.  Based on a relatively paltry response rate of 82 percent (i.e. 111 of 612 graduates failed to respond to the survey), approximately 82 percent of the class were employed nine months after graduation, including 47 percent of whom were allegedly working in private practice, 20 percent in "business," 17 percent in government, six percent in public interest, eight percent in judicial clerkships and two percent in academia.  *See* 2006 Thomas Cooley Employment Report and Salary Survey (the "2006 Employment Report") (attaching Ex. 4)[5].  The average salary for the entire class was $52,000, including $54,000 for those in private practice, $61,000 for those in "business," and $48,000 for those in government.

42.     For the Class of 2005, based on a shockingly low response rate of 68 percent (i.e. 161 of 503 graduates failed to respond to the survey), approximately 82 percent of the class were employed nine months after graduation, including 50 percent of whom were allegedly working in private practice, 16 percent in "business," 15 percent in government, five percent in public interest, ten percent in judicial clerkships and two percent in academia.  *See* 2005 Thomas Cooley Employment Report and Salary Survey (the "2005 Employment Report") (attaching Ex. 5).[6]  The average salary for the entire class was $49,000, including $49,000 for those in private practice, $60,000 for those in "business," and $45,000 for those in government.

43.     For the Class of 2004, based on a response rate of 82 percent (i.e. 72 out of 404 graduates failed to respond to the survey), approximately 79 percent of the class were employed

---

[5]Upon information and belief, Defendants posted on its website the 2006 Employment Report between 2007 and 2010, and did not post employment reports for 2007 and 2008.

[6]Upon information and belief, Defendants posted on its website the 2005 Employment Report between 2006 and 2007.

nine months after graduation, including 45 percent of whom were allegedly working in private practice, 16 percent in "business," 18 percent in government, ten percent in public interest, eight percent in judicial clerkships and three percent in academia.  *See* 2004 Thomas Cooley Employment Report and Salary Survey (the "2004 Employment Report") (attaching Ex. 6). [7]

44.  Throughout the Class Period, Thomas Cooley itself admits that its reported placement rates have hovered between 76 and 82 percent, "with a similar range reported back to 2000," even though its total number of graduates has increased by 137 percent over the past five years.  *See* Thomas Cooley Press Release, dated July 14, 2011 (attaching Ex. 7). [8]

45.  Tellingly, the employment reports make a number of startling factual omissions that would give prospective students a more accurate picture of their post-graduation employment prospects.  For example, Thomas Cooley simply presents an overall employment number, and fails to break down what percentage of graduates were employed in either part-time or temporary positions, or whether a job requires a JD degree.  Accordingly, based on these classifications, a graduate could be working as a barista in Starbucks -- or toiling away in *any* capacity in *any* kind of job, no matter how menial or poorly compensated or unrelated to law -- and would be deemed employed and working in "business," even though such employment is clearly temporary in nature and obviously does not require a JD degree.[9]  Similarly, a contract

---

[7] Upon information and belief, Defendants posted on its website the 2004 Employment Report between 2005 and 2006.

[8] Thomas Cooley circulated this press release upon filing two sham, SLAPP lawsuits against Plaintiffs' Counsel, David Anziska and Jesse Strauss, and four "John Doe" plaintiffs for alleged defamatory statements made over the Internet.  This crude, cynical attempt to intimidate prospective plaintiffs, chill free speech and police the Internet has been made with near universal derision, and Plaintiffs' counsel have simultaneously moved to dismiss Thomas Cooley's baseless claims and to sanction both Thomas Cooley and its attorneys.

[9] Indeed, two of the Plaintiffs, Danny Wakefield and Shane Hobbs, due to their inability to secure any type of legal employment, have been forced to work as a telephone book salesman

attorney who has yet to secure permanent employment and is forced to toil away in transitory document review projects would be deemed "employed" under Thomas Cooley's broad guidelines.

46.     Thomas Cooley also grossly inflates its graduates' reported mean salaries, by calculating them based on a small, deliberately selected subset of graduates who actually submit their salary information, thereby presenting statistically meaningless data that is not an emblematic representation of the entire class.  Thus, to take the above example, if a graduate working in Starbucks as a barista did not report his/her salary information that could potentially have a significant statistical effect on Thomas Cooley's reported mean salary for those employed in "business," lowering the number substantially from a seemingly impressive $71,470 for the Class of 2010.

### B.     Disseminating False Information to Third Parties

47.     The school also disseminates employment data and salary information to other sources that are readily available to prospective students.   In general, there are three primary sources that Thomas Cooley -- along with all other accredited law schools -- provides such information to:  *US News,* the ABA and the National Association of Law Placement ("NALP").[10] However, the *US News* and the ABA simply require law schools to report an overall employment number, and do not require schools to distinguish between part-time and full-time jobs or temporary and permanent employment.   Consequently, the data contained in these sources is

---

and as a substitute teacher/day laborer, respectively, in order to make ends meet, positions that they obviously could have obtained without a JD degree.  *See infra* ¶24, ¶ 26.

[10] All ABA-accredited and provisionally-accredited law schools are required to provide employment data to the ABA, but only submit such data to *U.S. News* and NALP on a voluntary basis.

riddled with the same legerdemain, dubious calculations and deliberate omissions as found in the employment information posted and marketed by Thomas Cooley on its website and brochures.

48.     In a letter sent to the deans of all accredited law schools, Brian Kelly, the editor-in-chief of the *US News*, essentially conceded this point, acidly noting that the "entire law school sector is perceived to be less than candid" when reporting employment data, and that many schools appear "not to treat the ABA reporting rules with the seriousness one would assume." Robert Morse, "U.S. News Urges Law School Deans to Improve Employment Data," *U.S. News & World Report*, March 9, 2011 (attaching Ex. 8).   Acknowledging the obvious, Kelly concludes, "Perhaps we need metrics besides total employment rates to evaluate a successful law program." *Id*.

49.     Nonetheless, despite knowing full well of the deficiencies in law school-supplied employment data, such information constitutes a whopping 18 percent (four percent for the employment rate upon graduation and 14 percent for the rate nine months after graduation) of a law school's ranking in *US News*, the second most important factor after a law school's peer assessment.

50.     As for NALP, law schools, when responding to their questionnaires, must not simply report an overall employment number, but specifically break down the exact type of employment their graduates have obtained, differentiating between part-time and full-time jobs or whether a position requires a JD degree.  Unfortunately, NALP does not either publish or make available to the public these questionnaires, and instead compiles and tabulates their data into a single document which contains aggregate statistical information from all law schools. *See* NALP Class of 2009 National Summary Report ("NALP Employment Report") & NALP Class of 2010 National Summary Report ("2010 NALP Employment Report")(attaching Ex. 9).

31

51.     In other words, Thomas Cooley, by virtue of its participation in NALP's annual employment survey, clearly has the means to, and actually does, distinguish between various degrees of employment, and breaks down the exact percentage of its recent graduates who have secured either part-time or full-time employment or whether a position requires a JD degree. Yet, rather than including these numbers on its website and marketing material and making this information available to public at large, the school continues to present highly misleading data to prospective and current students that grossly inflate post-graduation employment rates while depicting an unrealistic, if not entirely inaccurate picture of bountiful career prospects that do not exist.

## III.     Manipulating Employment Data

52.     In reality, the employment data reported and marketed by Thomas Cooley bears little resemblance to the actual experiences and dim employment opportunities encountered by their recent graduates.  Based on interviews with former students and other investigatory work, Plaintiffs believe that perhaps fewer than *25 percent* -- if not even fewer -- of recent Thomas Cooley graduates secure full-time, permanent employment for which a JD degree is required or preferred within nine months of graduating, and that the majority of them work in either part-time or temporary positions.

