# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN

JOHN T. MACDONALD JR., CHELSEA A. PEJIC,
SHAWN HAFF, STEVEN BARON, DIMPLE KUMAR,
CARRIE KALBFLEISCH, ANDERS CHRISTENSEN,
DANNY WAKEFIELD, DAN GUINN,
BENJAMIN FORSGREN, SHANE HOBBS, and
KEVIN PRINCE,

       Plaintiffs,                              Case No. 11-cv-00831

vs.                                          Hon. Gordon J. Quist

THOMAS M. COOLEY LAW SCHOOL and        **ORAL ARGUMENT**
DOES 1-20,                                    **REQUESTED**

       Defendants.

The Hyder Law Firm, P.C.
Steven Hyder (P69875)
PO Box 2242
Monroe, MI 48161
(734) 757-4586
hyders@hyderlawfirm.com

Kurzon Strauss LLP
Jesse Strauss
305 Broadway, 9th Floor
New York, NY 10007
(212) 822-1496
jesse@kurzonstrauss.com
Attorneys for Plaintiffs

Miller, Canfield, Paddock and Stone, PLC
Michael P. Coakley (P34578)
Brad H. Sysol (P58138)
Paul D. Hudson (P69844)
150 West Jefferson, Suite 2500
Detroit, MI 48226
(313) 963-6420
coakley@millercanfield.com
sysol@millercanfield.com
hudson@millercanfield.com
Attorneys for Defendant
Thomas M. Cooley Law School

# DEFENDANT THOMAS M. COOLEY LAW SCHOOL'S
## MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

Defendant Thomas M. Cooley Law School ("Cooley"), through its attorneys Miller, Canfield, Paddock and Stone, PLC, hereby moves to dismiss Plaintiffs' Amended Complaint (ECF 22) pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b).

1.      In support of this Motion, Cooley respectfully submits the incorporated Brief in Support of Defendant Thomas M. Cooley Law School's Motion to Dismiss Plaintiffs' Amended Complaint.

2.      Pursuant to Local Rule 7.1(d), Cooley contacted counsel for Plaintiffs on November 22, 2011 in an effort to obtain concurrence in this Motion.  On November 22, 2011, counsel for Plaintiffs refused to concur.

WHEREFORE, Cooley respectfully requests that this Court grant this Motion, dismiss Plaintiffs' action in its entirety with prejudice, and order such other and further relief this Court deems appropriate.

Respectfully submitted,

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.


By: s/  Brad H. Sysol                                            .
        Michael P. Coakley (P34578)
        Brad H. Sysol (P58138)
        Paul D. Hudson (P69844)
        Attorneys for Defendant Thomas M. Cooley Law School
        150 West Jefferson, Suite 2500
        Detroit, MI  48226
        (313) 963-6420
        coakley@millercanfield.com
        sysol@millercanfield.com
        hudson@millercanfield.com

November 22, 2011

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN

JOHN T. MACDONALD JR., CHELSEA A. PEJIC,
SHAWN HAFF, STEVEN BARON, DIMPLE KUMAR,
CARRIE KALBFLEISCH, ANDERS CHRISTENSEN,
DANNY WAKEFIELD, DAN GUINN,
BENJAMIN FORSGREN, SHANE HOBBS, and
KEVIN PRINCE,

        Plaintiffs,                            Case No. 11-cv-00831

vs.                                             Hon. Gordon J. Quist

THOMAS M. COOLEY LAW SCHOOL and        **ORAL ARGUMENT**
DOES 1-20,                                 **REQUESTED**

        Defendants.

---

The Hyder Law Firm, P.C.        Miller, Canfield, Paddock and Stone, PLC
Steven Hyder (P69875)         Michael P. Coakley (P34578)
PO Box 2242                  Brad H. Sysol (P58138)
Monroe, MI 48161           Paul D. Hudson (P69844)
(734) 757-4586              150 West Jefferson, Suite 2500
hyders@hyderlawfirm.com     Detroit, MI 48226
                             (313) 963-6420
Kurzon Strauss LLP          coakley@millercanfield.com
Jesse Strauss                sysol@millercanfield.com
305 Broadway, 9th Floor     hudson@millercanfield.com
New York, NY 10007       Attorneys for Defendant
(212) 822-1496              Thomas M. Cooley Law School
jesse@kurzonstrauss.com
Attorneys for Plaintiffs

---

## BRIEF IN SUPPORT OF
## DEFENDANT THOMAS M. COOLEY LAW SCHOOL'S
## MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES……………………………………………………… iii

INTRODUCTION………………………………………………………………… 1

FACTS…………………………………………………………………………….. 4

     A.    Plaintiffs' 42-Page, 111 Paragraph Complaint and 64-Page,
            126-Paragraph Amended Complaint…………………………………….  4

     B.    The Lawsuits Filed Against Thomas Jefferson School of Law, New
            York Law School, and Cooley………………………………………………  5

     C.    The Claims Against Cooley…………………………………………….. 7

     D.    Cooley's Summary Employment and Salary Reports…………………….  8

     E.    The Federally Mandated Reporting Requirements………………………..  9

     F.    The Plaintiffs…………………………………………………………… 10

MOTION TO DISMISS STANDARDS……………………………………………  10

ARGUMENT………………………………………………………………….. 11

     I.     PLAINTIFFS' AMENDED COMPLAINT VIOLATES RULE 8……… 11

     II.    FAILURE TO JOIN THE ABA AND NALP…………………………  14

           A.    Plaintiffs' Claims Are Aimed at ABA and NALP Standards,
                 Not at Cooley's Compliance With Them…………………………  14

           B.    An Overview of Federal Law and ABA and NALP Standards
                 Governing Law School Reporting Requirements…………………  15

           C.    Plaintiffs Seek to Rewrite ABA and NALP Standards, But Fail
                 To Join the ABA and NALP……………………………………  19

     III.   A COMPREHENSIVE SCHEME OF FEDERAL REGULATION
           GOVERNING LAW SCHOOL EMPLOYMENT AND SALARY
           REPORTING PREEMPTS PLAINTIFFS' CLAIMS…………………….. 20

           A.    Field and Conflict Preemption Standards………………………… 20

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

# TABLE OF CONTENTS (cont.)

B.     Field Preemption……………………………………………21

    1.    A comprehensive scheme of federal regulation occupies the field of law-school employment and salary reporting    21

    2.    The text of the HEA reveals that Congress intended its rules to be exclusive and uniform in the field of law-school employment and salary reporting………………….. 22

C.     Conflict Preemption Bars this State Law Action………………….. 24

IV.    THE STATUTE OF LIMITATIONS BARS AT LEAST FIVE PLAINTIFFS' CLAIMS IN WHOLE OR IN PART……………………… 26

A.     The Michigan Consumer Protection Act Does not Apply………… 26

B.     Plaintiffs Fail To State A Claim For Fraud………………………..  29

    1.    Plaintiffs fail to plead a false statement………………………30

        a.    Plaintiffs fail to allege any specific statement upon which any one of them relied in applying to or deciding to remain enrolled at Cooley……….. 31

        b.    Plaintiffs do not allege that the statements they do identify are false…………………………………34

    2.    Plaintiffs fail to plead silent fraud………………………… 36

    3.    Plaintiffs fail to plead reasonable reliance…………………38

    4.    Plaintiffs fail to plead injury and causation………………... 40

C.     Plaintiffs Fail to State a Claim for Negligent Misrepresentation….. 42

CONCLUSION……………………………………………………………… 44

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

**Federal Cases**

*Baptichon v. Thomas M. Cooley Law School*,
2009 WL 5214911 (W.D. Mich. Dec. 28, 2009)…………………………  27

*Bassett v. National Collegiate Athletic Association*,
528 F.3d  (6th Cir. 2008)……………………………………………………  18

*Bell Atlantic Corp. v. Twombly*, 550 U.S. (2007)…………………………  10-11

*Bennett v. MIS Corp.,* 607 F.3d (6th Cir 2010)……………………………  29-30, 32, 34, 37, 40

*Boles v. Greeneville Housing Auth.*, 468 F.2d (6th Cir. 1972)……….........  20

*Chesterfield Exchange, LLC v. Sportsman's Warehouse, Inc.*,
572 F. Supp.2d (E.D. Mich. 2008)…………………………………………… 42-43

*Cooley v. Kurzon Strauss et al.*, W.D. Mich. Case No. 11-cv-0844……….. 6

*Fednav, Ltd. v. Chester*, 547 F.3d (6th Cir. 2008)………………………… 20-21, 23-24

*Found. for Int. Design Ed. Research v. Savannah Coll. of Art & Design*,
244 F.3d (6th Cir. 2001)…………………………………………………… 17, 22

*Frank v. Dana Corp.*, 547 F.3d (6th Cir. 2008)…………………………… 30

*Gora v. Gelabert*, 2009 WL 3233849 (W.D. Mich. Sept. 30, 2009)……… 14

*Hillsborough County, Fla. v. Automated Medical Labs., Inc.*,
471 U.S. (1985)…………………………………………………………… 21

*Hines v. Davidowitz*, 312 U.S. (1941)…………………………………….. 24

*Jones v. Rath Packing Co.*, 430 U.S. (1977)……………………………… 20

*Medtronic, Inc. v. Lohr*, 518 U.S. (1996)………………………......... 20

*Ohio Mfrs. Assoc. v. City of Akron*, 801 F.2d (6th Cir.1986)……………… 21, 24

*Schied v. Daughtrey*, 2008 WL 5422680 (E.D. Mich. 2008) ………………14

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

**Federal Cases (cont.)**

*Tackett v. M & G Polymers, USA, LLC,*
561 F.3d (6th Cir. 2009)…………………………………………………… 10, 11

**State Cases**

*Alaburda v. Thomas Jefferson School of Law,*
Case No. 2011-00091898, San Diego (California) Superior Court..………5

*Baptichon v. Thomas M. Cooley Law School,*
Ingham County Circuit Court Case No. 03-1784-CZ, Nov. 2, 2004……….27

*Boyle v GMC,* 468 Mich. (2003)……………………………………………25

*Casey v. Auto-Owners Ins. Co.,* 273 Mich. App. (2006)………………….. 43

*Cummins v. Robinson Twp.,* 283 Mich. App. (Mich. App. 2009)…………. 38, 39

*Fejedelem v. Kasco,* 269 Mich. App. (2006)………………………………. 42

*Gomez-Jimenez v. New York Law School,*
Supreme Court of the State of New York Case No. 652226/2011…………6

*Hord v. Environmental Research Inst.,* 463 Mich (2000)…………………. 30, 34-38

*Kaiser v. Allen,* 480 Mich. (2008)…………………………………………. 40

*Kraft v. Detroit Entertainment,* 683 N.W.2d  (Mich. App. 2004)…………. 28

*Laura v. DaimlerChrysler Corp.,* 269 Mich. App. (2006)………………… 5

*Law Offices of Lawrence J. Stockler v. Rose,* 174 Mich. App. (1989)……. 42

*Liss v. Lewiston-Richards, Inc.,* 478 Mich. (2007)…………………………28-29

*McMullen v. Joldersma,* 174 Mich. App. (1988)…………………………...29

*Newton v. Bank West,* 686 N.W.2d (Mich. App. 2004)……………………28

*Quality Mfg., Inc. v. Mann,* 2009 WL 4827068, *10 (Mich. App. 2009)…. 29

*Smith v. Globe Life Ins. Co.,* 597 N.W.2d (Mich. 1999)………………….. 28

*Unibar Maintenance Servs. v. Saigh,* 283 Mich. App. (2009)……………. 40

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

**State Cases (cont.)**

*U.S. Fidelity and Guaranty Co. v. Black,*
412 Mich. 99; 313 N.W.2d (1981)…………………………………….. 29

