UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

————————————

JOHN T. MACDONALD JR., *et al.*,
on behalf of themselves and all others
similarly situated,

             Plaintiffs,                           Case No.  1:11-CV-831

v.                                        HON. GORDON J. QUIST

THOMAS M. COOLEY LAW SCHOOL
and DOES 1-20,

             Defendants.

————————————————————————/

## OPINION GRANTING COOLEY'S MOTION TO DISMISS

Plaintiffs are 12 graduates of Defendant, Thomas M. Cooley Law School.[1]  They allege that Cooley deceived, defrauded, and misled them regarding Cooley graduates' employment prospects, which caused Plaintiffs to pay more to attend law school than they would have paid if Plaintiffs had known the true prospects of their employment.  The three-count amended complaint charges Cooley with violating Michigan's Consumer Protection Act (MCPA), M.C.L. § 445.901, *et seq.* (Count I); fraud (Count II); and negligent misrepresentation (Count III).  Plaintiffs seek, among other things, $300,000,000 in damages.

Pursuant to Fed. R. Civ. P. 12(b)(6), Cooley filed a Motion to Dismiss.  (Docket no. 30.) Plaintiffs responded to the motion, to which Cooley replied.  (Docket nos. 37 & 40.)  Moreover, after a New York state trial court issued an opinion granting a law school's motion to dismiss a

---

[1] Plaintiffs also claim that they have filed suit against unnamed individuals, "Does 1-20," but nowhere in the complaint are any unnamed individuals identified in any way.

nearly identical complaint, against a different law school, Cooley filed supplemental authority, to which Plaintiffs replied. (Docket nos. 43-2, 43-3 & 48.) This Court has heard oral argument. On June 7, 2012, this Court rejected several of Cooley's arguments, but did not dismiss any claim in its entirety.

Because, in this Court's judgment, the MCPA does not apply to the purchase of a legal education to attain employment, Count I does not state a claim for which relief can be granted. Counts 2 and 3 are dismissed because one representation is literally true and because Plaintiffs unreasonably relied upon the representations that comprise Plaintiffs' misrepresentation claims. Therefore, Cooley's motion will be granted and Plaintiffs' amended complaint will be dismissed.

## I. ALLEGATIONS

The following factual background comes from the allegations in Plaintiffs' amended complaint (which has 66 pages containing 126 paragraphs) and the attached exhibits.[2]

Cooley, a for-profit law school, enrolls more law students than any other law school in the country–approximately 4,000. (Amended Complaint (AC) ¶ 2.) It is ranked in the bottom tier by every major law school ranking. (*Id.* ¶ 5.c.) Cooley has the lowest admission standards of any accredited or provisionally-accredited law school in the country. (*Id.* ¶ 31.) In 2010, the incoming students' mean Law School Admissions Test (LSAT) score was 146,[3] and the mean undergraduate Grade Point Average was 2.99. (*Id.*) Cooley enrolls roughly 1,500 new students each year.

---

[2] Although a court is normally precluded from considering matters outside of the pleadings in addressing a motion under Rule 12(b)(6), there is an exception for documents attached to or referenced in a complaint. "When a court is presented with a Rule 12(b)(6) motion, it may consider the Complaint and any exhibits attached thereto . . . so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. NCAA*, 528 F.3d 426, 430 (6th Cir. 2008) (citation omitted).

[3] Each person who takes the LSAT receives a scaled score between 120 and 180. According to some websites, a score of 146 is usually around the 30th percentile. That is, a person receiving a score of 146 performed as well as 30 percent of the total number of people who took the LSAT throughout the country, and 70 percent of the LSAT-takers did better than a person who received a 146.

Approximately one-third of those students fail to graduate.  (*Id.* ¶ 32.)  Don LeDuc, the Dean of Cooley, was paid more than $500,000 in 2008 and 2009.  (*Id.* ¶ 10.)

Cooley publishes its own law-school rankings, which have been met with "great skepticism, if not outright ridicule, and no reputable academic or legal commentator takes it serious."  (AC ¶ 36 & n.1.)  Dean LeDuc and former Dean Brennan publish these rankings.  "Incredulous[ly]," (AC ¶ 35), these rankings place Cooley as the second best law school in the country.  (*Id.*)  Apparently, Dean LeDuc and former Dean Brennan think that the overall size of the student body, library total square footage, and library seating capacity are some of the factors that make a law school better than others.  (*Id.*)  Cooley still publishes these rankings, which are still available on Cooley's website at the following link, on page 22 of the .pdf document (page 1 of the actual book)http://www.cooley.edu/rankings/_docs/Judging_12th_Ed_2010.pdf (last  visited July 20, 2012).

The crux of Plaintiffs' complaint, however, comes from an "Employment Report and Salary Survey" ("Employment Report") that Cooley provides to prospective and current students.  (AC. Exs. 2-6.) Plaintiffs allege that Cooley "blatantly misrepresent[s] and manipulat[es] its employment statistics" in these Employment Reports.  (*Id.* ¶ 3.)  Specifically, "Cooley, through both print and internet marketing materials it produced and disseminated, makes **two uniform, written misrepresentations**."  (*Id.* ¶ 4.)  The following is an excerpt from the 2010 Employment Report, which includes the "two uniform, written misrepresentations" that form the basis of Plaintiffs' complaint:

---

## THOMAS M. COOLEY LAW SCHOOL
## EMPLOYMENT REPORT AND SALARY SURVEY

## 2010 GRADUATES

**Theodore Souris**, **Augustus B. Woodward**, and **James Witherell classes**
(September 2009, January 2010, and May 2010)

_____

Number of 2010 graduates                                      934
Number of graduates with employment status known             780
Percentage of graduates employed                              76%
Average starting salary for all graduates                     $54,796

---

(AC Ex. 2.)  The full 2010 Employment Report is attached to this opinion as Exhibit 1.