### A.     Proof of Fraud

53.      Indeed, perhaps there is no better proof that Thomas Cooley grossly inflates its placement rates than the fact that these rates have remained eerily steady throughout the past decade, even though the school has experienced a seismic growth spurt, and its total number of graduates between 2004 and 2009 has increased by an astounding 554 students or roughly *137* percent.  *Compare* Ex. 3 and Ex. 6. For that matter, the school's reported placement rates for the

classes of 2009 and 2010 have barely dipped, despite the onslaught of the "Great Recession" which has decimated the legal industry, leading to thousands of mass layoffs.

54.     Similarly, basic deductive reasoning suggests that the school is failing to disclose that the majority of its graduates are employed in either part-time or temporary or non-legal positions. According to the 2010 Employment Report, 157 out of a total 285 graduates working in private practice are employed by law firms with 2-10 attorney, while 70 graduates -- or nearly 25 percent -- are solo practitioners. *See* Ex. 2. Most likely, the overwhelming majority of these graduates are not gainfully employed, and are either working on a part-time or temporary basis. To that end, only 11 students -- or about one percent of Thomas Cooley's entire graduating class – are purportedly working in firms with more than 100 attorneys.

55.     Moreover, an examination of the 2009 NALP Employment Report confirms that Thomas Cooley blatantly manipulates employment data, and that substantially fewer than 76-78 percent of recent graduates are gainfully employed.

56.     According to NALP, 88.2 percent of all law school graduates are "employed" within nine months of graduation.   However, upon greater scrutiny, this number is virtually meaningless, as it includes *any* kind of employment, no matter how unrelated to the legal field. *See* Ex. 8.

57.     Rather, the 2009 NALP Employment Report further breaks down this number into specific percentages of graduates who are working either part-time or in non-legal jobs.  By doing this, it appears that, in actuality, only <u>62.9</u> percent of all graduates have secured some kind of full-time legal employment.

58.     Still, even that number is grossly inflated, as the 2009 NALP Employment Report does not distinguish between temporary and permanent employment, and, thus, does not

expressly exclude temporary positions.   If the report was to exclude temporary employment, most likely the employment number would fall well below 50 percent.[11]

59.     Still, even that number is probably significantly inflated, since the NALP data is based on unaudited, unverified, self-reported information.  In actuality, if law schools were required to employ proper accounting methodologies to ascertain the true employment status of all of their graduates -- i.e. by actually speaking to each graduate instead of relying on self-reported data from those who actually supply it -- the employment number would be much lower.

60.     Moreover, upon information and belief, Thomas Cooley, much like many other law schools, tabulates, calculates and tallies the raw data inputted in the job surveys filled out by recent graduates in a shoddy, slipshod manner, cynically choosing to omit or ignore critical statistical data that would substantially lower both placement rates and salary information reported in its employment reports and distributed to third-party data clearinghouses.[12]

61.     One must also bear in mind that the NALP employment number includes data supplied by all law schools, the overwhelming majority of whom are ranked significantly higher

---

[11] For greater analysis on the accuracy -- or inaccuracy -- of law school employment data see Professor Paul Campos's article in the *New Republic*, "Served: How Law Schools Completely Misrepresent Their Job Numbers" (April 25, 2011), where he courageously takes law schools to task for adopting dubious accounting methods in tabulating and reporting recent graduates' employment data.  (Attached as Ex. 10).  In particular, he deftly demonstrates through some impressive deductive reasoning how for one highly ranked state school the actual percentage of graduates who have secured full-time, permanent legal positions could be as low as 33 percent.  (*Id*).

[12] For example, one law school, the University of California-Davis School of Law, was found to be classifying students who were studying for the bar exam as being "employed at the time of graduation," even though they obviously were not earning any money for their studies and did not have a job lined up following taking the bar.  Joel Murray, "Professional Dishonesty: Do U.S. Law Schools Who that Report False or Misleading Employment Statistics Violate Consumer Protection Laws?" Working Paper at pp. 12, fn. 49, June 7, 2011 (available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1854709).

and have considerable more prestige than Thomas Cooley, which is ranked by *US News* in the fourth or bottom tier of all accredited law schools. As such, logic dictates that Thomas Cooley's true employment rate would be well below the statistical mean of the bell curve.

62. Upon information and belief, Thomas Cooley has also employed a limited program to further "pretty up" their employment numbers, by, among other things, hiring unemployed graduates as "research assistants" or other "make work" positions for a specified period of time, so as to classify them as "employed" in various employment surveys. In some instances these internships begin in the ninth month following graduation, right before Thomas Cooley would be required to report its employment data to the ABA, NALP and *US News*.

63. This practice is emblematic of the extreme measures many law schools across the country have undertaken recently to paper over the devastation that the Great Recession has wrought. According to NALP, 42 percent of all law schools have created post-graduate "jobs programs" into which they hired their own recently graduated students. In particular, for the Class of 2009, it is estimated that these programs provided over 800 jobs, accounting for a full two percentage points in the NALP overall employment rate. For the Class of 2010, this number has jumped to 1,200 jobs, or approximately 2.7 percent of all jobs taken by law school graduates. *See* "Selected NALP Findings for the Class of 2010" (attaching Ex. 11). Thus, instead of coming clean to prospective and current students and acknowledging the steep odds that graduates face in securing gainful employment, law schools continue to bury their heads in the sand like nothing is wrong, as if they can somehow wish away the brutal reality of the current economic environment.

64. Thomas Cooley's manipulation of employment data is all the more galling considering that its students are graduating in one of the grimmest legal job markets in decades.

Since 2009 alone, some 15,000 attorney and legal-staff jobs have been eliminated by large corporate law firms, while commoditized, legal-entry work such as document review is increasingly being outsourced to countries outside the US, such as India.   The entry-level employment offer rate for 2009 summer associates was at a historic low of 69 percent, as compared to 90 percent in 2008 and 93 percent in 2007.  Scores of law firms have cancelled summer programs, and in a recent survey 55 percent of law schools reported a decrease of 30 percent or more of the number of firms doing on-campus interviews, an unprecedented decline.  In another survey, only 3 percent of on-campus recruiters indicated that they were looking to hire third-year law students, as compared to 25 percent in 2008 and 42 percent in 2007.

65.     The job statistics for the Class of 2010 are equally grim, if not more so.  According to NALP, the overall employment rate for new law school graduates is the lowest it has been since 1996.  *See* Ex. 11. Only 68.4 percent of the class have obtained employment for which a JD degree is required, while barely over 50 percent of the class are working in private practice, a five-percent drop from the previous year.  *Id*.  A paltry 71 percent of the class have obtained a job that is both full-time and permanent.  *Id*.  The number of graduates working as solo practitioners has similarly soared, rising to 5.7 percent of all graduates employed in private practice, which is most likely a result of graduates, faced with negligible job prospects, being forced to hang up their own shingle.  *Id*.

66.     The starting salaries of newly minted lawyers have likewise dropped precipitously over the past few years.  The national median salary for the Class of 2010 was $63,000, a $9000 -- or 13 percent -- decline from the previous year, while the national mean salary was $84,111, an almost $10,000 -- or ten percent -- decline from the previous year. [13] Moreover, because many

---

[13] *See* http://www.nalp.org/classof2010_salpressrel.

large law firm salaries cluster around $145,000 and $160,000, whereas most smaller firm salaries hover in the $40,000 to $65,000 range, relatively few salaries were actually near the overall median or mean.