*Webb v. First of Michigan Corp.*, 195 Mich. App. (1992)………………… 39

*Zine v. Chrysler Corp.*, 236 Mich. App. (1999)…………………………… 27

**Federal Statutes, Rules, and Regulations**

Fed. R. Civ. P. 8……………………………………………………44

Fed. R. Civ. P. 8(a)(2)…………………………………………… 11

Fed. R. Civ. P. 8(d)(1)…………………………………………… 11

Fed. R. Civ. P. 9(b)…………………………………………… 30, 37

Fed. R. Civ. P. 19……………………………………………… 14

Fed. R. Civ. P. 19(a)(1)(A)…………………………………… 14, 19

Code of Federal Regulations, 34 C.F.R. § 668.41(d)…………………….. 17

Code of Federal Regulations, 34 C.F.R. § 668.41(d)(5)………………….. 17

Code of Federal Regulations, 34 C.F.R. § 668.41(d)(5)(i)……………….. 17, 22

Code of Federal Regulations, 34 C.F.R. § 668.41(d)(5)(ii)………………... 17, 22

Code of Federal Regulations, 34 C.F.R. § 668.41(d)(5)(iii)………………..17, 22

Higher Education Act, 20 U.S.C. § 1001………………………………... 9, 15

Higher Education Act, 20 U.S.C. § 1092……………………………….. 15

Higher Education Act, 20 U.S.C. § 1092(a)(1)…………………………… 15, 19, 22-23

Higher Education Act, 20 U.S.C. § 1092(a)(1)(R)………………………… 25, 40

Higher Education Act, 20 U.S.C. § 1092(c)………………………………… 16

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

**Federal Statutes, Rules, and Regulations (cont.)**

Higher Education Act, 20 U.S.C. § 1094……………………………….. 16

Higher Education Act, 20 U.S.C. § 1094(a)……………………………. 16, 23

Higher Education Act, 20 U.S.C. § 1094(a)(8)……………………….…..16

**Michigan Statutes**

MCL 445.901…………………………………………………………….4, 26

MCL 445.902(1)(g)……………………………………………………... 27

MCL 445.903(1)…………………………………………………….. 27

MCL 445.904(1)(a)…………………………………………………….. 28, 29

MCL 445.911(7)…………………………………………………….25, 26

MCL 450.2123(2)(e)…………………………………………………… 28

MCL 600.5813…………………………………………………………... 26

MCL 600.943…………………………………………………….. 28

**Scholarship**

Wright & Miller, Federal Practice and Procedure
    § 1281 at 709 (3d ed. 2004)……………………………………………. 11

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

# INTRODUCTION

Plaintiffs have now filed two lengthy complaints against Defendant Thomas M. Cooley Law School, totaling between them 106 pages and 237 paragraphs. Despite all that, Plaintiffs still fail to state a claim as a matter of law. Plaintiffs allege that they are "naïve, relatively unsophisticated consumers" who misunderstood Cooley's accurate post-graduate employment and salary data when they applied to Cooley. (Am. Compl. ¶ 72.) Plaintiffs allege that, as a result, they did not obtain the "kind of job" that provided the "compensation" and "lifestyle" they expected upon graduation. (*Id.*) Nowhere, however—in either the 42-page, 111-paragraph Complaint or in the 64-page, 126-paragraph Amended Complaint—do Plaintiffs identify *any* specific false statement particular to any one of them on which they relied in applying to or remaining enrolled at Cooley. In other words, despite having two chances to do so, Plaintiffs still fail to specify actionable statements on which their claims are purportedly based.

Plaintiffs—twelve former Cooley students purporting to represent a class of current and former Cooley students—do not allege that *any* of Cooley's reported employment and salary numbers were false or inaccurate. And Plaintiffs do not allege that Cooley failed to comply with any rule or standard of the American Bar Association (ABA) or National Association for Law Placement (NALP) governing law-school employment and salary reporting. Indeed, Plaintiffs acknowledge that Cooley reported its numbers the same way that "nearly every" other law school in the country reports them. Plaintiffs allege instead that they misunderstood Cooley's true, accurate numbers because Cooley's employment numbers included part-time and non-legal employment and the salary numbers were based on voluntary graduate surveys—even though that is exactly what the ABA and NALP standards call for. Plaintiffs do not dispute that the ABA and NALP standards were available to all of them, and Plaintiffs do not allege that they

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

asked anyone for additional information or any of the detail they now—with the benefit of hindsight—claim they needed.

Plaintiffs' Amended Complaint fails as a matter of law for several reasons. First, like its predecessor, Plaintiffs' 64-page, 126-paragraph Amended Complaint violates Federal Rule of Civil Procedure 8. The Amended Complaint includes a seven-page "preliminary statement," an entire four-page section aimed solely at a party not before the Court (the ABA), and, attached as exhibits, a baker's dozen articles, press releases, and letters that have nothing to do with Cooley. The Amended Complaint—even more so than the 42-page, 111-paragraph original Complaint before it—reads more like a free-form blog rant than Rule 8's required "short and plain statement of the claim."

Second, on a tortured journey through Plaintiffs' Amended Complaint, it is more evident than ever that Plaintiffs' claims are aimed at ABA and NALP standards, not Cooley's compliance with them. Plaintiffs ask for an "industry"-wide rewrite of those standards, but fail to name as defendants the very entities whose standards they want the Court to rewrite. Absent joinder of the ABA and NALP, the Court should dismiss the Amended Complaint for failure to join indispensable parties.

Third, Plaintiffs' claims are preempted by federal law. Congress has implemented a comprehensive and uniform national scheme governing law-school employment reporting requirements, and Plaintiffs may not disrupt that scheme through the assertion of state-law tort claims. Under the existing uniform system, prospective students weighing law-school choices would know that all law-school employment and salary data is calculated and reported the same way. In contrast, the remedy Plaintiffs seek would impose law-school- and state-specific requirements, and would leave prospective law students sorting through a mass of varied

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

methodologies to figure out what the numbers mean for each law school in each state. That is not what Congress intended.

Fourth, the claims of at least five of the named Plaintiffs are barred, in whole or in part, by the statute of limitations. Five of the Plaintiffs applied to Cooley well before August 2005, the outer edge of the six-year limitations periods for Michigan Consumer Protection Act and fraud claims, and thus their claims are barred.

Fifth, in addition to all of those fatal defects in the Amended Complaint, each of Plaintiffs' three claims fails on its own as a matter of law. Plaintiffs' purported Michigan Consumer Protection Act (MCPA) claim fails because the MCPA does not apply to Plaintiffs' acquisition of a legal education from Cooley, and because the MCPA *exempts* from its coverage any transaction or conduct already regulated by a state or federal agency, like the federal and Michigan departments of education here. Plaintiffs' fraud and negligent-misrepresentation claims fail because Plaintiffs fail to allege with Federal Rule 9(b)'s required specificity: (i) any false statement; (2) *any* specific statement that any one of them relied on—false, misleading, or otherwise; (iii) any legal duty to provide the specific data "breakdown" they allege Cooley should have provided; (iv) reasonable reliance; and (v) any damages cognizable at law proximately caused by Cooley.

In sum, Plaintiffs' enlarged Amended Complaint—just like their original Complaint—simply fails to state any plausible claim for relief. Plaintiffs say they were "naïve" and "unsophisticated," but two of them served in the United States Navy, one as an officer, and all are college graduates. They complain that they did not get the "kind of job" that would have provided them the "lifestyle" they expected, but at least eight of them have had legal employment since graduating from Cooley, and six of them have owned and operated (apparently successful) law firms, all while admitting that they graduated into "one of the

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

grimmest legal job markets in decades" where salaries for new lawyers have "dropped precipitously." (Am. Compl. ¶ 64-65). In light of all its fatal flaws, Plaintiffs' Amended Complaint fails to state a claim and should be dismissed with prejudice.

## FACTS

### A. Plaintiffs' 42-Page, 111 Paragraph Complaint and 64-Page, 126-Paragraph Amended Complaint

On August 10, 2011, four former Cooley students, purporting to represent a class of all current and former students within an undefined statutory class period, filed a 42-page, 111-paragraph Complaint against Thomas M. Cooley Law School. (ECF 1, Complaint.) Plaintiffs asserted claims for alleged violations of the Michigan Consumer Protection Act (MCPA), MCL § 445.901 et seq. (Count I), common-law fraud (Count II), and negligent misrepresentation (Count III). Plaintiffs alleged that Cooley made misrepresentations and omissions relating to its post-graduate employment and salary statistics. (Compl. ¶ 4.)

On October 20, 2011, Cooley filed a motion to dismiss the Complaint for failure to plead a claim upon which relief can be granted. (ECF 18.) Cooley argued that Plaintiffs' Complaint violated Rule 8, failed to join indispensible parties, was preempted by federal law, was barred by the statute of limitations, and failed to state claims for a violation of MCPA, fraud, or negligent misrepresentation. Cooley noted, among other defects, that Plaintiffs—despite having 42 pages and 111 paragraphs to do so—failed to identify a single specific statement by Cooley that any one of them even *allegedly* relied on in applying to law school. (*See* ECF 18 at 28.)

On November 9, 2011, in response to the motion to dismiss, Plaintiffs filed an Amended Complaint. (ECF 22.) Eight more named Plaintiffs joined, and Plaintiffs now define the purported class as "[a]ll persons who are either presently enrolled or have been enrolled in a JD program at any Thomas Cooley campus anytime since August 11, 2005." (Am. Compl. ¶ 93.)

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

The three claims remain the same, but Plaintiffs add 22 pages and 15 paragraphs, for a total of 64 pages and 126 paragraphs in the Amended Complaint. Despite those additions, Plaintiffs still do not identify—a couple heavy coats of gloss aside—a single specific statement that any one of them relied on in applying to Cooley.

### B. The Lawsuits Filed Against Thomas Jefferson School of Law, New York Law School, and Cooley

Plaintiffs' case has its roots in a similar action filed in California in May 2011 against the Thomas Jefferson School of Law. (*See Alaburda v. Thomas Jefferson School of Law*, Case No. 2011-00091898, San Diego (California) Superior Court, Complaint attached as Exhibit A.) There, as here, the plaintiff alleges that post-graduate employment and salary statistics produced by her law school pursuant to Department of Education, ABA, and NALP rules and regulations were misleading because the statistics included part-time and non-legal positions and were calculated based on student surveys. (*See* Ex. A ¶ 4.)

Following the filing of the Thomas Jefferson complaint, Plaintiffs' lawyers here, the Kurzon Strauss firm of New York, began posting online solicitations for a suit of their own, targeting graduates of New York Law School and Cooley, among others.[1] In the solicitations, Kurzon Strauss and its lawyers falsely accused Cooley of "grossly inflat[ing] its post-graduate employment data and salary information," among other things, and asked Cooley graduates to sign up for a class action against Cooley. In a separate defamation action in this Court filed on

---

[1] Kurzon Strauss LLP has apparently disbanded, but Plaintiffs' lawyers to date have not filed a substitution of counsel in this action. *See* http://www.kurzonstrauss.com (last accessed on October 19, 2011). Plaintiffs' lawyers have filed a "change of address" notification for Jesse Strauss, indicating that Strauss is now associated with Strauss Law PLLC. (ECF 21.)

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

July 14, 2011, Cooley alleges that Kurzon Strauss's statements were false, defamatory, and unethical. (*See Cooley v. Kurzon Strauss et al.*, W.D. Mich. Case No. 11-cv-0844.)[2]

On August 10, 2011, Kurzon Strauss filed purported class-action complaints against Cooley and New York Law School. (*See Gomez-Jimenez v. New York Law School*, Supreme Court of the State of New York Case No. 652226/2011, Complaint attached as Exhibit B.) The complaints echoed the Thomas Jefferson complaint, and mirrored each other. Indeed, the two Kurzon complaints repeated the same allegations from the Thomas Jefferson complaint that the law schools' employment and salary data were misleading. (*See* ECF 1, Compl. ¶¶ 4-5; NYLS Compl. ¶¶ 5.) And each Kurzon complaint was a copy-and-paste job of the other—no fewer than 77 paragraphs of the complaints were nearly identical save the swapping of school names. (*Compare* ECF 1, Compl. ¶¶ 1, 4-5, 7-8, 10-15, 24, 29, 33-40, 42-45, 47-52, 54-56, 58, 61-71, 81-111, *with* Ex. B, NYSL Compl. ¶¶ 1, 4-5, 7-8, 10-15, 23, 28, 34-41, 43-46, 48-53, 56-58, 61, 67-77, 81-111.)