Plaintiffs allege that the statistics are "demonstrably false" for three reasons.  First, Cooley's reported placement rates and salary information have remained steady from 2004 to 2009, even though the total number of annual Cooley graduates has increased from 404 to 958 students over that time period.  (*Id.* ¶ 5.a.)  That is, according to basic algebra, if the total number of graduates increases (further saturating the legal market) and the total number of jobs available remains constant or decreases, then Cooley's placement rate should have decreased.  Second, Cooley's reported placement rates and salary information have "barely dipped since the onslaught of the 'Great Recession.'" (*Id.* ¶ 5.b.)  Third, Cooley's statistics are at odds with the employment statistics reported by NALP because, despite Cooley's lenient admission standards and bottom-tier ranking, Cooley's statistics suggest that it had a higher placement rate than 40 percent of the nation's law schools.  (*Id.* ¶ 5.c.)  Of course, every one of these "reasons" relies upon the assumption that Cooley graduates' employment statistics move in correlation with overall market statistics.

4

All of the data in the Employment Reports is compiled from a survey that Cooley sends to all recent graduates.  (*Id.* ¶ 39.)  For Cooley's 2010 Employment Report, about 83 percent of Cooley's graduates responded to the survey.  (*Id.*)  Each survey returned by a graduate is unaudited, unverified, and self-reported.  (*Id.*)

Cooley disseminates employment data and salary information to sources that are readily available to prospective students.  (AC ¶ 47.)  Cooley made the Employment Reports available to current and prospective students through Cooley's website.  In addition, Cooley, along with every accredited law school, provides this information to U.S. News and World Report, the American Bar Association (ABA), and the National Association for Law Placement (NALP).  (*Id.*)  U.S. News and the ABA do not require law schools to distinguish between part-time and full-time employment or temporary and permanent employment.  (*Id.*)  NALP uses employment data from law schools that differentiates between part-time and full-time employment, and temporary and permanent employment.  (*Id.* ¶ 50.)  However, NALP does not make employment data for each law school available to the public, but instead compiles and tabulates the data into a single document which contains aggregate statistical information about all law schools.  (*Id.*)  Cooley's compliance with NALP's requirements shows that Cooley is capable of providing more accurate data to prospective and current students.  (*Id.* ¶ 51.)

Plaintiffs are purportedly acting for themselves and all persons who currently attend or graduated from Cooley from August 11, 2005 to the present.  (*Id.* ¶ 4.a.)  Plaintiffs' goal is to bring "transparency to the way law schools report post-graduate employment data and salary information, by requiring that they make critical, material disclosures that will give both prospective and current students a more accurate picture of their post-graduate financial situation."  (*Id.* ¶ 1.)

5

The 12 named Plaintiffs' allegations are nearly identical, with the exception of their post-graduate employment (or lack thereof).  (*See id.* ¶¶ 16-27.)

The common allegations are that each Plaintiff "did not enroll in Thomas Cooley with the intention of using his [or her] JD degree for an ongoing business or to start a non-legal business, but rather intended to use [the] JD degree to prospectively better himself [or herself] and his [or her] personal circumstances through the attainment of full-time employment in the legal sector." (*Id.* ¶ 16.)  "In applying and deciding to remain enrolled at Thomas Cooley, [each Plaintiff] relied on salary data and employment information posted on [Cooley's] website, marketing material and/or disseminated to third-party data clearinghouses and publications, such as the ABA and U.S. News." (*Id.*)  Each Plaintiff specifically relied upon Cooley's "representations that, depending on the year, approximately 80 percent of its graduates were employed within nine months of graduation and earned a median salary of roughly $50,000." (*Id.*)  "Had [each Plaintiff] been aware that Thomas Cooley's reported placement rates included temporary and part-time employment and/or employment for which a JD was not required or preferred, he [or she] would have elected to either pay less to [Cooley] or perhaps not attend the school at all." (*Id.*)

Plaintiff John T. MacDonald is an attorney in Michigan, who opened his own law firm.  (*Id.* ¶ 16.)  Plaintiffs Chelsea Pejic, Shawn Haff, Carrie Kalbfleisch, and Dan Guinn have also opened their own law firms.  (*Id.* ¶ 17, 18, 21, & 22.)  A few other Plaintiffs have found meaningful legal work, while others did not.  Shane Hobbs has worked as a substitute teacher and day laborer at a golf course since graduation.  (*Id.* ¶ 26.)  Danny Wakefield manages the deliveries of telephone books. (*Id.* ¶ 24.)  Steve Baron is unemployed.  (*Id.* ¶ 19.)

Plaintiffs allege that "Cooley is primarily marketing its product to naive, relatively unsophisticated consumers – many of whom are barely removed from college – who are often

making their first 'big-ticket' purchase." (*Id.* ¶ 72.) In turn, Cooley's alleged misrepresentations led Plaintiffs to take on tens of thousands of dollars in debt so that they could attend Cooley. (*Id.* ¶¶ 8, 12.) Currently, tuition for full-time students at Cooley exceeds $36,000 per year. (*Id.* ¶ 8.) When taking into account living expenses and other miscellaneous costs, the annual cost to attend Cooley is approximately $52,000. (*Id.* ¶ 28.) According to U.S. News, Cooley's graduates have an average of $105,798 in student loans when they graduate. (*Id.* ¶ 8.)