67.     A recent study by the consulting company Economic Modeling Specialist, Inc. ("EMSI") confirms the historically weak job market and dire employment prospects facing current law school graduates.[14] According to the study, every state besides Nebraska and Wisconsin are producing more attorneys than they need for the foreseeable future.  Across the country, there were twice as many people who passed the bar in 2009 -- 53,508 -- as there were job openings -- 26,239.  In Michigan the numbers are particularly daunting, with 1,024 people having passed the bar, even though the state is estimated to only need 862 new lawyers for each year through 2015.  The Bureau of Labor Statistics projects the creation of 28,000 new lawyer positions annually, well below the roughly 43,000 freshly-minted JDs pumped out in 2009.

**B.**     **Intent to Defraud**

68.     Thomas Cooley, as with any law school, has every incentive to perpetuate this mass deception, because they are not required by the ABA, Department of Education or any other governing body to independently audit or verify their employment data.  The incentive to cheat is so great that one law school dean, Phillip J. Closius of the University of Baltimore School of Law, in a *New York Times* exposé about the manipulation of placement rates went to the extent of publicly conceding that "[t]here are millions of dollars riding on students' decisions about where to go to law school, and that creates real institutional pressures [to manipulate data]."[15]

---

[14] *See* http://economix.blogs.nytimes.com/2011/06/27/the-lawyer-surplus-state-by-state/.

[15] On July 29, 2011, Mr. Closius formally resigned as dean from the University of Baltimore. In stepping down, Mr. Closius  circulated a highly controversial -- and surprisingly

69.     Thomas Cooley's tuition has risen dramatically over the past decade, with annual increases that far exceed the level of inflation, and currently the tuition for full-time students stands at $36,750, as opposed to the $24,750 that it cost a student to attend Thomas Cooley in 2005-2006.  This sharp increase mirrors the tuition trend in the legal education industry in general.  Over the past two decades, law school tuition has risen exponentially, far exceeding any increase in lawyers' starting salaries, and at many private institutions can exceed well over $40,000 annually, excluding living expenses.   Between 1989 and 2009 alone, tuition rates have shot up by 317 percent, well above the 71 percent seen at the undergraduate level.

70.     The dramatic increase in law school tuition has dovetailed with the dramatic increase in faculty compensation and size.  The total number of law school faculty positions has grown rapidly over the past two decades, rising from 7,241 full-time faculty members in 1990 to 10,965 full-time positions in 2008.  Law school professors and deans are perhaps the best remunerated in academia today, enjoying both lavish perks and exorbitant salaries that rival those of Fortune 500 executives.  For example, Thomas Cooley took in over $116 million in revenue for the fiscal year 2009, and in the past two years paid its Dean, Don LeDuc, $548,047

---

frank -- resignation letter in which he conceded that the University of Baltimore president had asked for his resignation, and that the tensions between them had largely stemmed from the law school's rapidly rising tuition and the fact that the University was essentially using the school to subsidize the undergraduate program, retaining an astounding 45 percent of all revenue generated by law tuition, fees and state subsidies.  *See* http://abovethelaw.com/2011/07/a-law-dean-resigns-and-spills-the-beans-on-how-his-university-has-been-taking-advantage-of-law-students/#more-85162.  The problem had grown so acute that the ABA's Accreditation Committee requested that the University submit a report by March 2012 "which provides in part a rationale for the School of Law's share of costs for non-law school activities and central administration services and information about any agreement between the Law School and the University regarding a fair process by which the Law School's contribution to the University for direct and indirect costs will be determined." *Id.*

and \$523,213 in total compensation as compared to about \$230,000 a mere six years ago, while still paying its former Dean and school founder, Thomas Brennan, \$368,581 and \$370,245 in total compensation.  Thomas Cooley's 11 other highest paid employees earned between \$200,225 and \$249,499 in total compensation respectively, and the school spent over \$47 million on faculty salaries.

71.     More disturbingly, Thomas Cooley misleads and defrauds its students while saddling them with tens of thousands of dollars in crushing, non-dischargeable debt.  According to *US News*, TCLS students graduate on average with a staggering *\$105,798* in loans, with a stunning 93 percent of them taking out loans to attend the school.[16]  Nationwide, the debt burden of law school graduates continues to rise unabated, and the average debt burden for all law school graduates is almost \$100,000, up sharply from \$16,000 in 1987.

72.     Worse yet, Thomas Cooley is primarily marketing its product to naïve, relatively unsophisticated consumers -- many of whom are barely removed from college -- who are often making their first "big-ticket" purchase based on asymmetrical information.  These prospective students are applying to law school with one objective in mind: to attain the kind of job that provides compensation and a lifestyle that is commensurate with and worthy of the enormous time, money and personal sacrifice invested in a legal education.   However, if Thomas Cooley was to disclose accurate employment data and the steep odds its graduates face in securing gainful employment, it would become abundantly clear to any rational purchaser how poor of an investment attending TCLS is.

---

[16] According to FinAid.org, a graduate needs to make at least \$138,000 annually to repay \$100,000 without enduring financial hardship, or \$92,000 annually to repay the debt with financial difficultly. *See* http:/www.finaid.org.calculators/loanpayments/phtml.

73.      To a remarkable extent, Thomas Cooley -- like most law schools -- has been astonishingly successful in pulling the wool over prospective students.  Currently, the school enrolls about 4,000 students, and its enrollment has skyrocketed since 2006, when the ABA finally granted accreditation to its three satellite campuses.  Last year, law schools awarded over 43,000 JD degrees (an additional 41,156 this year), an increase of 11 percent from a decade earlier, while the number of students taking the law school entrance examination (LSAT) increased by over 20 percent between 2007 and 2009.[17]  For the 2009-2010 academic year, a record 154,549 students were enrolled in American law schools, including a record 51,426 first-year students, up by over 60 percent from the 91,225 students who enrolled in ABA accredited law schools in 1971.  The total number of law schools has increased by nine percent over the past decade and by over 25 percent over the past four decades, and, despite the ominous employment trends and dearth of available jobs, there are a handful of new law schools that are slated to open their doors in the next few years.  Allowing the *status quo* to persist will almost certainly ensure that tens of thousands of law school graduates -- a whole "lost" generation of lawyers -- will continue to be churned out over the next decade with absolutely no realistic chance of ever earning back their investment. [18]

---

[17] Finally, after years of double-digit growth, law school applications for the 2011-2012 academic year dropped by 10 percent. *See* Nathan Koppel, "Bloom's Off Law School Rope," Wall Street Journal Law Blog, September 28, 2011, http://blogs.wsj.com/law/2011/09/28/bloom-remains-off-law-school-rose/. Undoubtedly, this stems from the recent upsurge in media scrutiny on the inability of law school graduates to obtain gainful employment and the overall grim reality of one of the worst legal job market in decades.  *See e.g.* David Segal, "Is Law School a Losing Game?" *New York Times*, January 8, 2011.

[18]True to its past pattern and practices of making unfounded claims that are simply not supported by facts, Thomas Cooley, despite the wealth of evidence indicating to the contrary, erroneously contends that the legal industry has somehow been immune to the ravages of the recession.  *See in general* http://www.cooley.edu/reports/nationalem_ployment.html.  In fact, Thomas Cooley has issued its own report to expressly counter the narrative of "bloggers" and "small elements within the media" that attending law school could be financially ruinous and

IV.    **Manipulating Salary Information**

74.    Further, Thomas Cooley grossly inflates their graduates' reported mean salaries, by calculating them based on a small, deliberately selected subset of graduates who actually reported their salary information, and not on a broad, statistically meaningful representation of its graduates.

75.    For that matter, Thomas Cooley doesn't even publish in its employment report the percentage or number of graduates who actually report salary information.  *See* Exs. 2-6. As such, there is no possible way for a prospective student looking at Thomas Cooley's marketing material to determine if the reported salary information accurately reflects the salaries earned by recent Thomas Cooley graduates.