In both cases, Kurzon Strauss seeks to rewrite in gross the reporting requirements mandated by Congress, the Department of Education, and the law-school-accrediting body recognized by the Department of Education, the ABA. Incredibly, 23 paragraphs of the original Complaint and 26 paragraphs of the Amended Complaint do not so much as mention Cooley. (*See* Compl. ¶¶ 1, 11, 13, 14, 35-37, 42-44, 47, 49-51, 63-71; Am. Compl. ¶¶ 1, 11, 48-50, 56-59, 63, 65-67, 79-89, 91-92.) Plaintiffs' allegations instead target allegedly misleading employment- and salary-reporting methods that are "endemic in the law school industry" and followed by "nearly every school." (Am. Compl. ¶ 6.) An entire four-page section of the Amended Complaint, titled "Role of the ABA," is leveled solely against the ABA, currently a

---

[2] U.S. District Judge Robert Jonker recently denied motions by Kurzon Strauss, LLP, Jesse Strauss, and David Anziska to dismiss Cooley's claims. (*See id.* Docket No. 34, Nov. 21, 2011 Order.)

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

non-party.  (*See* Am. Compl. ¶¶ 85-92.)  Plaintiffs' claims against Cooley, in other words, could have been lodged against any other law school in the country that complies with the ABA's reporting requirements.[3]

### C.    The Claims Against Cooley

Plaintiffs' claims against Cooley center on the false allegations that Cooley made "two uniform, written misrepresentations" relating to its post-graduate employment and salary statistics.  (Am. Compl. ¶ 4; emphasis omitted.)  Plaintiffs allege that, "[f]irst, from August 11, 2005 to the present ('Class Period'), TCLS reported . . . that, depending on the year, between 76 and 82 percent of its graduates secured employment within nine months of graduation."  (*Id.*)  Second, Plaintiffs allege that Cooley "grossly inflated its graduates' reported mean salaries, by calculating them based on a small, deliberately selected subset of graduates who submit their salary information."  (*Id.*)

Empty conclusory labels aside (*see, e.g.*, Am. Compl. ¶¶ 4, 5), Plaintiffs do not allege that Cooley's employment or salary statistics were false or inaccurate.  With respect to the post-graduate employment information, Plaintiffs allege instead that the numbers were misleading to them because the "reported employment numbers include *any* type of employment, including jobs that have absolutely nothing to do with the legal industry, do not require a JD degree or are temporary or part-time in nature."  (Am. Compl. ¶ 4; emphasis in original.)  Plaintiffs allege that Cooley should have broken down the numbers further to show the percentages of full-time, part-time, legal, and non-legal jobs.  (*Id.*)  With respect to salary information, Plaintiffs allege that the

---

[3] Indeed, Plaintiffs' lawyers have recently announced plans to sue an additional 15 law schools, and also plan to sue nearly every other law school by the end of next year.  *See, e.g.*, http://www.law.com/jsp/nlj/PubArticleNLJ.jsp?id=1202517930210&Another__law_schools_tar geted_over_jobs_data (last accessed October 19, 2011).

numbers would be lower if they were based on information collected from a larger number of graduates rather than from voluntary graduate surveys. (*Id.*)

Plaintiffs do not identify the precise statistics or data that any one of them allegedly specifically relied upon in deciding to attend or remain at Cooley. Plaintiffs first allege only generally that they "relied on [unspecified] salary data and employment information posted on TCLS's website, [unspecified] marketing material and/or disseminated [sic] to third-party data clearinghouses and publications, *such as* the ABA and *US News*, and specifically relied on TCLS's representations that, depending on the year, approximately 80 percent of its graduates were employed within nine months of graduation and earned a median salary of roughly $50,000." Not one of them though identifies the specific statement or report upon which he or she purportedly relied. (Am. Compl. ¶¶ 16-27; emphasis added.) Plaintiffs then allege generally that, "upon information and belief," Cooley posted certain summary employment and salary surveys on its website. (*See* Am. Compl. ¶¶ 40-43 nn. 4-7) But not one of the Plaintiffs alleges that he or she actually relied on, laid eyes on, or even was *aware of the existence of*, any one of those reports when they decided to apply to or remain at Cooley. (*See* Am. Compl. ¶¶ 16-27.) Although this information was supposedly central to each Plaintiff's decision to attend or stay at Cooley, Plaintiffs nowhere allege or even suggest that they made any inquiries of anyone relating to any of Cooley's data or reports.

### D.    Cooley's Summary Employment and Salary Reports

The documents attached as Exhibits 2-6 to the Amended Complaint are summaries of more detailed data that Cooley provided to NALP in accordance with NALP instructions. (*See* Am. Compl. ¶ 50.) The summary documents themselves, however, provide detailed employment and salary information about the graduating class for a given year. The 2010 summary employment report, for example, specifies the number of graduates (934), and the "[n]umber of

graduates with employment status known" (780). (Am. Compl. Ex. 2.) The document provides the "[p]ercentage of graduates employed" among those who reported an employment status (76%), and the "[a]verage starting salary for all graduates" who provided salary information ($54,796). (*Id.*)

The document then breaks down those numbers for reporting graduates entering private practice, government, public interest, academia, judicial clerkships, and business. (*Id.*) The document details, for example, that 50% of the employed reporting graduates went into private practice, earning an average starting salary of $52,318. (*Id.*) The document then gives further information about the names and sizes of the law firms that employed the reporting Cooley graduates, detailing, for example, that 70 graduates were self-employed, 157 graduates worked for firms with 2 to 10 attorneys, 21 worked at firms with 11-25 lawyers, and so on. (*Id.*) The summary reports for other years provide similarly detailed employment and salary numbers for the prior year's graduating classes. Plaintiffs do not allege, however, that any of the numbers in any of the reports were false or inaccurate.

### E.     The Federally Mandated Reporting Requirements

The summary employment reports and salary surveys Plaintiffs attach as Exhibits 2-6 are part of Cooley's—and every other ABA-accredited law school's—reporting requirements mandated by federal law pursuant to the Higher Education Act, 20 U.S.C. § 1001 et seq., the Department of Education, the ABA, and NALP. As detailed below, those federal accreditation-related reporting requirements are comprehensive and specific, and direct law schools precisely how to collect, calculate, and report their post-graduation employment and salary data. These standards do not leave room for Cooley to wander in reporting its data. Cooley complied with every one of the requirements, and Plaintiffs do not allege otherwise.

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

### F. The Plaintiffs

The twelve named Plaintiffs—who include a "commissioned Naval Officer who served for four years with distinction" and another who served eight years in the Navy before law school—allege that they were "naïve, relatively unsophisticated consumers" who relied on unspecified employment and salary information in deciding to attend Cooley. (Am. Compl. ¶¶ 16, 22, 72.) Plaintiffs allege that they could not find full-time legal employment following graduation from Cooley and were "forced" to seek other employment arrangements, but admit they graduated into one of the grimmest job markets for legal services in memory. (Am. Compl. ¶¶ 16-27, 72.) Ten out of twelve named Plaintiffs passed state bar examinations upon graduating from Cooley. (*Id.*) (Plaintiffs do not allege that Steven Baron or Shane Hobbs passed any state bar examination.) (Am. Compl. ¶¶ 19, 26.) At least eight have been employed in legal jobs after graduating from Cooley. (Am. Compl. ¶¶ 16-27.) Six of them have owned and operated their own law firms. (Am. Compl. ¶¶ 16-18, 20-22.) All of them complain that they did not obtain the "kind of job" that provided the "compensation" and "lifestyle" they had expected upon graduation, yet none of them allege they ever sought clarification from Cooley or anyone else about how to interpret Cooley's accurately reported employment and salary information or the ABA and NALP standards for those reports, even though they allege with the benefit of hindsight this was supposedly important information to them in deciding whether and where to attend law school. (Am. Compl. ¶¶ 16-27, 72.)

### MOTION TO DISMISS STANDARDS

"[T]o survive a motion to dismiss a complaint must contain (1) 'enough facts to state a claim to relief that is plausible,' (2) more than 'a formulaic recitation of a cause of action's elements,' and (3) allegations that suggest a 'right to relief above a speculative level.'" *Tackett v. M & G Polymers, USA, LLC*, 561 F.3d 478, 488 (6th Cir. 2009) (quoting *Bell Atlantic Corp. v.*

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

*Twombly*, 550 U.S. 544 (2007)). "In deciding a Rule 12(b)(6) motion, a district court must (1) view the complaint in the light most favorable to the plaintiff and (2) take all well-pleaded factual allegations as true." *Tackett*, 561 F.3d at 488.

## ARGUMENT

## I.     PLAINTIFFS' AMENDED COMPLAINT VIOLATES RULE 8

Plaintiffs' 64-page, 126-paragraph rant of an Amended Complaint violates Federal Rule of Civil Procedure 8. Rule 8 provides that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief," and that "[e]ach allegation must be simple, concise, and direct." Fed. R. Civ. P. 8(a)(2), 8(d)(1).

The Rule 8 pleading requirements "are for the benefit of both the parties and the court," and when "the rambling and disjointed nature of [a] plaintiff's complaint makes it virtually impossible to find that the allegations state a claim for relief," the Court may dismiss it. *Gora v. Gelabert*, 2009 WL 3233849 (W.D. Mich. Sept. 30, 2009). "Unnecessary prolixity in a pleading places an undue burden on the court and the party who must respond to it because they are forced to select the relevant material from a mass of verbiage." *Id.* (quoting Wright & Miller, Federal Practice and Procedure § 1281 at 709 (3d ed. 2004)). "When faced with voluminous pleadings, neither the Court nor opposing counsel should be required to expend time and effort searching through large masses of conclusory, argumentative, evidentiary and other extraneous allegations in order to discover whether the essentials of claims asserted can be found in such a mélange." *Id.* (internal quotation marks omitted).

Plaintiffs' Amended Complaint is neither short nor plain, and their allegations are neither simple, concise, nor direct. Plaintiffs' Amended Complaint instead contains "large masses of conclusory, argumentative" and "other extraneous allegations" that Cooley and the Court are left to sort through to try to discover Plaintiffs' purported claims. *Gora*, 2009 WL 3233849 at *1.

-11-

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

Plaintiffs start with a melodramatic quote that alleges nothing at all, and then launch into a seven-page "preliminary statement" that hurls untethered and sweeping allegations of "ubiquitous" and "systemic" fraud. (Am. Compl. ¶ 1.) From there, Plaintiffs level a four-page section of the Complaint, titled "Role of the ABA," at a party not before the Court, the ABA. (Am. Compl. ¶¶ 85-92.) Plaintiffs mention Cooley only once in passing in that section. (Am. Compl. ¶ 90.) Plaintiffs tack on another four-page section devoted to "public hand-wringing," "media scrutiny," congressional letters, and legislation proposed by a student bar association. (Am. Compl. ¶¶ 79-84.) Plaintiffs do not mention Cooley a single time in that section. Indeed, Plaintiffs do not mention Cooley in wholly 26 paragraphs of the Amended Complaint. (*See* Am. Compl. ¶¶ 1, 11, 48-50, 56-59, 63, 65-67, 79-89, 91-92.)

Along the way, Plaintiffs toss in extraneous allegations by the fistful. Plaintiffs take aim at the *US News & World Report* (Am. Compl. ¶ 7), tuition increases (¶¶ 9, 69), "exorbitant" salaries and "lavish perks" of Cooley's president and its founder (in three separate paragraphs of the Amended Complaint, ¶¶ 10, 28, 70), Cooley's law-school rankings (¶¶ 35-36), and proverbial foxes guarding proverbial henhouses (¶ 92). In purported support of all those extraneous allegations, Plaintiffs attach to the Amended Complaint a baker's dozen of news articles, press releases, and letters that are irrelevant to any of their claims against Cooley. (*See* Am. Compl. Exs. 8, 10-21.)