Cooley's students, like all other law students throughout the country, or any student at any college in the country for that matter, are graduating into one of the toughest job markets in decades. (*Id.* ¶ 64.) Law firms, federal and state governments, and other employers have slashed recent law school graduate hiring. According to the complaint, in 2009, twice as many people passed the bar as there were job openings. (*Id.* ¶ 67.) In addition, the national median salary for recent graduates has declined a great amount. (*Id.* ¶ 66.)

## II. STANDARD OF REVIEW

A complaint may be dismissed for failure to state a claim if it fails to give the defendant fair notice of what the claim is and the grounds upon which it rests. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 1964 (2007). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1964-65; *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570, 127 S. Ct. at 1974. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 556 U.S. at 678, 129 S. Ct. at 1949.

### III. ANALYSIS

**A.      Violation of the MCPA (Count I)**

Plaintiffs allege that Cooley violated the MCPA because Cooley's "actions constitute unlawful, unfair, deceptive and fraudulent actions/practices as defined" by the MCPA. (AC ¶ 104.) Cooley allegedly "engaged in a pattern and practice of knowingly and intentionally making numerous false representations and omissions of material facts, with the intent to deceive and fraudulently induce reliance by Plaintiffs." (*Id.* ¶ 106.)

Plaintiffs allege that they "did not enroll in Thomas Cooley with the intention of using their JD degree for an ongoing business or to start a non-legal business, but rather intended to use their JD degree to prospectively better themselves and their personal circumstances *through the attainment of full-time employment in the legal sector*." (*Id.* ¶ 105 (emphasis added).) In other words, Plaintiffs applied to law school "with one objective in mind: to attain the kind of job" that they wanted, so that they could live a lifestyle commensurate with that job. (*Id.* ¶ 72.)

The MCPA applies to "conduct of trade or commerce," which is defined as "providing goods, property, or service primarily for personal, family, or household purposes." M.C.L. §§ 445.903(1), 445.902(1)(g). "[I]f an item is purchased primarily for business or commercial rather than personal purposes, the MCPA does not supply protection." *Zine v. Chrysler Corp.*, 236 Mich. App. 261, 273, 600 N.W.2d 384, 393 (1999); *see also Slobin v. Henry Ford Health Care*, 469 Mich. 211, 217, 666 N.W.2d 632, 635 (2003). The purpose for which an item is purchased depends on how the consumer puts the product to use. *Zine*, 236 Mich. App. at 273, 600 N.W.2d at 393; *Saunter v. Fleetwood Enters.*, No. 05-73252, 2007 WL 1343806, at *7 (E.D. Mich. May 8, 2007).

Plaintiffs did not purchase a Cooley legal education so that they could leisurely read and understand Supreme Court Reports, or to provide legal services for themselves or family members.

8

Rather, Plaintiffs purchased a legal education in order to make money as lawyers so that they could live a lifestyle that they believed (perhaps naively) would be more pleasing to them.  This is a business purpose.  Of course, making more money can lead to happiness, or not.  For example, purchasing a new woodworking machine might make the owner of a small furniture company more productive, more money, and, therefore, happier, but the purchase is still for business or commercial rather than for personal purposes.  Even the president of a major company of one type or another may receive personal pleasure from the acquisition of another company or machine, but this would not change the fundamental purpose of the purchase – "primarily for business or commercial." Plaintiffs "intended" their legal employment to subsequently better their personal circumstances, these better "personal circumstances" would be attained through their work as lawyers, i.e. a business.  *See Baptichon v. Thomas M. Cooley Law Sch.*, No. 1:09-cv-562, 2009 WL 5214911, at *6-*7 (W.D. Mich. Dec. 28, 2009) (finding, in an action by a former Cooley student against Cooley, that the "Plaintiff attended Cooley (i.e., purchased its services) so that he could obtain work and start his own business," and therefore, the MCPA did not apply because the plaintiff purchased the services for a business or commercial purpose).  Likewise, this Court holds that the Complaint does not allege a claim under the Michigan Consumer Protection Act.

**B.      Fraud (Count II)–Cooley Did Not Make a False Representation Upon Which Plaintiffs Reasonably Relied**

Plaintiffs identify two representations in Cooley's employment reports that comprise Plaintiffs' fraud claim.[4]   The two representations were disseminated in each of Cooley's

---

[4] Plaintiffs have complied with Fed. R. Civ. P. 9(b).  A plaintiff alleging fraud must "allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *Coffey v. Foamex L.P.*, 2 F.3d 157, 161-62 (6th Cir. 1993); Fed. R. Civ. P. 9(b).  In other words, a party alleging fraud must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  *Frank v. Dana*, 547 F.3d 564, 570 (6th Cir. 2008) (quotation omitted).

Plaintiffs allege the time at which they relied upon the statements: when deciding to apply or remain enrolled

Employment Reports for 2004, 2005, 2006, 2009, and 2010 graduates.[5]  (AC Exs. 2-6.)  From the 2010 Employment Report excerpt, the two alleged misrepresentations are italicized below.