76.    Additionally, an examination of employment data produced by *U.S. News* demonstrates the dubious value and deceptive nature of Thomas Cooley's mean salary information.  According to *US News*, for the Class of 2009, only *38 percent* of graduates working in the private sector -- i.e. private practice or "business" -- reported salary information, which is a mere 18 percent of the all graduates reporting employment data.  Meanwhile *US News*

---

which supposedly summarizes data produced by the U.S. Bureau of Labor that allegedly demonstrates that the actual unemployment rate for lawyers is 1.5 percent.

Needless to say, this report is full of logical fallacies, false assumptions, and deliberate half-truths and omissions, including, chiefly, that the data is self-reported and involves the employment rate for all attorneys, not recent graduates.  *See in general*, Matt Leichter, "Dear Prospective Law Students, Do Not 'Reasonably Rely' on Cooley's 'Report One'" The AmLaw Daily, November 3, 2011, http://amlawdaily.typepad.com/amlawdaily/2011/11/dear-prospective-law-students-do-not-reasonably-rely-on-cooleys-report-one.html.  Additionally, the Bureau of Labor and Statistics ("BLS") itself predicts that between 2008 and 2018 the U.S. economy will add roughly 240,000 attorney jobs, while ABA-accredited law schools are estimated to graduate over 440,000 graduates during that period of time.  *Id.* The BLS's Occupational Outlook Handbook specifically states about the employment prospects of recent law school graduates that "competition for job openings should continue to be keen because of the large number of students graduating from law school each year," a sentiment it has persistently reiterated each year since 1996. *Id*

did not report the percentage of students working in non-private-sector positions, such as government or public interest, who disclosed salary information.

77.     Upon information and belief, Plaintiffs believe that a substantial portion of recent TCLS graduates make significantly less than the reported mean salaries, and that Thomas Cooley has intentionally failed to include these salaries in any statistical analysis or calculations. Thomas Cooley knowingly and purposely omits the salaries of graduates who have secured only temporary or part-time employment from its official marketing material.  This material nondisclosure has the effect of "goosing" the numbers, making it appear their graduates earn substantially more money than the reality of the situation.

78.     In actuality, many TCLS graduates are in dire financial straits, living paycheck to paycheck, barely able to pay off their tens of thousands of dollars in non-dischargeable debt, much less save enough money for down payments for homes or other major purchases that signify one's entrance into adulthood.  They are working in mostly dead-end jobs, doing document review and other menial, mindless drudgery, essentially functioning as glorified paralegals or secretaries with little control over their careers.  In short, they do not earn -- and most likely will never earn -- the kind of money that could possibly make attending Thomas Cooley a worthwhile investment.

**V.     Challenging the *Status Quo***

79.     Fortunately, after much public hand-wringing and increased media scrutiny, the tectonic plates in the legal profession have finally begun to shift, as practitioners and politicians alike are starting to roundly demand that law schools change their deceptive ways and accurately report all available employment information.

80.     For example, Senator Barbara Boxer of California has sent three separate letters to the ABA taking them to task for failing to properly police the law school industry.  *See* Letters from Senator Barbara Boxer to Stephen Zack, dated March 31, 2011 & May 20, 2011 (attaching Ex. 12). In her May 20th letter, she directly implored the ABA to require that all law schools independently audit and verify employment data and salary information that are either included in marketing material to prospective students or disseminated to third-party information clearinghouses and publications, such as *US News* and the ABA.  In her third letter sent on October 6, 2011, she further admonished the organization for "resorting to half measures instead of tackling a major problem head on" despite the deafening public outcry for greater scrutiny in the way law schools disclose placement rates.  *See* Letter from Senator Barbara Boxer to Wm. T. Robinson III, dated October 6, 2011 (attaching Ex. 13).  Senator Boxer has even reached across the aisle with her colleague Senator Tom Coburn of Oklahoma to ask the Department of Education to step in and investigate the law school industry for its systemic failure to properly disclose employment prospects to prospective and current students.  *See* Letter from Senator Barbara Boxer & Senator Tom Coburn to Kathleen Tighe, dated October 13, 2011 (attaching Ex. 14).

81.     Senator Charles Grassley of Iowa has sent his own letter to the ABA, demanding that the organization answer 31 detailed questions pertaining to the ABA's regulation of the law school industry.  *See* Letter from Senator Charles Grassley to Stephen Zack, dated July 11, 2011 (attaching Ex. 15).  In particular, Senator Grassley references the questionable practices employed by law schools when offering merit-based scholarships (i.e. they extend substantially more scholarships than they can possibly renew), the supersaturated job market facing new graduates, and the increased debt burden assumed by law school students as raising serious

43

concerns whether tax payers will ultimately be on the hook for the billions of millions of dollars in federally-backed loans that ultimately flow into law school coffers each year. Following an inadequate response by the ABA to his queries, Senator Grasserly has sent a second letter, dated August 8, 2011, challenging the ABA's apparent confidence that law students will be able to pay back their government-backed, non-dischargeable loans despite the dearth of available job opportunities. *See* Letter from Senator Charles Grassley to Stephen Zack, dated August 8, 2011, & Accompanying Press Release (the "Second Grassley Letter")( attaching Ex. 16).

82.     Similarly, a coalition of 55 law school student body presidents, fed up with the ABA's inability to properly police law schools, have sent to Congress proposed legislation that would ensure "enhanced accuracy, accountability and transparency in the reporting of data pertaining to legal education." *See* Student Bar Association's Proposed Bill ("SBA Bill") and accompanying Press Release (attaching Ex. 17). Among other things, the proposed legislation creates a new standard for reporting employment data, requires law schools to submit annual employment reports to the Department of Education ("DOE"), mandates that law school deans personally endorse such reports, and empowers the DOE to audit the reports. The SBA Bill expressly aims to parallel federal securities laws, where publicly-held companies must submit annual reports to the SEC disclosing material financial information.

83.     The problem has gotten so far out of hand that Bill Hebert, President of the California Bar Association, in a much-publicized article in the California Bar Journal exhorts law school deans to adopt more rigorous reporting standards by disclosing the type of detailed employment and salary data that would allow students to get a realistic picture of their post-graduate financial situation. Bill Hebert, "What is the Value of the Law Degree?" California Bar Journal, February 2011(attaching Ex. 18). Hebert chides schools for "hiding employment

outcomes in aggregate statistical forms," and impresses upon them the need to reveal the exact percentage of their graduates who have actually obtained full-time, permanent employment -- the type of information Plaintiffs are now seeking. *Id.*

84. Along these lines, Howard B. Miller, the previous President of the California Bar, went so far as to all but accuse law schools of committing fraud in the way they tabulate and report employment information to third party data clearinghouses like the ABA and *U.S. News*. Specifically, he wrote in the California Bar Journal: "There is notoriously unreliable self-reporting by law schools and their graduates of employment statistics. They are unreliable in only one direction, since the self reporting by law schools of 'employment' of graduates at graduation and then nine months after graduation are, together, a significant factor in the *U.S. News* rankings -- which are obsessed over, despite denials, by law schools and their constituencies. The anecdotes are as telling as the statistics: prestigious lawyers in the state are hiring their own children to work in their firms because even with their connections they were unable to find employment elsewhere." Howard B. Miller, "Truth in Lending and Careers," California Bar Journal, May 2010 (attaching Ex. 19).

## VI.   Role of the ABA

85. The ABA's Section of Legal Education and Admissions to the Bar is responsible for accrediting and regulating all accredited legal institutions. Unfortunately, despite years of vociferous complaints by industry insiders regarding the pervasive practice that law schools blatantly manipulate employment data, the ABA has been largely derelict in its duties, essentially allowing law schools to behave with impunity as they bamboozle their students.