Plaintiffs' Amended Complaint hardly presents a "short and plain statement" of their claims. Nowhere can a "simple, concise, and direct" allegation be found. The following allegation from the original Complaint is typical of what remains in the Amended Complaint: "Thus, the law school industry today is much like a game of three-card monte, with law schools flipping ace after ace, while a phalanx of non-suspecting players wager mostly borrowed money based on asymmetrical information on a game few of them can win." (Compl. ¶ 11.) The

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

original allegation was bad enough on its own—it said nothing about Cooley, nothing about any of the Plaintiffs, and nothing about any of the Plaintiffs' supposed claims against Cooley. Worse, it appeared to shamelessly plagiarize a January 8, 2011 New York Times article, in which author David Segal wrote: "Or perhaps this is more like a game of three-card monte, with law schools flipping the aces and a long line of eager players, most wagering borrowed cash, in a contest that few of them can win." (*See* Ex. C, David Segal, "Is Law School a Losing Game?" *The New York Times*, Jan. 8, 2011.) Indeed, it appears that Plaintiffs borrowed quite liberally from Mr. Segal's article without attribution throughout the original Complaint and again in the Amended Complaint. (*Compare, e.g.*, Compl. ¶ 3 and Am. Compl. ¶ 3, alleging "'Enron-style' accounting techniques," *with* Segal at 2, quoting a source stating that "Enron-type accounting standards have become the norm.") After Cooley called out Plaintiffs' apparent plagiarism in its original motion to dismiss the Complaint, Plaintiffs removed the "three-card monte" reference in the Amended Complaint and, in its place, now instead falsely accuse Cooley of "'Madoff'-like consistency" in its employment reporting. (Am. Compl. ¶ 4.)

Amidst all that bloat, Plaintiffs fail to state a claim against Cooley. As discussed in detail below, Plaintiffs purport to bring fraud and misrepresentation claims against Cooley, but entirely fail to identify any specific false statement or omission by Cooley that any one of them relied on in applying to or remaining at Cooley. To be sure, Plaintiffs attach to their Amended Complaint several of Cooley's summary employment and salary surveys. But not a single Plaintiff alleges that he or she actually relied upon, viewed, or was even aware of the *existence* of any of those reports when he or she applied to or attended Cooley. In other words, despite spewing 126 paragraphs over 64 pages on topics ranging from disinfectants to the Department of Education, Plaintiffs fail to specify the very statements on which their claims purportedly depend. And that's despite having *two* chances to write a complaint identifying those statements.

Plaintiffs' Amended Complaint flagrantly violates Rule 8, and the Court should dismiss it. *See Gora*, 2009 WL 3222849 at \*9-10 (dismissing complaint for violating Rule 8); *Schied v. Daughtrey*, 2008 WL 5422680 (E.D. Mich. 2008) (same).

## II.     FAILURE TO JOIN THE ABA AND NALP

### A.     Plaintiffs' Claims Are Aimed at ABA and NALP Standards, Not at Cooley's Compliance With Them

One thing is clear in Plaintiffs' Amended Complaint:  Although Cooley appears in the caption, Plaintiffs really take aim at the ABA and NALP.  Indeed, Plaintiffs have an entire section of the Amended Complaint titled, "Role of the ABA," and several paragraphs of the Amended Complaint are aimed primarily or entirely at the ABA and NALP—not Cooley.  (*See* Am. Compl. ¶¶ 85-92.)  Plaintiffs acknowledge that their underlying claims are not Cooley-specific—noting that "nearly every school" calculates and reports its employment and salary data the same way Cooley does (i.e. the way the ABA and NALP direct all ABA-accredited law schools to report the data).  (Am. Compl. ¶ 6.)  And Plaintiffs allege in the first paragraph of their Amended Complaint that "[t]his action seeks to remedy a *systemic*" issue relating to reporting that is "*ubiquitous* in the legal education industry."  (Am. Compl. ¶ 1; emphasis added.)  Plaintiffs, in other words, take aim at the system-wide rules themselves, not Cooley's compliance with them.

Federal Rule of Civil Procedure 19 provides that a person or entity "*must* be joined as a party" if "in that person's absence, the court cannot accord complete relief among existing parties[.]"  Fed. R. Civ. P. 19(a)(1)(A) (emphasis added).  Here, the Court cannot accord to Plaintiffs the system-wide remedy they seek with the parties currently before the Court.

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

### B. An Overview of Federal Law and ABA and NALP Standards Governing Law School Reporting Requirements

Specifically, even if it were inclined to do so, the Court cannot order a rewrite of the uniform, national employment- and salary-reporting standards applicable to ABA-accredited law schools without joining the bodies responsible for those standards. The ABA, as the accrediting body recognized by the federal Department of Education pursuant to Congressional authority in the Higher Education Act, imposes standards for all law schools to meet to maintain accreditation. Those standards, which adopt NALP employment data reporting rules, are comprehensive and specific, and govern the precise methodologies law schools must employ in calculating and disclosing employment and salary information.[4]

The scheme of reporting rules starts with a federal statute, the Higher Education Act, 20 U.S.C. § 1001 et seq. ("HEA"), and specifically Section 1092 in Title IV of the HEA. Section 1092(a), titled, "Information dissemination activities," provides that "institutions of higher learning"—defined in the HEA to include law schools—"shall carry out information dissemination activities for prospective and enrolled students." 20 U.S.C. § 1092(a)(1). The statute provides that the "information required by this section shall be produced and be made readily available upon request, through appropriate publications, mailings, and electronic media, to an enrolled student and to any prospective student." *Id.* The statute further provides that each law school "shall, on an annual basis, provide to all enrolled students a list of the information

---

[4] Apparently trying to respond to Cooley's arguments about the ABA's position as an indispensable party, in ¶ 12 of the Amended Complaint Plaintiffs assert that they have "no means by which … [to] obtain relief from the ABA because the [ABA] specifically disallows disputes between individuals and approved law schools[.]" (*See also* Am. Compl., ¶ 86.) But Plaintiffs fail to acknowledge Rule 24(b) of the ABA's Rules of Procedure for Approval of Law Schools, which does, in fact, permit "[a]ny person" to file "a written complaint alleging non-compliance with the Standards for the Approval of Law Schools by an approved law school." *See* http://www.americanbar.org/content/dam/aba/publications/misc/legal_education/Standards/2011 _2012_aba_standards_rules_of_procedure.authcheckdam.pdf (last accessed November 21, 2011).

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

that is required to be provided by institutions to students by this section . . . together with a statement of the procedures required to obtain such information." *Id.*

The statute then specifically provides that a law school "shall accurately describe" in those reports its graduates' employment information, and specifically provides the methods by which a law school may gather such information. *Id.* § 1092(a)(1)(R). The HEA provides that a law school "shall accurately describe" in its mandated information dissemination "the placement in employment of, and types of employment obtained by, graduates of the institution's degree or certificate programs[.]" *Id.* The HEA also specifically describes the methods a law school must use to gather such information, providing specifically that the information "shall" be "gathered from such sources as alumni surveys, student satisfaction surveys . . . or other relevant sources." *Id.* The HEA also requires law schools to designate employees "who shall be available on a full-time basis to assist students or potential students in obtaining" the mandatory reporting information. *Id.* § 1092(c).

A separate section of the HEA provides additional employment reporting requirements. Section 1094 provides that each school participating in Title IV federal financial aid programs shall "enter into a program participation agreement" with the Secretary of the Department of Education ("DOE"). The agreement "shall condition the initial continuing eligibility of an institution . . . upon compliance" with a list of requirements. 20 U.S.C. § 1094(a). The list includes, "[i]n the case of an institution that advertises job placement rates as a means of attracting students to enroll in the institution, the institution will make available to prospective students, at or before the time of application . . . the most recent available data concerning employment statistics, graduation statistics, and any other information necessary to substantiate the truthfulness of the advertisements[.]" *Id.* § 1094(a)(8).

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

The DOE picks up from there.  Pursuant to HEA authorization to promulgate regulations governing law schools (among other institutions of higher education), the DOE publishes extensive reporting requirements in the Code of Federal Regulations.  Under regulations titled, "Reporting and disclosure of information," the DOE requires law schools to make "[g]eneral disclosures for enrolled or prospective students."  34 C.F.R. § 668.41(d).  The regulations provide that a law school "must make available to any enrolled student or prospective student through appropriate publications, mailings or electronic media, information concerning . . . the placement of, and types of employment obtained by, graduates of the institution's degree or certificate programs."  *Id.* § 668.41(d)(5).  The regulations provide that the "information provided in compliance with this paragraph may be gathered from . . . alumni or student satisfaction surveys; or . . . other relevant sources."  *Id.* § 668.41(d)(5)(i).  "The institution must identify the source of the information provided in compliance with this paragraph, as well as any time frames and methodology associated with it," and the "institution must disclose any placement rates it calculates."  *Id.* § 668.41(d)(5)(ii)-(iii).

The DOE then hands off to the ABA.  Through specific regulatory grant of authority as the accrediting body of the DOE, the ABA—as a "quasi-administrative" agency, *see Found. for Int. Design Ed. Research v. Savannah Coll. of Art & Design*, 244 F.3d 521, 527-28 (6th Cir. 2001)—adds more detailed reporting standards.  The ABA mandates that all law schools seeking, or seeking to retain, accreditation "shall publish basic consumer information" in "a fair and accurate manner reflective of actual practice."  ABA Standard 509, ABA Interpretation 509-1.  That information includes employment "placement rates and bar passage data."  *Id.*

More specifically, and related to the ABA's "placement rates" reporting requirement, law schools are required to submit detailed employment data to the ABA in an "Annual Questionnaire" the ABA provides.  Questions and data categories that solicit job-placement data

are drawn from NALP's "Graduate Survey Form," which most law schools voluntarily submit to NALP each year. Using the same data law schools report to NALP, the ABA, on its own and in conjunction with the Law School Admission Council (LSAC), publishes an "Official Guide" to ABA-approved law schools, which contains, among many other types of data, standardized information about each law school's graduate employment status, type of employment, and geographic location of employment.

Both the ABA and NALP issue extensive and detailed instructions that govern precisely how law schools are to calculate and report job-placement data. (*See* Ex. D, ABA 2010 Annual Questionnaire Part I; Ex. E, NALP 2010 Methodology for Calculating Graduate Employment Rate.)[5] These instructions are publicly available on the ABA and NALP websites. (*See* http://www.americanbar.org/groups/legal_education/resources/questionnaire.html; http://www.nalp.org/erssinfo.) The ABA, for example, instructed for 2010 that post-graduate employment numbers "*should include graduates employed on a part-time or full-time basis in a legal or non-legal job*." (Ex. D; emphasis added.) NALP, for its part, provides a specific "Methodology for Calculating Employment Rate," which for 2010 included a specific "formula" instructing law schools to disclose the "Number employed divided by the number whose status is known." (Ex. E.) NALP instructed that the "numerator (number employed)" is defined as "[a] graduate who has a job as of February 15 . . . . The job may be *full-time, part-time, temporary, permanent, law-related or not*." (Ex. E; emphasis added.) The "denominator (number whose status is known)" is defined as "those who are employed, those pursuing an advanced degree full-time, those not working and seeking a job, and those neither working nor seeking a job." (*Id.*) NALP states that

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

---

[5] The Court may consider these documents in this motion to dismiss because the ABA and NALP standards and methodologies are "referred to in the Complaint and are central to the claims contained therein." *Bassett v. National Collegiate Athletic Association*, 528 F.3d 426, 430 (6th Cir. 2008).

"*[a]ll employment rates* published by NALP in its national reports, and rates reported back to individual schools in their school report, *are calculated using this methodology*." (*Id.*; emphasis added.)