---

# THOMAS M. COOLEY LAW SCHOOL
# EMPLOYMENT REPORT AND SALARY SURVEY

## 2010 GRADUATES

**Theodore Souris**, **Augustus B. Woodward**, and **James Witherell classes**
(September 2009, January 2010, and May 2010)

---

| | |
|---|---|
| Number of 2010 graduates | 934 |
| Number of graduates with employment status known | 780 |
| *Percentage of graduates employed* | *76%* |
| *Average starting salary for all graduates* | *$54,796* |

---

(AC Ex. 2.)

    *1.*    *Percentage of Graduates Employed*

In the 2010 Employment Report, Cooley indicates that 76% of its graduates were employed within nine months of graduation.  This statistic could, at most, refer only to the 780 graduates who responded to the survey because Cooley could not know the employment status of those who did

---

at Cooley.  Plaintiffs sufficiently allege the place: the Employment Reports either on Cooley's website or disseminated through third party materials.  Last, Plaintiffs allege the specific content upon which they relied: the two statistics in the Employment Reports.  In fact, the amended complaint includes the very documents that contain the representations upon which Plaintiffs' fraud claim is based.  (AC Exs. 2-6.)  Therefore, Plaintiffs sufficiently allege reliance in compliance with Rule 9(b) so that Cooley is put on notice of the alleged misrepresentations which comprise Plaintiffs' fraud claim. *See Michaels Bldg. Co. v. Ameritrust Co.,* 848 F.2d 674, 680 (6th Cir. 1988) ("Rule [9(b)] requires that the circumstances of the fraud be pled with enough specificity to put defendants on notice as to the nature of the claim.").

    [5] Plaintiffs also allege that these representations were disseminated through third parties in both digital and marketing materials.

not respond to the survey.  Since 780 of Cooley's graduates responded to the survey, this statistic, standing by itself, says that 593 of Cooley's graduates were employed.  187 were unemployed, and the employment status of 154 of Cooley's graduates was unknown (934 minus 780).

Plaintiffs allege that a reasonable consumer would think that this statistic represents graduates who obtained employment in full-time, permanent positions for which a law degree is required or preferred.  (*Id* ¶ 4.a.)  Plaintiffs contend that the numbers are "false" because Cooley's reported employment statistics include any type of employment, whether or not a Juris Doctor (JD) degree is required.  (*Id.*)  Plaintiffs claim that, in actuality, the number of graduates who have secured employment for which a JD degree is required or preferred could be well below 25 percent. (*Id.*)  Using "basic deductive reasoning," however, Plaintiffs say that the number of graduates who are not employed in full-time legal employment can roughly be calculated.  (*Id.* ¶ 54.)

In *Hord v. Environmental Research Institute of Michigan*, 463 Mich. 399, 617 N.W.2d 543 (2000), the plaintiff alleged that he relied to his detriment on financial statements that his employer had given him during a job interview.  *Id*. at 403, 617 N.W.2d at 543, 545-46.  The plaintiff alleged that the financial statements created a false impression that the company was doing well when, in fact, the company was deteriorating, which he did not find out until he began his employment.  *Id.* The plaintiff said that the financial statements he received were false representations.  *Id.*

The Michigan Supreme Court rejected the plaintiff's fraud claim because the plaintiff did not identify a *false* representation.  *Id.* at 410, 617 N.W.2d at 549.  Even though the plaintiff said that he inferred that the company's financial condition was consistent with the financial statement that he received, the financial statement was not a representation to that effect.  *Id*.  All of the statements in the financial statements were accurate.  *Id.*  "A plaintiff's subjective misunderstanding of information that is not objectively false or misleading cannot mean that a defendant has committed the tort of fraudulent misrepresentation."  *Id.* at 411, 617 N.W.2d at 549.

The "percentage of graduates employed" statistic is not objectively false. The statistic descriptor does not differentiate between part-time, full-time, legal, or non-legal jobs.  Indeed, Plaintiffs allege that a correct reading of the Employment Report indicates that the statistic includes *any* kind of employment within nine months of graduation.  (*Id.* ¶ 56.)  *See Schuler v. Am. Motors Sales Corp.*, 39 Mich. App. 276, 279, 197 N.W.2d 493, 495 (1972) ("Plaintiff cannot show a misrepresentation by ignoring a part of information supplied him, and then later claim he was defrauded because he was not told of the facts which he chose to ignore.").  Even though Plaintiffs plead that they thought that the statistic referred to only full-time legal jobs, their subjective misunderstanding of information that is not objectively false or misleading cannot mean that Cooley has committed the tort of fraudulent misrepresentation.  *Hord*, 463 Mich. at 411, 617 N.W.2d at 549.

In addition, Plaintiffs unreasonably relied on the "percentage of graduates employed" statistic to include only graduates who were employed in full time legal positions.  First, the statistic's descriptor–"percentage of graduates employed"–does not distinguish between legal or non-legal, and full-time or temporary positions.  Second, the Employment Reports expressly state that many Cooley graduates were "self employed" solo practitioners; it is unreasonable to think that all self-employed graduates from arguably the lowest-ranked law school in the country have bustling full-time legal practices immediately upon graduation.  Third, and perhaps most importantly, "basic deductive reasoning," (*see* AC ¶ 54), informs a reasonable person that the employment statistic includes all employed graduates, not just those who obtained or started full-time legal positions.  *See Cummins v. Robinson Twp.,* 283 Mich. App. 677, 696, 770 N.W.2d 421, 435 (2009) ("There can be no fraud where a person has the means to determine that a representation is not true." (quotation omitted)); *Aron Alan,* 240 F. App'x 678, 682 (6th Cir. 2007); *Novak v. Nationwide Mut. Ins. Co.*, 235 Mich. App. 675, 689, 599 N.W.2d 546, 553 (1999).