86. In general, the ABA has absolutely no mechanism by which to address Plaintiffs' claims, since law school students and graduates are strictly prohibited from bringing such claims

before the organization.  Indeed, Rule 24 of the ABA Standards for Approval of Law Schools expressly states:

> This process is not available to serve as a mediating or dispute-resolving process for persons with complaints about the policies or actions of an approved law school. The Council, Accreditation Committee and the Consultant on Legal Education <u>will not intervene with an approved law school on behalf of an individual with a complaint against or concern about action taken by a law school that adversely affects that individual. The outcome of this process will not be the ordering of any individual relief for any person or specific action by a law school with respect to any individual.</u>

(Emphasis added). [19]

87.    Considering the makeup of the two ABA committees that regulate law schools, it is not surprising that the ABA has consistently acted on the law school industry's behalf at the expense of students and graduates.  The ABA's Legal Education Council is dominated by law school deans, as both its current chair, John O'Brien of the New England School of Law, and chair-elect, Kent Syverud of the Washington University School of Law, are deans of large, prominent law schools.  Likewise, the committee of the Legal Education Council which is directly responsible for regulating the reporting of post-graduate placement data -- i.e. the Questionnaire Committee -- is dominated by law school deans and professors, including its current chair, Dean Art Gaudio of the Western New England College School of Law.  *See in general* Ex. 16 (Second Grassley Letter) at p. 2 (noting that legal academics and university presidents and vice presidents comprise approximately 48, 52 and 64 percent of the three accreditation-related committees).

---

[19] Similarly, Plaintiffs cannot seek redress from the Department of Education, which administers Federal financial assistance to students, since the DOE only authorizes suits against the Secretary of Education, not against individual schools.  *See* 20 U.S.C. § 1082(a)(2).

88.     The undue influence exerted by the legal academy over the ABA has led the

National Advisory Committee on Institutional Quality and Integrity, which advises the

Department of Education on accreditation issues, to question the ABA's overall competency as

an accrediting body.  Specifically, the committee found that the ABA had failed to comply with

17 regulations, including, among others, failing "to set a standard for job placement by its

member institutions." *See* http://taxprof.typepad.com/taxprof_blog/2011/06/aba-is.html.  One of

the members on the committee, Arthur Keiser, publicly accused the ABA of "not getting it,"

noting that an accrediting agency would never accredit an institution with 17 outstanding issues.

*Id*; *see also* Ex. 15 (First Grassley Letter) at p.1  (quoting June 11, 2011 article from *The*

*Chronicle of Higher Education* which describes the committee's members as expressing

"frustration that they could not take stronger actions or at least state their concerns [regarding the

ABA's lackluster accreditation process] with stronger language.")

89.     It is only until recently that the ABA has finally adopted measures that would

require greater reporting transparency, by mandating that law schools "unbundle" employment

data.  *See* "Questionnaire Committee's Memo on Reporting Placement Data on Annual

Questionnaire," dated July 27, 2011 (attaching Ex. 20).  Admittedly, these new guidelines mark a

positive first step forward and at least attempts to rectify the most egregious deceptive practices,

by, among other things, expressly mandating that law schools distinguish between various

degrees of employment, such as permanent or temporary, JD-required and not requiring a JD

degree, and whether a position is funded by a law school.

90.     Nonetheless, the ABA has not gone nearly far enough in disincentivizing schools

from "cooking" the data.  First, the guidelines will not go into effect for at least another year,

thereby allowing law schools to continue deceiving prospective students.  For example, the ABA

will not require that law schools publicly disclose the true employment data for the Class of 2010, even though it is retroactively requiring that school obtain such data for bookkeeping purposes.[20] Second, the guidelines still permit schools to continue self-reporting all employment data and salary information, and do not require that they retain unrelated, independent third-parties to audit and verify such data. Finally, these changes come too late for Plaintiffs and thousands of TCLS graduates like them who have already taken on tens of thousands of dollars in non-dischargeable debt based on Thomas Cooley's deceptive and misleading statements.

91.    Indeed, based on the ABA's recent behavior one wonders how serious the organization is in implementing these reforms. After initially agreeing to rely on the independent-minded and industry gold-standard NALP to gather the relevant employment data, the ABA, in a complete 180-degree turn, attempted to cut NALP out of the process entirely, expressly rejecting the recommendation of the Questionnaire Committee that NALP and the ABA work jointly together. *See e.g.*, "Letter from James Leipold and Marcelyn Cox to Christine Durham," dated July 28, 2011 (attaching Ex. 21). In assessing the reason for this apparent about-face, James Leipold, NALP's Executive Director, in an interview with the *National Law*

---

[20]Robert Morse, "ABA Falls Short in Efforts to Improve Law School Placement Data," *U.S. News & World Report*, September 1, 2011 ("The ABA says it will not publish school specific salary data [for the Class of 2010], but instead will publish salaries by state and region not linked to the performance of any school. These state and region results are not limited to the data from any particular law school. Prospective students want to know the average salaries of the graduates from each law school as part of being able to determine the economic viability of earning a J.D. degree from that school. The ABA should have the power to get law schools to report accurate salary data on a school-by-school basis and should trust law students to be able to understand the meaning and limits of such data."); *see also* Karen Sloan, "ABA Stalls on Honing Law Schools' Job Placement Reports," *The National Law Journal*, September 26, 2011 ("The ABA Section of Legal Education and Admission to the Bar 'has done a huge disservice to prospective law students, law schools and the legal profession,' said Law School Transparency Executive Director Kyle McEntee. 'The legal employment rate is a basic yet crucial part of informing prospective law students. The failure to require law schools to disclose this rate legitimizes questions about whether *the section is a body captured by special interests*.'") (emphasis added).

*Journal* stressed, "I think they [the ABA] see NALP's candor about the state of the legal job market as harmful to the industry. I believe their intent is to recapture their ability to control the message to the public about the status of the job market. There's a conflict of interest here."[21] While the two organizations, for the time being, have articulated a desire "to move forward" and "discuss ways to address the needs of all parties," no official compromise has been reached on this issue.[22]

92.     The sobering reality of the situation is that law schools are no different than the proverbial fox guarding the henhouse, and when given the opportunity and incentive to act within their self-interests by making themselves look better, they almost certainly will. Earlier this year, the Dean of Villanova Law School was forced to come clean and admit that the school in the past "knowingly" reported false and inaccurate information to the ABA.[23] Likewise, the

---

[21] Karen Sloan, "NALP Clashes with ABA over Jobs Data – and Hints at Legal Action," *National Law Journal*, August 1, 2011; *see also*, Professor William D. Henderson, "More Data but Less Transparency," *National Law Journal,* August 2, 2011, (noting that ABA's proposal would undermine NALP's ability to collect, analyze and publish accurate employment data; "In a nutshell, here is the problem. Law schools are heavily burdened by information requests. The law schools will comply with any information request from the ABA because the ABA is their accrediting agency. If the ABA and NALP cover much of the same ground but use different terminology -- the ABA will have to invent its own to avoid infringing on NALP's detailed classification system -- then some schools may forgo the voluntary submission to NALP. Unfortunately, NALP cannot publish reliable industry-level statistics if law schools cannot spare the time and expense to fill out a duplicative information request.").

[22] Rachel Zahorsky, "NALP Backs Off Threat to Sue ABA, Renews Spirit of Collaboration," *ABA Journal*, August 5, 2011, http://www.abajournal.com/news/article/aba_and_nalp_renew_collaboration_efforts_at_aba_annual_meeting/.