**C.**  **Plaintiffs Seek to Rewrite ABA and NALP Standards, But Fail to Join the ABA and NALP**

Plaintiffs seek to rewrite all of that.  But instead of engaging the democratic processes to amend the reporting requirements expressly detailed in a federal statute, federal regulations, and standards and rules promulgated by the ABA and NALP, Plaintiffs seek to amend them through the back door with a tort suit—a tort suit that does not even name as parties the very entities whose standards and rules Plaintiffs seek to rewrite.  Instead of the comprehensive national regulations and standards Cooley follows, Plaintiffs want Cooley to "break down" its employment numbers further in all reports of that data (Am. Compl. ¶ 45), and to stop calculating its salary numbers based on voluntary student surveys (Am. Compl. ¶ 46).  Plaintiffs demand this relief despite the express federal laws and regulations directing law schools exactly how to calculate and report their employment data, which expressly instruct that salary data "*shall*" be gathered from sources such as student surveys.  *See, e.g.*, 20 U.S.C. § 1092(a)(1)(R).[6]

The Court should reject that improper attempt.  Federal Rule of Civil Procedure 19 provides that a person or entity "*must* be joined as a party" if, "in that person's absence, the court cannot accord complete relief among existing parties[.]"  Fed. R. Civ. P. 19(a)(1)(A) (emphasis added).  Here the Court cannot accord the complete relief Plaintiffs seek—a rewrite of the ABA

---

[6] As noted above in note 4, in ¶ 12 of the Amended Complaint Plaintiffs assert that they have "no means by which … [to] obtain relief from the ABA because the [ABA] specifically disallows disputes between individuals and approved law schools[.]"  (*See also* Am. Compl., ¶ 86.)  But Plaintiffs fail to acknowledge Rule 24(b) of the ABA's Rules of Procedure for Approval of Law Schools, which does, in fact, permit "[a]ny person" to file "a written complaint alleging non-compliance with the Standards for the Approval of Law Schools by an approved law school." *See* http://www.americanbar.org/content/dam/aba/publications/misc/legal_education/Standards/2011_2012_aba_standards_rules_of_procedure.authcheckdam.pdf (last accessed November 21, 2011).

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

and NALP employment and salary reporting rules—without joining the ABA and NALP. Cooley should not stand on its own to answer for the perceived malfeasance (or nonfeasance) of the ABA and NALP. Unless the ABA and NALP are joined as parties, the Court should dismiss this action against Cooley. *See Boles v. Greeneville Housing Auth.*, 468 F.2d 476 (6th Cir. 1972) (holding that a plaintiff failed to join an indispensable party, the federal Department of Housing and Urban Development, where the plaintiff challenged a building project approved by HUD).

## III. A COMPREHENSIVE SCHEME OF FEDERAL REGULATION GOVERNING LAW SCHOOL EMPLOYMENT AND SALARY REPORTING PREEMPTS PLAINTIFFS' CLAIMS

### A. Field and Conflict Preemption Standards

Plaintiffs' claims also fail because the comprehensive and uniform national federal scheme of regulation set forth above preempts the field of law school employment and salary reporting requirements, which Plaintiffs seek to regulate here through a scattershot of state tort laws. Extensive regulations promulgated pursuant to federal statute by layers of federal administrators and regulators expressly govern these reporting requirements. Cooley complied with every one of them, and Plaintiffs do not allege otherwise. Plaintiffs cannot, through assertions of state-law tort claims, impose additional and conflicting requirements.

Congress's intent is the "ultimate touchstone in every preemption case." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996). "Preemption can be express or implied." *Fednav, Ltd. v. Chester*, 547 F.3d 607, 618 -619 (6th Cir. 2008). Express preemption does not apply here because Congress did not "explicitly state" either way in the relevant statute—the HEA— whether it intended to preempt state reporting (or tort) laws. *Jones v. Rath Packing Co.*, 430 U.S. 519, 525 (1977). "Implied preemption comes in two forms, field and conflict preemption." *Fednav*, 547 F.3d at 618. Field preemption occurs when either (1) "the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress 'left no

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

room' for supplementary state regulation"; or (2) "a statute's text indirectly reveals [that] Congress intended its rules to be exclusive in a particular field." *Id.* at 618, 620 (quoting *Ohio Mfrs. Assoc. v. City of Akron*, 801 F.2d 824, 828 (6th Cir.1986) and *Hillsborough Cty, Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985)). Conflict preemption in turn "occurs when a provision of state law 'actually conflicts with federal law.'" *Fednav*, 547 F.3d at 619 (quoting *City of Akron*, 801 F.2d at 828).

### B.    Field Preemption

1.    <u>A comprehensive scheme of federal regulation occupies the field of law-school employment and salary reporting</u>.

The first step in a field-preemption analysis is to define the relevant "field" a plaintiff seeks to regulate. *See Fednav*, 547 F.3d at 619. In their Amended Complaint, Plaintiffs seek to impose additional employment and salary reporting requirements nationally on accredited law schools across the entire "legal industry" through their state-law tort claims. (*See* Am. Compl. ¶ 1) (alleging that Plaintiffs seek to compel law schools in general to "make critical, material disclosures" that will bring "transparency to the way law schools report post-graduate employment data and salary information"). The relevant field, therefore, is the field of uniform national law-school employment and salary reporting.

A comprehensive scheme of federal regulations occupies that field. As set forth in great detail above, the federal regulatory scheme is so comprehensive that providing even a summary of the regulations takes some leg-work. The scheme starts with a federal statute, the HEA, which provides that a law school "shall accurately describe" in its mandated reporting "the placement in employment of, and types of employment obtained by, graduates of the institution's degree or certificate programs," and *specifically* describes the methods a law school must use to gather such information, providing that the information "shall" be "gathered from such sources

as alumni surveys, student satisfaction surveys . . . or other relevant sources." 20 U.S.C.
§ 1092(a)(1). The DOE then echoes those requirements in its own regulations. 34 C.F.R.
§ 668.41(d)(5)(i)-(iii). From there, the ABA—as a quasi-administrative agency, *see Found. for Int. Design*, 244 F.3d at 527-28—and NALP add more detailed reporting standards, including standards governing "placement rates and bar passage data." ABA Standard 509, ABA Interpretation 509-1.

The "scheme of federal regulation" governing law-school employment and salary reporting "is sufficiently comprehensive to make reasonable the inference that Congress 'left no room' for supplementary state regulation." *Fednav*, 547 F.3d at 618. Indeed, the comprehensive federal scheme *specifically* governs the precise reporting standards Plaintiffs seek to amend here. Federal law therefore preempts the field, and the Court should reject Plaintiffs' attempt to rewrite the United States Code, the Code of Federal Regulations, and the ABA and NALP's reporting standards promulgated pursuant thereto.

        2.    <u>The text of the HEA reveals that Congress intended its rules to be exclusive and uniform in the field of law-school employment and salary reporting</u>.

Moreover, the text of the HEA demonstrates Congress's intent to occupy the field. Even where federal regulation is not comprehensive and even where Congress has not expressly stated its intent to preempt, federal law preempts state law where "a statute's text indirectly reveals [that] Congress intended its rules to be exclusive in a particular field." *Fednav*, 547 F.3d at 620.

The text of the HEA indirectly reveals that Congress intended its rules to be exclusive in the field of law-school employment and salary reporting. In some cases, Congress contemplates federal and state cooperation and coordination in carrying out the purposes of a federal statute, indicating that state laws or regulations may supplement federal law in a federal-state regulatory regime. In such cases, Congress indirectly expresses its intent not to preempt state law. *See*

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

*Fednav*, 547 F.3d at 620 (holding that federal statute did not preempt state law where the statute expressly noted that carrying out the statute's purposes would "require the participation and cooperation of the Federal Government and State governments").

This is not such a case. The text of the HEA does not contemplate any federal-state regulatory regime governing law-school employment and salary reporting. To the contrary, the text of the HEA indicates that Congress intended the law-school reporting rules to be uniformly applied at a national level to all accredited law schools, and uniformly enforced by a federal agency, the DOE. The reporting rules apply to "[e]ach eligible institution"—meaning all accredited law schools nationwide—and provide that each law school "shall" disclose employment and salary in a uniform way, detailed in the statute. 20 U.S.C. § 1092(a)(1). In the HEA, Congress then expressly appoints the Secretary of the federal DOE—as opposed to any state body such as state bar associations or state boards of education—to uniformly enforce those uniform reporting requirements, including by requiring each law school to "enter into a program participation agreement" with the Secretary, who "condition[s] the initial continuing eligibility of an institution [to participate in Title IV federal financial aid programs] . . . upon compliance" with the reporting requirements. *Id.* § 1094(a).

In short, the comprehensiveness of federal regulation and the text of the HEA both demonstrate Congress's desire for a uniform federal scheme of regulation governing law-school employment and salary reporting. That mandate of uniformity makes good sense. Uniform reporting requirements provide prospective students deciding which of the many law schools throughout the nation to attend with uniform data that has been collected and presented in the same way across the board. A prospective student should know that the employment and salary data for Northwestern University Law School in Illinois was calculated based on the same

methodology and presented in the same way as the data for Tulane Law School in Louisiana or Cooley in Michigan. Uniformity promotes informed decision-making.

Allowing a plaintiff to impose additional requirements and change reporting methodologies through state-law tort suits one law school at a time would turn that uniform system on its head. Plaintiffs here, for example, seek to impose special reporting requirements on Cooley in Michigan based on Michigan statutory and common law, and Plaintiffs' lawyers have filed a separate suit in New York seeking to impose similar reporting requirements on New York Law School through New York tort claims. A third suit is pending in California, seeking to impose requirements on Thomas Jefferson School of Law based on California tort claims.[7] If this suit and the ones like it were permitted to proceed, instead of a uniform national set of law-school reporting requirements, there would be a patch-work of law-school- or state-specific requirements. And prospective students—instead of being able to pull up the ABA website to see exactly how the employment and salary numbers are calculated by every ABA-accredited law school—would be left to sort through numbers and methodologies that differed across the law schools they apply to. That is not what Congress intended.

### C. Conflict Preemption Bars this State Law Action

Plaintiffs' claims are also preempted because the reporting requirements they propose flatly conflict with federal law. Conflict preemption occurs when either "a provision of state law 'actually conflicts with federal law,'" or where the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Fednav*, 547 F.3d at 619, 623 (quoting *City of Akron*, 801 F.2d at 828, *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

---

[7] Plaintiffs' lawyers have also announced plans to sue 15 other law schools. *See supra* note 3.

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

Here, Plaintiffs' proposed employment and salary reporting requirements conflict with federal law and stand as an obstacle to the objectives of Congress, the DOE, the ABA, and NALP of creating a national uniform set of job data reporting requirements for all ABA-accredited law schools. Plaintiffs' proposed requirement that law schools *not* be permitted to gather salary information from graduate surveys plainly conflicts with Congress's directive in the HEA that such information "*shall*" be "gathered from such sources as alumni surveys [and] student satisfaction surveys[.]" 20 U.S.C. § 1092(a)(1)(R) (emphasis added). Yet alumni surveys and student satisfaction surveys are precisely what Plaintiffs say is wrong with law-school salary numbers. (*See* Am. Compl. ¶ 4.) And, as detailed above, Plaintiffs' proposed requirements—which would be uniquely thrust upon Cooley in this action via state-law statutory and tort claims and perhaps upon other law schools in other states on an ad hoc basis via similar tort suits—would stand as a hulking obstacle in the way of uniformity in law-school employment and salary reporting. Federal law preempts Plaintiffs' claims.