12

## 2.  *Average Starting Salary for All Graduates*

The 2010 Employment Report states that the "average starting salary for all graduates" is $54,796.  Thus, a quick assumption might be that since there were 934 graduates, the average starting salary for all 934 graduates was $54,796.  Plaintiffs say that this is the median average.  But, of course, Cooley would have no way of knowing the starting salaries of graduates who did not respond to the survey.  The only possible way to determine the median starting salary of Cooley graduates would be to list the starting salaries of the respondents who indicated their starting salaries and then determine the middle point of those salaries.  Thus, $54,796 represents the average starting salary of graduates who responded to the survey *and* chose to include their salaries.  The number of graduates who responded and indicated their starting salaries is impossible to determine from the Employment Report.

Quite simply, as alleged, $54,796 does not represent the average starting salary for "all" graduates; nor does it even represent the graduates' average starting salary for whom Cooley knew the employment status.  Standing alone, the representation is objectively untrue because $54,796 represents the median average starting salary for graduates who responded to the survey *and* included their salary information.

Plaintiffs, however, further allege that the "average starting salary" statistic is false for another reason–that Cooley omitted survey responses that included salary information.  (AC ¶ 60.)  That is, even if the statistic descriptor read "the average starting salary for all graduates who responded to the survey with such information," the $54,796 number would be false.  Plaintiffs' counsel argued that Cooley may have omitted a solo practitioner's response indicating a starting salary of zero.  The omission of such responses would make the average salary statistic false, regardless of its descriptor.

13

However:

> To recover, Plaintiffs[] reliance on the alleged misrepresentation must be reasonable. Unreasonable reliance includes relying on an alleged misrepresentation that is expressly contradicted in a written contract that the plaintiff reviewed and signed. In a case where a broker assured the plaintiffs that an investment was "risk-free" the court stressed that the documentation involved in the transaction informed the plaintiffs of the risk. "Even a cursory review of any of these documents would have enlightened plaintiffs that the investment was not 'risk free' as represented by the broker." "[T]here can be no fraud where the means of knowledge regarding the truthfulness of the representation are available to the plaintiff and the degree of their utilization has not been prohibited by the defendant." The court in *Schuler* held that misrepresentations about the inventory of an automotive dealership were not actionable for the plaintiff who bought the dealership because the true figures and value appeared in schedules that the plaintiff received before making the deal. "Plaintiff either knew or could have readily discovered every material fact that was known by defendants at the time of sale."

*Aron Alan*, 240 F. App'x at 682 (citations omitted) (reviewing Michigan case law); *see also Titan Ins. Co. v. Hyten*, 491 Mich. 547, at n.4, ___ N.W.2d ___ (June 15, 2012);[6] *Chimko v. Shermeta*, No. 264845, 2006 WL 2060417, at *3 (Mich. Ct. App. July 25, 2006) (per curiam) ("It is clear that, as a matter of law, a plaintiff cannot reasonably rely on oral representations that are contradicted by a written contract between the parties or otherwise conflict with a written document that is readily available to the plaintiff." (citations omitted)); 10 Mich. Civ. Jur. Fraud & Undue Influence § 54 (2012) ("If facts . . . coming to the knowledge of a party, would raise a doubt in the mind of an ordinary person as to the validity of the representations made to that party by the defendant, and the facts are sufficient to put the party on inquiry, he or she may not later claim to have been deceived by the false representations." (citing *Lacny v. Alexander*, 238 Mich. 312, 213 N.W. 88 (1927))).[7]

---

[6] Westlaw currently has no page numbers for this citation.

[7] Michigan and the Sixth Circuit are not the only jurisdictions which adhere to the general principle that a plaintiff cannot reasonably rely upon a representation when the truth of the representation is called into question by a document that is readily available to the plaintiff. *See, e.g., Dodds v. Cigna Secs., Inc.*, 12 F.3d 346, 352 n.2 (2d Cir. 1993) (analyzing fraud in a securities case and stating "[w]here, as here, the facts needed for determination of when a reasonable investor of ordinary intelligence would have been aware of the existence of fraud can be gleaned from the complaint and papers . . . that are integral to the complaint, resolution of the issue on a motion to dismiss is

14

"[A] threshold inquiry into the circumstances surrounding the reasonableness of a party's reliance constitutes a question of law." *New Dimension Dev., Inc. v. Orchard, Hiltz & McCliment, Inc.*, 2005 WL 2806234, at *4 (Mich. Ct. App. Oct. 27, 2005) (per curiam) (citing *State Bank of Standish v. Curry*, 442 Mich. 76, 84, 500 N.W.2d 104, 107-108 (1993) and *Bergen v. Baker*, 264 Mich. App. 376, 388-89, 691 N.W.2d 770, 778 (2004)).