[23] Incredibly, the ABA, despite Villanova's acknowledgment that it systematically misrepresented its students' median LSATs and GPAs for an extended period of time, essentially slapped the school on the wrist, requiring that it merely post a "public censure" on its website for the next two years. *See e.g.*, Elie Mystal, "Villanova Might Need A Kiss From Mommy Since The ABA Slapped Their Wrist Wreally Wreally Whard," Abovethelaw.com, August 15, 2011, http://abovethelaw.com/2011/08/villanova-might-need-a-kiss-from-mommy-since-the-aba-slapped-their-wrist-wreally-wreally-whard/ ("We shouldn't be surprised that the American Bar

University of Illinois College of Law has recently admitted to grossly inflating their reported median LSAT score and grade point average that were posted on its website.[24] Rather, just as publicly-held companies must independently audit their financial statements so as to ensure the integrity of the marketplace, the same must be demanded of law schools so as to ensure that prospective students -- i.e. consumers -- are making well-informed, carefully-considered decisions based on 100-percent accurate information.

## CLASS ACTION ALLEGATIONS

93.    This action is brought and may properly be maintained as a class action pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rule of Civil Procedure.  Plaintiffs bring this action, on behalf of themselves and all other similarly situated, as representative members of the following proposed class (the "Class"):

All persons who are either presently enrolled or have been enrolled in a JD program at any Thomas Cooley campus anytime since August 11, 2005.

94.    Excluded from the Class are Defendants, Thomas Cooley, its employees, officers and directors, the Judge(s) assigned to this case, and the attorneys of record in this case. Plaintiffs reserve the right to amend the Class definition if discovery and further investigation reveal that the Class should be expanded or otherwise modified.

---

Association barely cares about law schools misleading prospective law students when the organization doesn't even really seem to mind when law school lie directly to the ABA itself. The Villanova Law LSAT scandal has been resolved, and boy are you going to be underwhelmed by the penalties associated with lying to the ABA for four years.")

[24]Karen Sloan, "Illinois Acknowledges Goosing Credentials of Incoming Students," *National Law Journal*, September 19, 2011, http://www.law.com/jsp/nlj/PubArticleNLJ.jsp?id=1202514918155&src=EMC-Email&et=editorial&bu=National%20Law%20Journal&pt=NLJ.com-%20Daily%20Headlines&cn=20110920nl.

95.     For the foregoing reasons, this action fulfills the standards and requirements as outlined in Rule 23(b)(2) and (b)(3) of the Federal Rule of Civil Procedure:

**A.      The Parties are Numerous and Easily Ascertainable**

96.     The proposed Class is so numerous that it is manifestly impracticable to bring them all before the court.  Though the exact number and identities of the Class is unknown at this time, they can be ascertained through appropriate discovery, and likely contain thousands of people, as nearly one thousand students graduate from Thomas Cooley each year.  The number and identities of other Class members may be determined from Defendants' records and files, and potential Class members may easily be notified about the pendency of this action.

**B.      Common Questions of Law and Facts Predominate**

97.     This action presents questions of law and facts common to the Class, including, but not limited to, the following:

        a.      Whether Defendants are engaged in deceptive, misleading, unfair, fraudulent and/or otherwise unlawful practices through their non-disclosure of material facts and affirmative misleading statements regarding post-graduate employment data and salary information, and by specifically representing that approximately 76-82 percent of their graduates secure employment within nine months of graduation at a salary of roughly $50,000;

        b.      Whether Defendants know the true and real percentage of recent graduates who secure full-time, permanent employment for which a JD degree is required or preferred and are, therefore, gainfully employed, and if that number is substantially lower than 76-82 percent;

        c.      Whether Defendants know the true mean salary of their graduates, and if that number is substantially lower than $50,000;

d.      Whether Defendants' conduct violated the MCPA and constitute fraud, constructive fraud and/or negligent misrepresentation, as alleged herein;

e.      Whether Plaintiffs and Class members are entitled to recover actual damages as a result of the actions alleged herein;

f.      Whether Plaintiffs and members of the Class are entitled to recover restitution of tuition monies remitted to Defendants as a result of the actions alleged herein;

g.      Whether Plaintiffs and members of the Class are entitled to ancillary relief, including the disgorgement of unearned profits, as a result of the actions alleged herein;

h.      Whether Plaintiffs and Class members of the Class are entitled to recover punitive damages as a result of the actions alleged herein;

i.      Whether Plaintiff and Class members are entitled to an award of reasonable attorneys' fees, pre-judgment interest and costs of this suit;

j.      Whether Defendants should be forced to retain independent, non-related third-parties to audit and verify their post-graduate employment data and salary information; and

k.      Whether Defendants should be enjoined from continuing to make false and misleading representations and omissions regarding their post-graduate employment data and salary information.

**C.      Plaintiffs' Claims Are Typical of the Class**

98.      Plaintiffs' claims are typical of the claims and of the members of the Class because they have all been damaged in the same manner and way as a result of Defendants' failure to disclose material facts and policies of misrepresentation and omissions.  Accordingly, the interests of the representative Plaintiffs are co-extensive with the interests of each Class member, and all have a common right of recovery based upon the same facts.

**D.**     **The Class Representatives Can Adequately Represent the Class**

99.     Plaintiffs are adequate representatives of the Class because Plaintiffs are members of the Class and their interests do not conflict with the interests of the Class.  The interests of the Class will be fairly and adequately protected by Plaintiffs and their undersigned counsel, who are competent and experienced in the prosecution of class action litigation.

**E.**     **A Class Action Provides a Substantial Benefit to the Courts and Litigants**

100.     Should individual Class members be required to bring separate actions, courts throughout Michigan would be confronted by a multiplicity of lawsuits, thus burdening the court system while also creating the risk of inconsistent rulings and contradictory judgments.  In contrast to proceeding on a case-by-case basis, in which inconsistent results would magnify the delay and expense to all parties and the court system, this class action will present far fewer management difficulties while providing unitary adjudication, economies of scale and comprehensive supervision by a single court.

101.     Members of the Class almost invariably lack the means to pay attorneys to prosecute their claims individually.  Given the complexity of the issues presented here, individual claims are not sufficiently sizeable to attract the interests of highly able and dedicated attorneys who will prosecute them on a contingency basis.  Only by aggregating claims can Plaintiffs gain the leverage necessary to pursue a just and global resolution of the issues raised in this Complaint.

102.     WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray for an order certifying the Class and appointing Plaintiffs and their counsel of record to represent the Class.

## <u>FIRST CAUSE OF ACTION</u>

**(Against All Defendants for Violations of the
Consumer Protection Act, MCLS §445.901, *et seq.*)**

103.    Plaintiffs incorporate by reference each and every allegation set forth above as if fully stated herein.

104.    Defendants' actions constitute unlawful, unfair, deceptive and fraudulent actions/practices as defined by the Consumer Protection Act, MCLS §445.901, *et seq.* or the MCPA, as they occurred in the course of trade or commerce.

105.    Plaintiffs did not enroll in Thomas Cooley with the intention of using their JD degree for an ongoing business or to start a non-legal business, but rather intended to use their JD degree to prospectively better themselves and their personal circumstances through the attainment of full-time employment in the legal sector.