## IV. THE STATUTE OF LIMITATIONS BARS AT LEAST FIVE PLAINTIFFS' CLAIMS IN WHOLE OR IN PART

At least five of the Plaintiffs' claims suffer yet another defect: Plaintiffs Pejic, Baron, Kumar, Wakefield, and Forsgren's claims are plainly barred in whole or in part by the relevant statutes of limitation. The statute of limitations for both MCPA and fraud claims is six years. *See* MCL 445.911(7) (MCPA); *Laura v. DaimlerChrysler Corp.*, 269 Mich. App. 446 (2006); MCL 600.5813 (fraud); *Boyle v GMC*, 468 Mich. 226 (2003). Such claims accrue "when the wrong is done," not when a plaintiff discovers the alleged wrong. *Boyle*, 468 Mich. at 231. That means here that any claims relating to alleged statements made more than six years prior to August 10, 2011, the date Plaintiffs filed their Complaint—meaning statements made prior to August 10, 2005—are barred by the statute of limitations.

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

Plaintiffs Pejic, Baron, Kumar, Wakefield, and Forsgren all applied to Cooley prior to 2005. (*See* Am. Compl. ¶¶ 17, 19, 20, 24, 25.) Although Plaintiffs do not allege specifically when the remaining Plaintiffs applied to Cooley, it appears Plaintiffs MacDonald, Haff, Kalbfleisch, Guinn, Christenson, Hobbs, and/or Prince also may have applied to Cooley prior to August 10, 2005. (*See* Am. Compl. ¶¶ 16, 18, 21, 22, 23, 26, 27; noting that Cooley allegedly posted a 2005 employment summary "prior to" Plaintiffs enrolling at Cooley.) All of Plaintiffs' claims relate to "salary data and employment information posted on TCLS's website . . . and/or disseminated to third-party clearinghouses" that they allegedly relied on "[i]n applying and deciding to remain enrolled at Thomas Cooley." (Am. Compl. ¶¶ 16-27.) Any claim that Plaintiffs relied on any such information "[i]n applying to" Cooley prior to August 10, 2005 is plainly barred by the statute of limitations. MCL 445.911(7); MCL 600.5813. So, too, is any claim that they relied on any such information in "deciding to remain enrolled" at Cooley prior to August 10, 2005. *Id.*

## V. EACH OF PLAINTIFFS' CLAIMS FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

The claims themselves fare no better. Underneath the Amended Complaint's overarching structural defects—failure to comply with Rule 8, failure to join indispensable parties, preemption, and statute-of-limitations bars—each of the Amended Complaint's three claims fails on its own as a matter of law.

### A. The Michigan Consumer Protection Act Does not Apply

Plaintiffs allege in Count I that Cooley violated the Michigan Consumer Protection Act, MCL 445.901 et seq. ("MCPA"), by allegedly making misrepresentations relating to its postgraduate employment and salary statistics, which allegedly deceived Plaintiffs and induced them to pay for a legal education at Cooley. The claim fails as a matter of law for two reasons.

First, the MCPA does not apply to the acquisition or providing of legal education. The MCPA applies only to the "conduct of trade or commerce," which is defined in the statute as "providing goods, property, or service primarily for *personal, family, or household purposes*." MCL 445.903(1); MCL 445.902(1)(g) (emphasis added). The MCPA "does not supply protection" if the goods or services are purchased "primarily for business or commercial rather than personal purposes." *Zine v. Chrysler Corp.*, 236 Mich. App. 261, 273 (1999). Courts applying the MCPA have determined—in cases involving a plaintiff seeking to obtain a law degree from Cooley no less—that "the MCPA does not apply" to a former law student's acquisition of a legal education, in part because the student's admitted purpose in attending law school was "to obtain work and start his own business." *See Baptichon v. Thomas M. Cooley Law School*, 2009 WL 5214911, *6-7 (W.D. Mich. Dec. 28, 2009); *see also Baptichon v. Thomas M. Cooley Law School*, Ingham County Circuit Court Case No. 03-1784-CZ, Nov. 2, 2004 Order Granting Summary Disposition at 9-11 (rejecting MCPA claim because the legal "education purchased from [Cooley] was clearly intended for a commercial or business purpose") (opinion attached as Ex. F).

Here, Plaintiffs admit by their own allegation that they sought a legal education from Cooley "for the purpose of securing full-time, permanent employment upon graduation." (Am. Compl. ¶ 113) (*see also id.* ¶ 72, "These prospective students are applying to law school with *one objective* in mind: to attain the kind of job that provides compensation and a lifestyle that is commensurate with and worthy of the enormous time, money and personal sacrifice invested in a legal education") (emphasis added). Plaintiffs, in other words—just like the student in *Baptichon*—admit they obtained a legal education for "commercial rather than personal purposes." *Zine*, 236 Mich. App. at 273; MCL 445.903(1); MCL 445.902(1)(g). The MCPA therefore does not apply, and Plaintiffs' purported MCPA claim fails as a matter of law. *Id.*

Second, the MCPA does not apply because it expressly "exempts any 'transaction or conduct specifically authorized under laws administered by a regulatory board or officer acting under statutory authority of this state or the United States.'" *Liss v. Lewiston-Richards, Inc.*, 478 Mich. 203, 205-06 (2007) (quoting MCL 445.904(1)(a)). The purpose of the MCPA is to protect consumers by regulating transactions not otherwise subject to regulation. *See id.* at 205-06. Thus, where a transaction is already regulated by a state or federal regulatory body, the MCPA specifically excludes it from the statute's coverage, and the courts have held that the MCPA exempts a wide variety of regulated transactions. *See id.*, 478 Mich. at 206 (rejecting MCPA claim relating to the construction of a residential home because the "general transaction of residential homebuilding" was specifically authorized and licensed by the Michigan Occupational Code); *Smith v. Globe Life Ins. Co.*, 597 N.W.2d 28, 38 (Mich. 1999) (sale of credit life insurance); *Kraft v. Detroit Entertainment*, 683 N.W.2d 200, 204 (Mich. App. 2004) (operation of slot machines); *Newton v. Bank West*, 686 N.W.2d 491, 493 (Mich. App. 2004) (sale of residential mortgage loans). To determine whether the MCPA exempts a transaction from its coverage, "[t]he relevant inquiry is whether the general transaction is specifically authorized by law, regardless of whether the specific misconduct alleged is prohibited." *Liss*, 478 Mich. at 206 (internal quotation marks omitted).

Here, the relevant general transaction is the providing of legal education, the service Cooley provided to Plaintiffs. (*See* Am. Compl. ¶¶ 16-27.) That transaction is "specifically authorized under law administered by a regulatory board or officer acting under statutory authority of this state or the United States"—namely, the Michigan Department of Education and Michigan Board of Law Examiners acting under statutory authority of the State of Michigan, *see, e.g.*, MCL § § 450.2123(2)(e) and 600.943, and, as explained in detail above, the federal Department of Education acting under statutory authority of the United States. The MCPA

-28-

therefore exempts the transaction from its coverage. *Liss*, 478 Mich. at 205-06; MCL 445.904(1)(a). Plaintiffs' MCPA claim fails as a matter of law and must be dismissed.

### B. Plaintiffs Fail To State A Claim For Fraud

Plaintiffs' fraud claim (Count II) fails to state a claim upon which relief can be granted. To state a claim for fraud, plaintiffs must establish *all* of the following: (1) that defendant made a material representation; (2) that it was false; (3) that when he made it he knew that it was false, or made it recklessly, without any knowledge of its truth and as a positive assertion; (4) that he made it with the intention that it should be acted upon by plaintiff; (5) that plaintiff acted in reliance upon it; and (6) that he thereby suffered injury. *U.S. Fidelity and Guaranty Co. v. Black,* 412 Mich. 99, 114; 313 N.W.2d 77, 83 (1981); *see also Bennett v. MIS Corp.,* 607 F.3d 1076, 1101 (6th Cir 2010). Plaintiffs must also establish that their reliance upon the false representation was reasonable. *See Bennett*, 607 F.3d at 1101. Each of these elements is essential, and the absence of any one of them is fatal. *U.S. Fidelity*, 412 Mich. at 114.

A plaintiff alternatively may satisfy the second requirement, a false statement, by alleging "the failure to divulge a fact or facts the defendant has a duty to disclose." *McMullen v. Joldersma*, 174 Mich. App. 207, 213 (1988). So-called "silent fraud" or "fraudulent concealment" arises where the defendant has a legal duty to speak but fails to disclose material facts, causing the plaintiff to have a false impression. *Id.*; *see Quality Mfg., Inc. v. Mann*, 2009 WL 4827068, *10 (Mich. App. 2009) ("The elements of silent fraud are the same as those of fraudulent misrepresentation except that the misrepresentation supporting a claim of silent fraud is based on the defendant's suppression of a material fact that he was legally bound to disclose, rather than on an affirmative representation"). When a plaintiff brings such a claim, however, the plaintiff must allege a specific "legal *duty* to make a disclosure," which usually arises when a plaintiff makes an inquiry, and the defendant gives an incomplete reply that is truthful in itself

but omits material information. *Hord v. Environmental Research Inst.*, 463 Mich 399, 412 (2000). In fact, the Michigan Supreme Court has noted that "in *every* case" it had reviewed, "the fraud by nondisclosure was based upon statements by the vendor that were made in response to a specific inquiry by the purchaser[.]" *Id.* at 409 (emphasis added).

"[B]ecause the nature of the evidence in cases involving allegations of fraud is often circumstantial, and claims of fraud can be fabricated easily," Federal Rule 9(b) requires that fraud be pled with particularity. *Bennett*, 607 F.3d at 1101. The Sixth Circuit interprets Rule 9(b) "as requiring plaintiffs to allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *Id.* at 1100; *see Frank v. Dana Corp.*, 547 F.3d 564, 569–70 (6th Cir. 2008) (to satisfy Rule 9(b) a plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent") (internal quotation marks and citation omitted). If a plaintiff fails to meet those standards—that is, if a plaintiff fails to plead each and every element of a fraud claim with 9(b) particularity—the claim must be dismissed.

1. Plaintiffs fail to plead a false statement.

Plaintiffs fail to meet those standards. First, Plaintiffs fail to identify a specific false statement on which any one of them relied. The "statements" at issue, as defined in the Amended Complaint section titled "Statements Constituting Fraud," are Cooley's summary post-graduate employment and salary reports for the years 2004-2006 and 2009-2010. (Am. Compl. ¶¶ 39-46; Am. Compl. Exs. 2-6.) But (a) not a single one of the Plaintiffs alleges that he or she relied on, viewed, or was even aware of the *existence* of, any one of those summary reports when he or she applied to or decided to remain enrolled at Cooley; and (b) at any rate, Plaintiffs do not

allege—empty conclusory labels aside—that any one of those reports was actually false or inaccurate.

      *a.*    *Plaintiffs fail to allege any specific statement upon which any one of them relied in applying to or deciding to remain enrolled at Cooley.*

A careful reading of the Amended Complaint shows that no Plaintiff alleges that he or she ever actually relied on any of the summary employment reports. Plaintiffs instead allege only that the summary reports were posted on the web "prior to" their enrolling at Cooley or "while" they were enrolled there, without ever—not a single time, anywhere in the massive 64-page, 126-paragraph Amended Complaint—alleging that they actually relied on, analyzed, asked questions about, read, or even looked at any of the reports before or during their time at Cooley. (*See* Am. Compl. ¶¶ 16-27.)

Instead of affirmatively alleging that they relied on the summary reports, Plaintiffs turn to sleight-of-hand. It proceeds as follows: First, Plaintiffs allege *generally* that they relied on statements *without identifying any specific statement they relied on*: "[Plaintiff] relied on TCLS's representations that, depending on the year, approximately 80 percent of its graduates were employed within nine months of graduation and earned a median salary of roughly $50,000." (Am. Compl. ¶¶ 16-27.) Then, Plaintiffs identify specific statements "posted" on the web without alleging that they actually relied on them: "Indeed, prior to [Plaintiff] enrolling in Thomas Cooley, the school posted on its website an employment report asserting that 82 percent of 2005 graduates secured employment within nine of [sic] graduation, and while [Plaintiff] was enrolled in TCLS the school posted on its website an employment report asserting that 82 percent of 2006 graduates secured employment within nine months of graduation." (Am. Compl. ¶ 16; *see id.* ¶¶ 17-27.) The desired effect, of course, is to create the *impression* that Plaintiffs

read and relied on the statements they identify, without actually *alleging* that they read and relied on those specific statements.