In *Aron Alan*, the Sixth Circuit affirmed summary judgment because the plaintiff unreasonably relied on written materials provided to the plaintiff. In *Aron Alan*, the plaintiff sought to purchase several tanning franchises from the defendant. *Aron Alan*, 240 F. App'x at 680. The defendant gave the plaintiff several sets of financial documents prior to the purchase. *Id.* The documents contained profit and loss statements of several existing franchises. *Id.* Moreover, several of the documents contained "widely divergent" and internally inconsistent statements for the same locations. *Id.* For example, one statement said that a particular location had income of $43,066 in 1998, while another document said that the same location had income of $325,000 in 1998. *Id.* Despite the inconsistencies, the plaintiff did not question the veracity of any document before entering into an agreement with the defendant. *Id.* Several years later, the plaintiff discovered that the statements were false. *Id.* The plaintiff sued alleging, among other things, fraud based upon the false statements contained in the profit and loss statements. *Id.*

The Sixth Circuit held that "no reasonable prospective franchisee could have relied upon the several allegedly false profit and loss statements presented by [the defendant], but rather would have been prompted to further inquiry, demanding an explanation of the 'widely divergent' and internally inconsistent figures in the statements." *Id.* The court said that the divergent numbers should have "raised a red flag" and that a reasonable buyer would approach such a large transaction with caution. *Id.* at 683.

---

appropriate."); *Malzewski v. Rapkin*, 296 Wis.2d 98, 112, 723 N.W.2d 156, 163 (Wis. App. 2006).

> Because the alleged misrepresentations are inconsistent and confusing, the documents containing them are inherently untrustworthy. **Any** reliance on the documents is therefore unreasonable. The truth of the matter was not apparent in the supporting documents, *Schuler*, 197 N.W.2d at 495, but at the very least it was clear that there were competing representations of truth. **There can be no fraud where it is apparent that all the representations cannot simultaneously be true**. *See Webb*, 491 N.W.2d at 853-54.

*Id.* (bold added). The same principle applies in the instant case.

Here, Plaintiffs' reliance is also unreasonable. To repeat, Plaintiffs allege that the "average starting salary" statistic is false because it does not incorporate the salary of "all" graduates. But, Plaintiffs knew that, according to the Employment Report, Cooley did not know "all" graduates' information. Furthermore, Plaintiffs had no way to determine the number or amount of graduates' salaries used to determine the average starting salary.

Without question, the Employment Reports are inconsistent, confusing, and inherently untrustworthy. For example, whether Plaintiffs are referring to the median or mean average, there is an ambiguity in the descriptor of salary because the average salary stated in Cooley's dissemination assumes the existence of a salary in the first place.[8] In other words, a question arises, as it arose in oral argument, does the statistic consider the "salaries" of those Cooley graduates who were not employed or who were sole practitioners who listed a salary of zero? Plaintiffs argued, as stated above, that to have failed to consider a "zero" salary would be misleading. But maybe not. This is the kind of question that a person serious about considering this statistic would ask. Plaintiffs and prospective students should have approached their decision to enter into law school with extreme caution given the size of the investment. Thus, even though Plaintiffs did not know the truth of how many graduates were used to calculate the average salary, at the very least, it is

---

[8] Plaintiffs interchangeably state that the "average starting salary" represents the "mean" or "median." (*Cf.* compl. ¶ 16 (stating that Mr. MacDonald relied on Cooley's representation that its graduates "earned a median salary of roughly $50,000") *with* compl. ¶ 4.b ("[Cooley] grossly inflated its graduates reported mean salaries.").) A "mean" is calculated differently than a "median." Plaintiffs interchanging the two descriptors has no bearing on the Court's analysis.

clear that the Employment Report has competing representations of truth. *See id*. at 683 (citing *Schuler*, 197 N.W.2d at 495). With red flags waiving and cautionary bells ringing, an ordinary prudent person would not have relied on the statistics to decide to spend $100,000 or more.

Furthermore, Plaintiffs' reliance is arguably more unreasonable than the plaintiff's reliance in *Aron Alan*. In the instant case, the competing representations were made on the same page of the Employment Reports. It is quite apparent from a reading of an Employment Report, without blinders as to a particular statistic, that all of the representations in the Employment Report cannot simultaneously be true. Plaintiffs *themselves* acknowledged that this internal consistency in the Employment Report would doom their fraud claim: "if there is some chance Plaintiffs could have discovered that Cooley's employment data was false, [then it] would not be reasonable to allow Cooley's employment data to affect their decision to enroll in Cooley." (Pls.' Resp. to Supplemental Authority at 3.) Plaintiffs are correct, "[t]here can be no fraud where it is apparent that all the representations cannot simultaneously be true." *Id.* (citation omitted); *see also Hyten*, 591 Mich. at n.4 (explaining that where an "allegedly defrauded party was given direct information refuting the misrepresentations" is the context where "[t]here can be no fraud where a person has the means to determine that a representation is not true").

Last, Plaintiffs unreasonably relied solely upon the two statistics in the Employment Reports when enrolling or deciding to remain enrolled at Cooley. This Court agrees with Judge Schwietzer, a judge for the New York Supreme Court[9] in a nearly identical case, for some of the reasons he discusses as to why reliance upon the two statistics would be unreasonable. *See Gomez-Jimenez v. New York Law Sch.*, Index No.652226/11, Seq. No. 002, Decision and Order (N.Y.S.Ct. Mar. 21, 2012) (Def.'s Supplemental Br. Ex. 1). This Court does not necessarily agree that college graduates

---

[9] The State of New York's trial court.