106.    As part of its fraudulent marketing practices and recruitment program, Thomas Cooley engaged in a pattern and practice of knowingly and intentionally making numerous false representations and omissions of material facts, with the intent to deceive and fraudulently induce reliance by Plaintiffs and the members of the Class and cause them to pay inflated tuition. These false representations violated the MCPA as follows:

    a.    Falsely stating that, depending on the year, approximately 80 percent of Thomas Cooley graduates secured employment within nine months of graduation, when, in fact, TCLS's reported employment rate included temporary and part-time employment and/or employment for which a JD was not required or preferred – employment Plaintiffs would have been eligible for even without obtaining a TCLS degree and paying TCLS tuition;

54

b.      Falsely stating that, depending on the year, Thomas Cooley graduates earned, on average, approximately $50,000, when, in fact, only a small subset of graduates earned such salaries;

c.      Failing to reveal that Thomas Cooley's reported employment rate included temporary and part-time employment and/or employment for which a JD was not required or preferred, which made the posted statistics misleading and could not be reasonably known to Plaintiffs;

d.       Failing to provide the promised benefit of a Thomas Cooley JD degree, namely that, depending on the year, approximately 80 percent of TCLS graduates secure full-time, permanent employment for which a JD degree is required or preferred and earned on average $50,000;

e.      Making the material representation that, depending on the year, approximately 80 percent of Thomas Cooley graduates are employed nine months after graduation and earn on average $50,000, thereby suggesting a state of affairs that was different than it actually was because TCLS's statistics included temporary and part-time employment and/or employment for which a JD was not required or preferred; and

f.       Failing to reveal that its reported employment rate included temporary and part-time employment and/or employment for which a JD was not required or preferred, facts that are material to the transaction (i.e. Plaintiffs decision to pay TCLS's tuition), and in fact resulted in Plaintiffs paying inflated tuition.

107.    The Defendants' above-alleged actions constitute unfair business practices since the actions were deceptive, immoral, unethical, oppressive, unscrupulous, substantially injurious,

55

and operate to the competitive disadvantage of other law schools. They are also likely to deceive the public. Moreover, the injury to the Plaintiffs was substantial and outweighs the utility of the Defendants' practices.

108.     The Defendants' practices, in addition, are unfair and deceptive because they have caused Plaintiffs and the Class substantial harm, which is not outweighed by any countervailing benefits to consumers or competition, and is not an injury consumers themselves could have reasonably avoided.

109.     The Defendants' acts and practices have misled and deceived the general public in the past, and will continue to mislead and deceive the general public into the future, by, among other things, causing them to apply to and enroll at Thomas Cooley under false pretenses.

110.     Plaintiffs are entitled to preliminary and permanent injunctive relief ordering the Defendants to immediately cease these unfair business practices, as well as disgorgement and restitution to Plaintiffs of all revenue associated with their unfair practices, or such revenues as the Court may find equitable and just, including the partial reimbursement of tuition.   Plaintiffs further request that the Court enters a declaratory judgment that Thomas Cooley's representation that approximately 80 percent of their graduates are employed and earn roughly $50,000 constitutes MCPA violations, insomuch as most of these graduates have not secured full-time, permanent employment for which a JD degree is required or preferred.  Plaintiffs also request that they be awarded all attorneys to the extent permitted by the MCPA.

## SECOND CAUSE OF ACTION

### (Against All Defendants for Fraud)

111.     Plaintiffs incorporate by reference each and every allegation set forth above as if fully stated herein.

112.    As part of its fraudulent marketing practices and recruitment program, Thomas Cooley engaged in a pattern and practice of knowingly and intentionally making numerous false representations and omissions of material facts, with the intent to deceive and fraudulently induce reliance by Plaintiffs and the members of the Class.  These false representations and omissions were uniform and identical in nature, and include, without limitation, the following:

a.    Stating false placement rates during the recruitment and retention process, including that, depending on the year, approximately 80 percent of TCLS graduates secured employment within nine months of graduation;

b.    Manipulating post-graduate employment data, so as to give the appearance that the overwhelming majority of recent TCLS graduates secure full-time, permanent employment for which a JD degree is required or preferred;

c.    Grossly inflating the salaries earned by recent TCLS graduates, by reporting that they earned approximately $50,000, even though only a small subset of graduates earned such wages;

d.    Disseminating false post-graduate employment data and salary information to various third-party data clearinghouses and publications, such as the ABA and *US News*;

e.    Making deceptive and misleading statements, representations and omissions concerning the value of a TCLS law degree;

f.    Making deceptive and misleading statements, representations and omissions concerning the pace at which recent graduates can obtain gainful employment in their chosen field; and

g.      Causing students to pay inflated tuition based on material misleading statement, representations and omissions, including, specifically, that, depending on the year, approximately 80 percent of TCLS graduates secure gainful employment and earned approximately $50,000.

113.    In general, Plaintiffs and members of the Class enrolled at Thomas Cooley for the purpose of securing full-time, permanent employment upon graduation.  Defendants' acts and practices, therefore, were material to Plaintiffs' decision to enroll and attend TCLS, and were justifiably relied upon by Plaintiffs, and further proximately caused Plaintiffs and other members of the Class to pay inflated tuition.

114.    Plaintiffs and members of the Class did in fact justifiably rely on these material representations and omissions when deciding to enroll at Thomas Cooley.  Specifically, Plaintiffs reviewed and relied upon post-graduate employment data and salary information posted on Thomas Cooley's website and included in marketing brochures, as well as all such information disseminated to third-party data clearinghouses and publications, such as the ABA and *US News*, and specifically relied on TCLS's representations that, depending on the year, approximately 80 percent of its graduates were employed within nine months of graduation and earned a mean salary of roughly $50,000.

115.    The material representations and omissions were part of a common scheme, practice and plan conceived and executed by Thomas Cooley to mislead, deceive and defraud Plaintiffs and members of the Class.  Defendants made these statements and representations regarding their graduates' employment data and salary information, including their graduates' ability to secure full-time, permanent employment for which a JD degree is required or preferred, knowing full well they were false, untrue, fraudulent and deceptive.  In fact, Defendants know

58

that the overwhelming majority of their graduates fail to secure gainful employment following graduation, and are forced to take jobs incommensurate to their education level.

116.    Plaintiffs were, at all relevant times, ignorant of the true facts and did not know that in actuality few Thomas Cooley graduates secure full-time, permanent employment for which a JD degree is required or preferred.   Had Plaintiffs known of the dire financial straits faced by the overwhelming majority of TCLS students following graduation, and that in fact substantially fewer than 80 percent of Thomas Cooley graduates secure full-time, permanent employment for which a JD degree is required or preferred or earned approximately $50,000, they would never have enrolled at Thomas Cooley and incurred tens of thousands of dollars in non-dischargeable debt.

117.    In addition, Thomas Cooley occupies a fiduciary position as educators and owes a heightened duty of care to Plaintiffs and members of the Class to act in good faith and engage in fair dealings.  Likewise, by virtue of the fact that many of Thomas Cooley's staff and faculty are attorneys and members of the Michigan Bar, they have certain ethical obligations and responsibilities to Plaintiffs and members of the Class.  Similarly, the existence of a Financial Aid Office and the fact that Thomas Cooley provides advice and assistance to students on how to procure the necessary financing to fund their education, establishes a fiduciary duty to act in good faith and engage in fair dealings.  Defendants breached these heightened duties of care by making a series of material misstatements and omissions regarding their graduates' employment data and salary information.

118.    The above-referenced material misstatements and omissions were knowingly, willfully, intentionally, maliciously, oppressively, and fraudulently undertaken with the express purpose and intention of defrauding Plaintiffs and the members of the Class, as well as to the

59

substantial benefit of the Defendants. Consequently, Plaintiffs and members of the Class are entitled to punitive damages, the disgorgement of tuition monies, the reimbursement of attorneys' fees and all other monetary and equitable relief as the Court may find equitable and just.