Plaintiffs' allegations fall far short of the pleading standards for fraud claims. Plaintiffs were required to allege with specificity the "time, place, and content of the alleged misrepresentation *on which he or she relied*." *Bennett*, 607 F.3d at 1101 (emphasis added). That means Plaintiffs were required to allege (1) the specific statements on which they relied in applying to and deciding to remain enrolled at Cooley, including the time, place, and content of the statements; and (2) that they actually relied on those statements to their detriment in applying to and deciding to remain enrolled at Cooley.

Plaintiffs allege nothing of the sort. The general statements Plaintiffs *do* allege they relied on—Cooley's alleged "representations that, depending on the year, approximately 80 percent of its graduates were employed within nine months," and, elsewhere, "information posted on TCLS's website," "disseminated to third-party data clearinghouses and publications such as the ABA and *US News*," "and/or" Cooley's "marketing materials"—are not stated with anything close to Rule 9(b)'s required particularity. (Am. Compl. ¶¶ 16-27.) Indeed, Plaintiffs cannot even narrow those alleged statements down to a month or *year*, and the "and/or" in that allegation means the Plaintiffs do not even know which of those *general*, loosely defined alleged statements he or she purportedly relied on. Moreover, Plaintiffs do not include *any* of those general statements in their so-called "Statements Constituting Fraud" section. (Am. Compl. ¶¶ 37-46.) The only statements Plaintiffs identify in that section are the 2004-06 and 2009-10 summary employment reports. (*Id.*) And, as detailed above, Plaintiffs do not allege that they relied on any one of those statements. (Am. Compl. ¶¶ 16-27.) Indeed, Plaintiffs concede that they are not even certain when Cooley posted the summary reports on its website, alleging only

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

"[u]pon information and belief" for each report that it was posted for some period of time, such as "between 2007 and 2010." (Am. Compl. ¶¶ 39-43 nn. 4-7.)[8]

Courts "will not strain to construe [a] complaint to say by . . . implication what it very simply could have said directly." *Cf. Fednav*, 547 F.3d at 618. As Plaintiffs note in the opening paragraph of their Amended Complaint, they of course have "personal knowledge" of their "individual actions." (Am. Compl. at p. 1.) If Plaintiffs had in fact relied on the summary reports, they would have known so and it would have been very easy for them to allege as much plainly, directly, and concisely, as they are required by law to do. Plaintiffs have failed to do so, and have failed to allege any specific statement—false or otherwise—on which any one of them relied in applying to or remaining enrolled at Cooley.

That omission is stark and fatal to Plaintiffs' claims. In Plaintiffs' original Complaint, the only statement they identified was Cooley's 2010 summary report. After Cooley pointed out in its motion to dismiss that Complaint that Plaintiffs had failed to allege that any one of them had relied on or even viewed the 2010 report (and couldn't have because it came after all of them graduated from law school), Plaintiffs added allegations relating to the 2004-06 and 2009 reports in their Amended Complaint. But Plaintiffs *still* do not allege that they relied on any of the summary reports. In other words, despite having *two* chances to write a complaint stating a fraud claim upon which relief could be granted, Plaintiffs still cannot even allege (much less prove) that they relied on any of the so-called "Statements Constituting Fraud."

---

[8] Similarly, though all of the Plaintiffs generally allege that they also "relied on salary data and employment information . . . disseminated to third-party data clearinghouses and publications, such as the ABA and *US News*," *see, e.g.*, Am. Compl. ¶ 16, not a single Plaintiff alleges that he or she actually looked at any specific Cooley employment or salary data reported by the ABA or *US News*, much less relied on it.

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

b.      *Plaintiffs do not allege that the statements they do identify are false.*

At any rate, Plaintiffs also do not allege that anything in the summary employment reports (or any other statement by Cooley) is false. A claim for "[f]raudulent misrepresentation, of course, requires a *false representation* by the defendant." *Hord*, 463 Mich. at 411 (emphasis in original). Plaintiffs fail to plead one here.

The summary employment and salary reports detail for each year the percentage of Cooley graduates employed nine months after graduation and the average starting salary for all graduates responding to the survey, based on ABA and NALP guidelines for calculating those numbers. For 2004, Cooley reported that 79% of graduates who responded to a NALP employment survey were employed nine months after graduation, and the average starting salary of those providing that information was $46,000. (Am. Compl. Ex. 6.) For 2005, 82% of those reporting were employed, and the average starting salary of those reporting was $49,000. (*Id.* Ex. 5.) For 2006, the numbers were 82% reporting employment, with a $52,000 average starting salary among those providing that information. (*Id.* Ex. 4.) The numbers were 78% and $52,000 and 76% and $54,796 for 2009 and 2010, respectively. (*Id.* Exs. 2, 3)[9]

Empty conclusory labels aside,[10] Plaintiffs do not allege that any of those numbers are false or inaccurate. Plaintiffs do not allege, in other words, that Cooley falsified any of those numbers, or falsely counted graduates who were not employed as employed, or falsely reported

---

[9] Plaintiffs do not attach any reports for the years 2007 and 2008.

[10] In various places in the Amended Complaint, Plaintiffs conclusorily allege that the summary employment and salary reports were "false" or "demonstrably false." (*See, e.g.*, ¶¶ 4-5, 112.) However, as detailed above and below, and those labels aside, it is clear from Plaintiffs' allegations that Plaintiffs allege not that the statements are false but that they contained "omissions"—alleged failure to break down the employment data—that allegedly misled Plaintiffs. (*See* Am. Compl. ¶ 45.) Plaintiffs' conclusory labels that Cooley's statements were "false" do not nearly satisfy the pleading requirements for fraud claims. *See Bennett*, 607 F.3d at 1101.

any graduate's salary, or anything of the sort (because it didn't happen). Plaintiffs allege instead that the truthful employment reports make "factual *omissions* that would give prospective students a *more accurate* picture of their post-graduation employment prospects." (Am. Compl. ¶ 45; emphasis added.) This is a tacit admission that the numbers Cooley reported were indeed accurate, and Plaintiffs complain only that Cooley "simply presents an overall employment number, and fails to break down what percentage of graduates were employed in either part-time or temporary positions, or whether the job requires a JD degree." (*Id.*) That does not amount to an allegation of a false statement.[11]

Plaintiffs' failure to plead a false statement here is much like the plaintiff's failure in *Hord v. Environmental Research Inst.*, 463 Mich 399 (2000). In *Hord*, the plaintiff alleged that he relied to his detriment on an earlier year's financial statement that his employer had given him at a job interview. *Id.* at 406-07. The plaintiff alleged that the financial statement gave him the false impression that the company was doing well, when in fact once he got there the financial situation at the company had deteriorated. *Id.*

The Michigan Supreme Court rejected the plaintiff's fraud claim. The court reasoned that "[f]raudulent misrepresentation, of course, requires a *false representation* by the defendant." *Id.* at 411 (emphasis in original). But there was "no claim that the financial statement covering the fiscal year 1991 was in any way false[.]" *Id.* at 410. "The plaintiff says he inferred from it that [the company's] current financial condition was consistent with that statement[, but] the statement itself is not a representation to that effect." *Id.* "*A plaintiff's subjective*

---

[11] Plaintiffs argue that "there is no better proof" that Cooley's numbers are inflated than the purported fact that Cooley's placement rates have allegedly remained "eerily steady throughout the past decade," despite an increase in enrollment. (*See* Am. Compl. ¶ 53.) The fallacy in that argument jumps off the page: Under that logic, one might just as well say that there is no better proof that the Bureau of Labor Statistics inflated U.S. employment numbers than the fact that unemployment rates remained "eerily steady" during the 1990s despite an increase in population.

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

*misunderstanding of information that is not objectively false or misleading cannot mean that a defendant has committed the tort of fraudulent misrepresentation*." *Id.* at 411 (emphasis added). "Thus the claim of fraudulent misrepresentation must fail because [the company] did not make any false statement." *Id.* at 410.

So it is here. There is no claim that Cooley's employment and salary reports are false, and Plaintiffs' alleged subjective misunderstanding of information in those reports that was not objectively false or misleading cannot give rise to a claim for fraud. Plaintiffs fail to allege a false statement, and thus their fraud claim fails. *Id.*

      2.    <u>Plaintiffs fail to plead silent fraud</u>.

Plaintiffs also fail to plead "silent" fraud. Plaintiffs' "fraud" claim, although titled "Fraud," if anything is a so-called "silent fraud" claim—Plaintiffs allege not that Cooley's employment and salary statements were false, but that the statements were misleading because the data allegedly contained "omissions" that would have given prospective students "a *more* accurate picture of their post-graduate employment prospects." (Am. Compl. ¶ 45; emphasis added.) Specifically, Plaintiffs allege that the (truthful, accurate) reported employment numbers "fail[ed] to break down what percentage of graduates were employed in either part-time or temporary positions, or whether a job requires a JD degree." (*Id.*) Plaintiffs further allege that the (truthful, accurate) average-salary numbers were misleading because they were calculated based on only a "subset of graduates who submit their salary information." (Am. Compl. ¶ 4.)

That's simply not silent fraud. "[M]ere nondisclosure is insufficient." *Hord*, 463 Mich. at 412. To plead silent fraud, a plaintiff must plead a "legal *duty* to make a disclosure." *Id.* (emphasis added). Such a legal duty arises "most commonly in a situation where inquiries are made by the plaintiff, to which the defendant makes incomplete replies that are truthful in themselves but omit material information." *Id.* Indeed, the Michigan Supreme Court has noted

that its "review of Michigan Supreme Court precedent regarding this issue reveals that, in *every* case, the fraud by nondisclosure was based upon statements by the vendor that were made in response to a specific inquiry by the purchaser[.]" *Id.* at 409 (emphasis added).

Plaintiffs plead nothing of the sort. Nowhere in the Amended Complaint do the Plaintiffs allege that they made any inquiry of Cooley for a "breakdown" of the employment data, and nowhere in the Amended Complaint do the Plaintiffs allege that Cooley made any incomplete reply to any inquiry by Plaintiffs. Certainly Plaintiffs fail to allege any such inquiry or a Cooley reply with the specificity Rule 9(b) requires, i.e., among other things, the "time, place, and content" of an inquiry and the reply. *Bennett*, 607 F.3d at 1100.

Nor did any other legal duty require Cooley to provide the breakdown Plaintiffs now ask for in this action. To the contrary, as detailed above, Cooley fully complied with the legal duties it *did* have, including the reporting duties expressly spelled out in Title IV, DOE regulations, and ABA and NALP standards. Those rules and standards required that Cooley present its employment and salary information exactly the way it did.[12]

Again, Plaintiffs' claim here is similar to the plaintiff's silent-fraud claim in *Hord*. There, as noted above, the plaintiff alleged that he had relied to his detriment on an earlier year's financial statement his employer had provided him at a job interview. The plaintiff alleged that, although accurate, the report was misleading because it gave him the impression that the company was in good financial health, even though it later turned out not to be so. The

---

[12] Plaintiffs make vague allegations in paragraph 117 of the Amended Complaint that Cooley "occupies a fiduciary position as educators and owes a heightened duty of care to Plaintiffs and members of the Class to act in good faith and engage in fair dealings," that "by virtue of the fact that many of Thomas Cooley's staff and faculty are attorneys" they purportedly have "certain ethical obligations and responsibilities to Plaintiffs and members of the Class," and that "the existence of a Financial Aid Office . . . establishes a fiduciary duty[.]" (Am. Compl. ¶ 117.) It is entirely unclear what those allegations mean but, at any rate, they are insufficient to allege a specific legal duty to disclose, particularly given Cooley's full compliance with its actual legal duties to disclose mandated by the HEA, the DOE, and the ABA.