17

are particularly sophisticated in making career or business decisions.  Sometimes hope and dreams triumph over experience and common sense.  Nevertheless, it would be unreasonable for Plaintiffs to rely on two bare-bones statistics in deciding to attend a bottom-tier law school with the lowest admission standards in the country.  In addition, "[i]t is widely accepted that American law schools, Cooley included, employ all sorts of legerdemain to boost employment rates in a contracting legal market" (Pls.' Resp. at 5); once again, Plaintiffs state that they had other reasons to not rely upon the Employment Reports.  Furthermore, whether before or during Plaintiffs' attendance at Cooley, it would have been unreasonable to continue to rely on the Employment Reports because of the economy's massive downfall, which hit the legal business as hard as any.

**C.**     **Plaintiffs Do Not State a Claim for Silent Fraud**

Plaintiffs also argue that they state a claim for silent fraud.  To state a claim for silent fraud, a plaintiff must allege that the defendant suppressed a material fact that the defendant had a duty to disclose.  *Bergen*, 264 Mich. App. at 382, 691 N.W.2d at 774-75 (citation omitted).  Further, mere nondisclosure is insufficient–"there must be some type of misrepresentation, whether by words or action, in order to establish a claim of silent fraud."  *Id.* at 775.

Plaintiffs allege that the two aforementioned statistics are misleading because Cooley did not disclose material facts accompanying the statistics.  For example, with regard to the percent of graduates employed, Cooley did not disclose "what percentage of graduates were employed in either part-time or temporary positions, or whether a job requires a JD degree." (AC ¶ 45.)  Moreover, as to the average salary of graduates, Cooley did not disclose that the statistics were calculated based on only a "subset of graduates who submit their salary information."  (*Id.* ¶ 4.)

"In order for the suppression of information to constitute silent fraud there must be a legal or equitable duty of disclosure."  *Hord,* 463 Mich. at 412, 617 N.W.2d at 550 (citation omitted);

18

*Alfieri v. Bertorelli*, 295 Mich. App. 189, 295 N.W.2d 772, 775 (2012) (per curiam); *Erickson's Flooring & Supply Co., Inc. v. Tembec, Inc.*, 212 F. App'x 558, 563 (6th Cir. 2007). Plaintiffs argue that Cooley had a duty to disclose the material omissions because of the "importance of the information." Plaintiffs also contend that Cooley had a duty as "an educator" and also as a recipient of the Federal government's student financial assistance funds to ensure that the government's money is properly spent.

"[A] legal duty to make a disclosure will arise most commonly in a situation where inquiries are made by the plaintiff, to which the defendant makes incomplete replies that are truthful in themselves but omit material information." *Hord*, 463 Mich. at 412, 617 N.W.2d at 550 (citations omitted). In fact, one court found that *every* Michigan Supreme Court case analyzing silent fraud revealed that the silent fraud involved a response to a purchaser's specific inquiry which was in some way incomplete or misleading. *See id.* at 409, 412, 617 N.W.2d at 549, 550 (quoting and agreeing with *M&D, Inc. v. W.B. McConkey*, 231 Mich. App. 22, 31, 585 N.W.2d 33, 39 (1998)); *see also Buntea v. State Farm Mut. Auto Ins. Co.*, 467 F. Supp. 2d 740, 745 (E.D. Mich. 2006) ("The misrepresentation occurs when a party suppresses part of the truth when asked, not by mere nondisclosure."). In *Hord*, without any further analysis about the importance of the information or some other factor, the Michigan Supreme Court entered a directed verdict in favor of the defendant because the plaintiff never made an inquiry into the truthful, but allegedly misleading, information upon which he relied. *Hord*, 463 Mich. at 413, 617 N.W.2d at 550-51.

Similarly, Plaintiffs do not allege that they made a specific inquiry for additional information regarding Cooley's Employment Reports. In fact, Plaintiffs have acknowledged the lack of such an allegation. (Pls.' Resp. at 40.) Furthermore, no other duty, such as that to properly spend the Federal government's money, gave rise to a duty of disclosure to Plaintiffs. *Buntea*, 467 F. Supp.

2d at 746 ("The existence of a number of enumerated duties does not automatically mean inclusion of a duty to disclose . . . ."); *see also* 10 Mich. Civ. Jur. Fraud & Undue Influence §§ 70-71 (2012). Therefore, as a matter of law, Plaintiffs do not state a silent fraud claim for which relief can be granted.

**D.      Negligent Misrepresentation (Count III)**

"A claim for negligent misrepresentation requires plaintiff to prove that a party justifiably relied to his detriment on information prepared without reasonable care by one who owed the relying party a duty of care." *Fejedelem v. Kasco*, 269 Mich. App. 499, 502, 711 N.W.2d 436, 437 (2006) (quoting *Mable Cleary*, 262 Mich. App. 485, 502, 686 N.W.2d 770, 783 (2004)) (internal quotation marks omitted).  A claim for negligent misrepresentation, like fraud, requires Plaintiffs to allege a misrepresentation and also reasonable reliance. *See Fejedelem*, 269 Mich. App. at 503, 711 N.W.2d at 438 ("Whether a person *justifiably* relies on a document is indistinguishable from whether the person *reasonably* relies on it.")  Since Plaintiffs have not alleged reasonable reliance, as discussed above, Plaintiffs do not state a claim for negligent misrepresentation.

### IV. Conclusion

The bottom line is that the statistics provided by Cooley and other law schools in a format required by the ABA were so vague and incomplete as to be meaningless and could not reasonably be relied upon.  But, as put in the phrase we lawyers learn early in law school–*caveat emptor*.

A separate Order will issue.