## THIRD CAUSE OF ACTION

### (Against All Defendants for Negligent Misrepresentation)

119.    Plaintiffs incorporate by reference each and every allegation set forth above as if fully stated herein.

120.    As part of its fraudulent marketing practices and recruitment program, Thomas Cooley engaged in a pattern and practice of knowingly and intentionally making numerous false representations and omissions of material facts, with the intent to deceive and fraudulently induce reliance by Plaintiffs and the members of the Class. These false representations and omissions were uniform and identical in nature, and include, without limitation, the following:

a.    Stating false placement rates during the recruitment and retention process, including that, depending on the year, approximately 80 percent of TCLS graduates secured employment within nine months of graduation;

b.    Manipulating post-graduate employment data, so as to give the appearance that the overwhelming majority of recent TCLS graduates secure full-time, permanent employment for which a JD degree is required or preferred;

c.    Grossly inflating the salaries earned by recent TCLS graduates, by reporting that they earned approximately $50,000, even though only a small subset of graduates earned such wages;

d.      Disseminating false post-graduate employment data and salary information to various third-party data clearinghouses and publications, such as the ABA and *US News*;

e.      Making deceptive and misleading statements, representations and omissions concerning the value of a TCLS law degree;

f.      Making deceptive and misleading statements, representations and omissions concerning the pace at which recent graduates can obtain gainful employment in their chosen field; and

g.      Causing students to pay inflated tuition based on material misleading statement, representations and omissions, including, specifically, that, depending on the year, approximately 80 percent of TCLS graduates secure gainful employment and earned approximately $50,000.

121.    In general, Plaintiffs and members of the Class enrolled at Thomas Cooley for the purpose of securing full-time, permanent employment upon graduation.  Defendants' acts and practices, therefore, were material to Plaintiffs' decision to enroll and attend TCLS, and were justifiably relied upon by Plaintiffs, and further proximately caused Plaintiffs and other members of the Class to pay inflated tuition.

122.    Plaintiffs and members of the Class did in fact justifiably rely on these material representations and omissions when deciding to enroll at Thomas Cooley.  Specifically, Plaintiffs reviewed and relied upon post-graduate employment data and salary information posted on Thomas Cooley's website and included in marketing brochures, as well as all such information disseminated to third-party data clearinghouses and publications, such as the ABA and *US News*, and specifically relied on TCLS's representations that, depending on the year, approximately 80

percent of its graduates were employed within nine months of graduation and earned a mean salary of roughly $50,000.

123.    The material representations and omissions were part of a common scheme, practice and plan conceived and executed by Thomas Cooley to mislead, deceive and defraud Plaintiffs and members of the Class.  Defendants made these statements and representations regarding their graduates' employment data and salary information, including their graduates' ability to secure full-time, permanent employment for which a JD degree is required or preferred, knowing full well they were false, untrue, fraudulent and deceptive.  In fact, Defendants know that the overwhelming majority of their graduates fail to secure gainful employment following graduation, and are forced to take jobs incommensurate to their education level.

124.    Plaintiffs were, at all relevant times, ignorant of the true facts and did not know that in actuality few Thomas Cooley graduates secure full-time, permanent employment for which a JD degree is required or preferred.   Had Plaintiffs known of the dire financial straits faced by the overwhelming majority of TCLS students following graduation, and that in fact substantially fewer than 80 percent of Thomas Cooley graduates secure full-time, permanent employment for which a JD degree is required or preferred or earned approximately $50,000, they would never have enrolled at Thomas Cooley and incurred tens of thousands of dollars in non-dischargeable debt.

125.    In addition, Thomas Cooley occupies a fiduciary position as educators and owes a heightened duty of care to Plaintiffs and members of the Class to act in good faith and engage in fair dealings.  Likewise, by virtue of the fact that many of Thomas Cooley's staff and faculty are attorneys and members of the Michigan Bar, they have certain ethical obligations and responsibilities to Plaintiffs and members of the Class.  Similarly, the existence of a Financial

Aid Office and the fact that Thomas Cooley provides advice and assistance to students on how to procure the necessary financing to fund their education, establishes a fiduciary duty to act in good faith and engage in fair dealings.  Defendants breached these heightened duties of care by making a series of material misstatements and omissions regarding their graduates' employment data and salary information.

126.    The above-referenced material misstatements and omissions were knowingly, willfully, intentionally, maliciously, oppressively, and fraudulently undertaken with the express purpose and intention of defrauding Plaintiffs and the members of the Class, as well as to the substantial benefit of the Defendants.  Consequently, Plaintiffs and members of the Class are entitled to punitive damages, the disgorgement of tuition monies, the reimbursement of attorneys' fees and all other monetary and equitable relief as the Court may find equitable and just.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and members of the Class, pray for relief and judgment against Defendants Thomas Cooley and Does 1 though 20 as follows:

1. For preliminary and injunctive relief enjoining Defendants, their agents, servants, employees and all persons acting in concert with them from continuing to engage in their unlawful recruitment program and manipulation of post-graduate employment data and salary information, and all other unfair, unlawful and /or fraudulent business practices alleged above and that may yet be discovered in the prosecution of this action;

2. For certification of the Class;

3. For restitution and disgorgement of partial tuition monies remitted to Thomas Cooley, totaling $300 million, which is the difference between the inflated tuition paid by Class members based on the material misrepresentations that, depending on the year, approximately 80 percent of graduates are employed within nine months of graduation and earn roughly $50,000, and the true value of a Thomas Cooley degree;

4. For damages;

5. For punitive damages;

6. For an accounting by Defendants for any and all profits derived by them from the herein-alleged unlawful, unfair, and/or fraudulent conduct and/or business practices;

7. For injunctive relief ordering that Thomas Cooley retains unrelated, independent third-parties to audit and verify post-graduate employment data and salary information, and that Thomas Cooley disclose the true percentage of graduates who secure full-time, permanent employment for which a JD degree is required or preferred;

8. For attorneys' fees and expenses pursuant to all applicable laws;

9. For prejudgment interest; and

10. For such other and further relief as the Court may deem proper.

DATED: November 9, 2011                    RESPECTFULLY SUBMITTED,


                                           **THE HYDER LAW FIRM, P.C.**


                                           By: /s/ Steven Hyder
                                               Steven Hyder (P69875)
                                               **The Hyder Law Firm, P.C.**

PO Box 2242
Monroe, MI 48161
hyders@hyderlawfirm.com
Phone (734) 757-4586


David Anziska
**Law Offices of David Anziska**
305 Broadway, 9th Fl.
New York, NY 10007
Phone (212) 822-1496
Facsimile (212) 822-1437


Jesse Strauss (admitted NY – 4182002)
**Strauss Law, PLLC**
305 Broadway, 9th Fl.
New York, NY 10007
Phone (212) 822-1496
Facsimile (212) 822-1437

*Counsel for Plaintiffs, individually
and for all others similarly situated*

65

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial on all causes of action so triable.

DATED: November 9, 2011                    RESPECTFULLY SUBMITTED,


                                           **THE HYDER LAW FIRM, P.C.**


                                    By: /s/ Steven Hyder
                                        Steven Hyder (P69875)
                                        **The Hyder Law Firm, P.C.**
                                        PO Box 2242
                                        Monroe, MI 48161
                                        hyders@hyderlawfirm.com
                                        Phone (734) 757-4586


                                        David Anziska
                                        **Law Offices of David Anziska**
                                        305 Broadway, 9th Fl.
                                        New York, NY 10007
                                        Phone (212) 822-1496
                                        Facsimile (212) 822-1437


                                        Jesse Strauss (admitted NY – 4182002)
                                        **Strauss Law, PLLC**
                                        305 Broadway, 9th Fl.
                                        New York, NY 10007
                                        Phone (212) 822-1496
                                        Facsimile (212) 822-1437

                                        *Counsel for Plaintiffs, individually
                                        and for all others similarly situated*