Michigan Supreme Court outright rejected the plaintiff's silent-fraud claim, holding that the employer had no legal duty to disclose any additional financial information not provided in the report. Quoting favorably from a lower-court opinion, the Supreme Court noted that the "most disconcerting aspect" of the plaintiff's claim "is that it expects that defendant will anticipate plaintiff's inference and then requires defendant to take appropriate remedial action." *Id.* at 407. "To elevate an inference made by another party's interpretation of a document that, on its face, is clear and unambiguous, *puts every supplier of information in jeopardy for the unforeseen misinterpretation of that information*." *Id.* (emphasis added). The court rejected that construction of silent fraud, noting that the plaintiff "simply had to ask" if he was confused about the information provided, and could not "expect[] the courts to bail him out because his assumption about [the information] was incorrect." *Id.*

Plaintiffs' claim here is similarly disconcerting. Plaintiffs do not allege that *any* of Cooley's employment or salary data was false or inaccurate. The methodology used to calculate and present that data was fully available to Plaintiffs, and Plaintiffs do not allege otherwise. Plaintiffs allege only that they supposedly misunderstood or were naïvely misled by that truthful and accurate data because the data was not broken down or gathered the specific way Plaintiffs now claim they wish it had been. Plaintiffs cannot "expect[] the courts to bail [them] out" for their "unforeseen misinterpretation" of accurate data. *Id.* Plaintiffs' silent-fraud claim—to the extent Plaintiffs have actually asserted one within their "Fraud" claim—therefore fails and must be dismissed.

> 3. <u>Plaintiffs fail to plead reasonable reliance</u>.

For many of those same reasons, Plaintiffs' alleged reliance on the allegedly omitted data was unreasonable. "[T]o establish a claim of fraudulent misrepresentation, the plaintiff must have reasonably relied on the false representation" or omission. *Cummins v. Robinson Twp.*, 283

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

Mich. App 677, 696 (2009). But "alleged misrepresentations regarding the terms of written documents that are available to the plaintiff cannot support the element of reasonable reliance." *Id.* at 698; *see also Webb v. First of Michigan Corp.*, 195 Mich. App. 470 (1992) ("there can be no fraud where the means of knowledge regarding the truthfulness of the representation are available to the plaintiff and the degree of their utilization has not been prohibited by the defendant").

Here, Plaintiffs' claim rests on the proposition that they assumed Cooley's summary reports indicating that approximately 80% of its surveyed graduates were employed nine months after graduation and earned an average salary of approximately $50,000 to mean that 80% of the graduates were actually employed in *full-time legal* jobs and that the salary numbers were based on data from *all* of Cooley's graduates in a given year, rather than from voluntary student surveys. That assumption was entirely unreasonable.

Indeed, as Plaintiffs admit, "*basic deductive reasoning*" tells Plaintiffs that Cooley's numbers include graduates "employed in either part-time or temporary or non-legal positions." (Am. Compl. ¶ 54; emphasis added.) According to Plaintiffs, it was misleading for Cooley to include solo practitioners as "employed"—because, Plaintiffs say, "[m]ost likely, the overwhelming majority of these graduates are not gainfully employed, and are either working on a part-time or temporary basis." (*Id.*) But Plaintiffs themselves admit that Cooley's summary employment reports *expressly state* that self-employed graduates *are* included in the total employment number. (*Id.*) As Plaintiffs note, "*[a]ccording to the 2010 Employment Report . . . 70 graduates—or nearly 25 percent—are solo practitioners*." (*Id.*; emphasis added.) It was not at all reasonable for Plaintiffs to assume that the total employment number did not include solo practitioners when the document itself and "basic deductive reasoning" told

Plaintiffs that it did. Nor was it at all reasonable for Plaintiffs to assume that the numbers meant something other than what they said.

Moreover, the publicly available and readily accessible ABA and NALP methodologies explaining the data state in detail precisely how law schools are to calculate and report that data. With respect to employment data, the ABA and NALP methodologies specifically explain that the data "include graduates employed on a part-time or full-time basis in a legal or non-legal job," and "may be full-time, part-time, temporary, permanent, law-related or not." (Exs. D, E; emphasis added.) With respect to salary, the ABA, NALP, and the *United States Code itself* provide that salary data "shall" be "gathered from such sources as alumni surveys." 20 U.S.C. § 1092(a)(1)(R). It was thus entirely unreasonable for Plaintiffs to believe that Cooley's data reflected only full-time legal jobs and was not gathered from alumni surveys.

4.      Plaintiffs fail to plead injury and causation.

Finally, Plaintiffs also fail to plead injury and causation. *See Bennett*, 607 F.3d at 1101. Plaintiffs in fraud cases must plead with specificity "proximate cause between defendants' alleged . . . misrepresentation[] and fraud and plaintiff's damages." *Unibar Maintenance Servs. v. Saigh*, 283 Mich. App. 609, 625 (2009). "[A] proximate cause is a foreseeable, natural, and probable cause of the plaintiff's injury and damages." *Id.* (quoting *Kaiser v. Allen*, 480 Mich. 31, 37-38 (2008).

Plaintiffs do not define their injury with any kind of specificity. Plaintiffs each make the same nebulous claim regarding injury: They allege that had they "been aware that Thomas Cooley's reported placement rates included temporary and part-time employment and/or employment for which a JD was not required or preferred, [they] would have elected to either pay less to TCLS or perhaps not attend the school at all." (Am. Compl. ¶¶ 16-27; emphasis added; *see also id.* ¶ 116, "Had Plaintiffs known of the dire financial straits faced by the

overwhelming majority of TCLS students following graduation, and that in fact substantially fewer than 80 percent of Thomas Cooley graduates secure full-time, permanent employment for which a JD degree is required or preferred or earned approximately $50,000, they would never have enrolled at Thomas Cooley and incurred tens of thousands of dollars in non-dischargeable debt").

This is a real head scratcher. Plaintiffs nowhere explain what they mean when they allege that they would have "elected" to "pay less to" Cooley had Cooley provided the data breakdown Plaintiffs now wish it had provided, but instead leave the Court and Cooley to guess how they would have "pa[id] less." And it is telling that Plaintiffs all concede that they can only speculate that "perhaps" they would have decided not to attend Cooley. (Am. Compl. ¶¶ 16-27.)

Regardless, Plaintiffs have not pled an injury cognizable at law. At least eight of the Plaintiffs have had legal employment since graduating from Cooley. (Am. Compl. ¶¶ 16-27.) Six of them have owned and operated law firms. (Am. Compl. ¶¶ 16-18, 20-22.) They now complain that they did not get the "kind of job" that would have provided them the "lifestyle" they expected, (Am. Compl. ¶ 72), but Cooley's summary employment reports were not a guarantee of any specific job or even a prediction as to any specific job Plaintiffs would land or when they might land it. The reports certainly were not a guarantee of a specific "lifestyle" for Plaintiffs. (Am. Compl. ¶ 72.)

If that's not enough, Plaintiffs have also utterly failed to plead that Cooley's summary employment report *caused* their purported injury. As detailed above, Plaintiffs do not tie any specific statement by Cooley to any specific action they took. Plaintiffs therefore do not allege that any statement by Cooley proximately caused their alleged injury. Moreover, innumerable intervening factors negate proximate causation. Cooley did not control the grades Plaintiffs received in law school, their class rank, whether they graduated, or whether they took and passed

state bar examinations that would be a prerequisite for many of the types of employment they claim they wanted; Cooley did not control how Plaintiffs constructed their résumés to make themselves relatively more or less marketable to potential legal employers than their classmates or students from other law schools; Cooley was not sitting in the interview chair with Plaintiffs when they met with prospective employers; Cooley was not sitting across the desk from Plaintiffs when the legal employers were making decisions on whom to hire for the law firm jobs Plaintiffs claim they wanted; and, most obviously, Cooley did not control the fact that Plaintiffs graduated into "one of the grimmest legal job markets in decades" where salaries for new lawyers have "dropped precipitously." (Am. Compl. ¶ 64-65). In short, Plaintiffs' bare allegation that Cooley caused their purported nebulous injury falls far short of stating a claim for relief.

### C. Plaintiffs Fail to State a Claim for Negligent Misrepresentation

Plaintiffs' claim for negligent misrepresentation (Count III) fails for many of the reasons detailed in Section B above. Under Michigan law, "[t]he elements of negligent misrepresentation are: (1) justifiable and detrimental reliance on (2) information provided without reasonable care (3) by one who owed a duty of care." *Chesterfield Exchange, LLC v. Sportsman's Warehouse, Inc.*, 572 F. Supp.2d 856, 866 (E.D. Mich. 2008) (citing *Law Offices of Lawrence J. Stockler v. Rose*, 174 Mich. App. 14, 33 (1989)); *see Fejedelem v. Kasco*, 269 Mich. App. 499, 502 (2006) ("A claim for negligent misrepresentation requires plaintiff to prove that a party justifiably relied to his detriment on information prepared without reasonable care by one who owed the relying party a duty of care").

Plaintiffs have not pled justifiable and detrimental reliance for the same reasons explained above. *See Fejedelem*, 269 Mich. App. at 503 ("Whether a person *justifiably* relies on a document is indistinguishable from whether the person *reasonably* relies on it. Indeed, courts

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

sometimes treat the two words essentially as synonyms") (emphasis in original). It was not reasonable or justifiable for Plaintiffs to think that the employment and salary numbers meant something other than what they said, or to believe that the numbers were gathered or presented in a way other than the way expressly spelled out in a federal statute, federal regulations, and ABA and NALP instructions.

Plaintiffs wholly fail to allege facts that establish that Cooley provided the employment and salary reports "without reasonable care" or that Cooley breached any duty of care. *Id.*[13] It is undisputed that Cooley reported its employment and salary numbers in full compliance with ABA and NALP standards, federal law, and federal regulations. Cooley therefore provided its employment and salary numbers in full and reasonable compliance with its duty of care. *Chesterfield Exchange*, 572 F. Supp. at 866. Plaintiffs do not allege otherwise.[14]

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

---

[13] Indeed, the fact that Plaintiffs failed to plead the elements of negligent misrepresentation is clear from the fact that Plaintiffs' purported negligent-misrepresentation claim is word-for-word the same as Plaintiffs' purported fraud claim. (Compare Am. Compl. Count II with Count III.)

[14] In Plaintiffs' prayer for relief, they purportedly seek punitive damages. (*See* Am. Compl. at p. 64.) Punitive damages, however, are not recoverable under Michigan law. *See Casey v. Auto-Owners Ins. Co.*, 273 Mich. App. 388, 400 (2006).

# CONCLUSION

Plaintiffs have failed to state any claim upon which relief can be granted, the claims are preempted by federal law and are barred in whole or in party by the applicable statutes of limitations, and the Amended Complaint violates Rule 8. The Court therefore should dismiss this action in its entirety and with prejudice.

Respectfully submitted,

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.


By: s/ Brad H. Sysol                                    .
  Michael P. Coakley (P34578)
  Brad H. Sysol (P58138)
  Paul D. Hudson (P69844)
  Attorneys for Defendant Thomas M. Cooley Law School
  150 West Jefferson, Suite 2500
  Detroit, MI 48226
  (313) 963-6420
  coakley@millercanfield.com
  sysol@millercanfield.com
  hudson@millercanfield.com

November 22, 2011

## CERTIFICATE OF ELECTRONIC SERVICE

I hereby certify that on November 22, 2011, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system which will automatically send e-mail notification of such filing to the attorneys of record:

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.


By: s/ Brad H. Sysol                                      .
      Michael P. Coakley (P34578)
      Brad H. Sysol (P58138)
      Paul D. Hudson (P69844)
      Attorneys for Defendant Thomas M. Cooley Law School
      150 West Jefferson, Suite 2500
      Detroit, MI 48226
      (313) 963-6420
      coakley@millercanfield.com
      sysol@millercanfield.com
      hudson@millercanfield.com

November 22, 2011

19,569,885.3\018763-00021

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.