Dated:  July 20, 2012                                      /s/ Gordon J. Quist
                                                    GORDON J. QUIST
                                                    UNITED STATES DISTRICT JUDGE

## THOMAS M. COOLEY LAW SCHOOL
## EMPLOYMENT REPORT AND SALARY SURVEY

## 2010 GRADUATES

**Theodore Souris, Augustus B. Woodward, and James Witherell classes**
(September 2009, January 2010, and May 2010)

| | |
|---|---|
| Number of 2010 graduates | 934 |
| Number of graduates with employment status known | 780 |
| Percentage of graduates employed | 76% |
| Average starting salary for all graduates | $54,796 |

### PRIVATE PRACTICE
Percent Employed: 50%
Average Starting Salary: $52,318

| SIZE OF FIRM | | FIRMS EMPLOYING COOLEY GRADS | |
|---|---|---|---|
| Self Employed | 70 | Sullivan, Ward, Asher & Patton, PC | Southfield, MI |
| 2 to 10 Attorneys | 157 | Graff & Associates | Columbus, OH |
| 11 to 25 Attorneys | 21 | Heavner,Scott, Beyers & Mihlar, PC | Chicago, IL |
| 26 to 50 Attorneys | 7 | Alstock,Witkin,Kreist, & Overholtz | Pensacola, FL |
| 51 to 100 Attorneys | 5 | Ryley, Carlock & Applewhite | Phoenix, AZ |
| | | | |
| 101 to 250 Attorneys | 7 | Thompson, Meier & King, PC | Canton, GA |
| 251 to 500 Attorneys | 2 | Plunkett Cooney | Bloomfield Hills, MI |
| 501+ Attorneys | 2 | Hoeppner, Wagner & Evans, LLP | Valparaiso, IN |
| Firm Size Unknown | 14 | Marinosci Law Group | Fort Lauderdale, FL |
| | | Stewart, Greenblatt, Manning & Baez | New York, NY |

### GOVERNMENT
Percent Employed: 15%
Average Starting Salary: $53,312

| TYPE OF AGENCY | | AGENCIES EMPLOYING COOLEY GRADS | |
|---|---|---|---|
| Military Federal | 4 | State of Louisiana Department of Labor | Baton Rouge, LA |
| Prosecutorial Local | 18 | Colorado State Public Defender | Denver, CO |
| Prosecutorial State | 4 | State Attorney's Office | Tampa, FL |
| | | Superior Court of New Jersey | Trenton, NJ |
| Other Federal | 8 | US Patent & Trademark Office | Alexandria, VA |
| Other State | 20 | Macomb County Prosecutor's Office | Mt. Clemens, MI |
| Other Local | 18 | Pima County Attorney's Office | Tucson, AZ |
| Unknown State | 1 | Allegheny County Public Defender | Pittsburgh, PA |
| Unknown Local | 3 | Superior Court of the District of Columbia | Washington, DC |
| Other Unknown | 2 | Office of Public Defender | Rockford, IL |
| | | U.S. Marine Corps JAG | Nationwide |
| | | IRS Office of Chief Counsel | Detroit, MI |

EXHIBIT 1

## **PUBLIC INTEREST**
Percent Employed: 2%
Average Starting Salary: $49,171

| *TYPE OF AGENCY* | | *AGENCIES EMPLOYING COOLEY GRADS* | |
|---|---|---|---|
| Community Education | 3 | Cristo Rey Community Center | Lansing, MI |
| Direct Legal Services | 2 | Lone Star Legal Aid | Houston, TX |
| Public Defender/Appellate | 4 | Virginia Indigent Defense Commission | Danville, VA |
| Other Public Interest | 4 | House of Ruth | Baltimore, MD |

## **ACADEMIC**
Percent Employed: 3%
Average Starting Salary: $58,223

| *TYPE OF POSITION* | | *SCHOOLS EMPLOYING COOLEY GRADS* | |
|---|---|---|---|
| | | Board of Education of City of Chicago | Chicago, IL |
| Other Higher Education | 6 | Pennsylvania State University | State College, PA |
| Other Academic Job | 11 | Western Michigan University | Kalamazoo, MI |

## **JUDICIAL CLERKSHIP**
Percent Employed: 3%
Average Starting Salary: $41,928

| *TYPE OF JUDICIAL CLERKSHIP* | | *COURTS EMPLOYING COOLEY GRADS* | |
|---|---|---|---|
| Judicial Clerkship – State | 9 | Stamford Superior Court | Stamford, CT |
| Judicial Clerkship – Federal | 1 | Michigan Court of Appeals | Detroit, MI |
| Judicial Clerkship – Local | 7 | Michigan Supreme Court | Lansing, MI |
| | | Hudson County Superior Court | Jersey City, NJ |

## **BUSINESS**
Percent Employed: 18%
Average Starting Salary: $71,470

| *TYPE OF BUSINESS* | | *BUSINESSES EMPLOYING COOLEY GRADS* | |
|---|---|---|---|
| Accounting | 1 | J.P. Morgan Chase | Chicago, IL |
| Banking/Financial | 4 | American Electric Power | Columbus, OH |
| | | Noble Energy, Inc. | Denver, CO |
| Insurance | 5 | General Motors Corporation | Warren, MI |
| Management Consulting | 9 | Decorum Consulting Group | New York City, NY |
| Technology | 4 | Texas Oil and Gas | Fort Worth, TX |
| Publishing | 2 | Assets International, LLC | Southfield, MI |
| Other Business/In-house | 72 | M. Lee Smith Publishers | Nashville, TN |